**U.S.C.A. No. 19-50224**

---

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA**,

Plaintiff-Appellee,

v.

**ARTURO DELGADO-VEGA**,

Defendant-Appellant.

---

Appeal from the United States

District Court for the Southern District

of California

Hon. ROGER T. BENITEZ, Presiding

---

# EXCERPTS OF RECORD

# Volume I

---

**GREGORY D. OBENAUER**
State Bar No. 103036
1901 First Ave. Ste. 213
San Diego, CA. 92101
Telephone: 619) 230-1523
E-mail: golaw@mac.net

Attorney for Defendant-Appellant

## <u>EXCERPTS OF RECORD INDEX</u>

| <u>Document</u> | <u>Docket No.</u> | <u>Excerpt Page No.</u> |
|---|---|---|
| 1. Judgment and Commitment Order (After Remand) date filed: July 19, 2019 | 97 | 2 |
| 2. Notice of Appeal (After Remand) date filed: July 5, 2019 | 94 | 9 |
| 3. Reporter's Transcript: Second Resentencing Hearing date held: July 1, 2019 | 93 | 11 |
| 4. Order Unsealing Documents date filed: June 10, 2019 | 92 | 101 |
| 5. Reporter's Transcript: First Resentencing Hearing date held: May 28, 2019 | 90 | 103 |
| 6. Exhibits to Defense Resentencing Memorandum date filed: May 13, 2019 | 87 | 129 |
| 7. Defendant's Summary Chart for Resentencing date filed: February 20, 2019 | 77 | 136 |

## <u>EXCERPTS OF RECORD INDEX (CONT'D)</u>

| <u>Document</u> | | <u>Docket No.</u> | <u>Excerpt Page No.</u> |
|---|---|---|---|
| 8. | Defendant's Memorandum for Resentencing<br>date filed: February 20, 2019 | 76 | 139 |
| 9. | Government's Memorandum for Resentencing<br>date filed: February 19, 2019 | 75 | 151 |
| 10. | Government's Summary Chart for Resentencing<br>date filed: February 19, 2019 | 74 | 161 |
| 11. | Judgment and Commitment Order<br>date filed: December 6, 2017 | 65 | 163 |
| 12. | Notice of Appeal<br>date filed: December 3, 2017 | 62 | 169 |
| 13. | Reporter's Transcript: Sentencing Hearing<br>hearing held: November 27, 2017 | 61 | 171 |
| 14. | Government's Sentencing Summary Chart<br>date filed: October 12, 2017 | 52 | 207 |

# EXCERPTS OF RECORD INDEX (CONT'D)

| **Document** | **Docket No.** | **Excerpt Page No.** |
|---|---|---|
| 15. Plea Agreement<br>date filed: May 23, 2017 | 42 | 211 |
| 16. Information<br>date filed: November 10, 2016 | 10 | 225 |
| 17. Docket Sheets | -- | 227 |

# JUDGMENT AND COMITTMENT ORDER (AFTER REMAND)

date filed: July 19, 2019

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT AFTER REMAND** |
| **V.** | (For Offenses Committed On or After November 1, 1987) |
| ARTURO DELGADO-VEGA (1) | Case Number: 16CR2609-BEN |
| | GREGORY D. OBENAUER |
| | Defendant's Attorney |

**FILED**

JUL 19 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                         DEPUTY

**USM Number**          59680298

☐ –

THE DEFENDANT:

☒ pleaded guilty to count(s)      1 OF THE INFORMATION.

☐ was found guilty on count(s)

after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| **Title & Section** | **Nature of Offense** | **Count Number(s)** |
|---|---|---|
| 21 USC 841(a)(1) | POSSESSION OF METHAMPHETAMINE WITH INTENT TO DISTRIBUTE | 1 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ is      dismissed on the motion of the United States.

Assessment : $100.00 forthwith or through the Inmate Financial Responsibility Program (IFRP) at the rate of not less than $25.00 per quarter during the period of incarceration.
☒

☐ JVTA Assessment*: $

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

☐ No fine      ☐ Forfeiture pursuant to order filed                         , included herein.

IT IS ORDERED that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of any material change in the defendant's economic circumstances.

JULY 1, 2019
Date of Imposition of Sentence

HON. Roger T. Benitez
UNITED STATES DISTRICT JUDGE

2

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | |
|---|---|
| DEFENDANT: | ARTURO DELGADO-VEGA (1) |
| CASE NUMBER: | 16CR2609-BEN |

Judgment - Page **2** of **6**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: ONE HUNDRED AND TEN (110) MONTHS.

☐     Sentence imposed pursuant to Title 8 USC Section 1326(b).

☒     The court makes the following recommendations to the Bureau of Prisons:
1. DEFENDANT BE INCARCERATED WITHIN THE WESTERN REGION OF THE UNITED STATES.
2. DEFENDANT BE ALLOWED TO PARTICIPATE IN THE 500-HOUR DRUG TREATMENT PROGRAM.

☐     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant must surrender to the United States Marshal for this district:

       ☐   at _____ A.M.     on _____

       ☐   as notified by the United States Marshal.

☐     The defendant must surrender for service of sentence at the institution designated by the Bureau of Prisons:

       ☐   on or before

       ☐   as notified by the United States Marshal.

       ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By _____

DEPUTY UNITED STATES MARSHAL

16CR2609-BEN

3

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page **3** of **6** |
|---|---|---|
| CASE NUMBER: | 16CR2609-BEN | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant will be on supervised release for a term of:
FIVE (5) YEARS.

## MANDATORY CONDITIONS

1. The defendant must not commit another federal, state or local crime.
2. The defendant must not unlawfully possess a controlled substance.
3. The defendant must not illegally possess a controlled substance. The defendant must refrain from any unlawful use of a controlled substance. The defendant must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter as determined by the court. Testing requirements will not exceed submission of more than 4 drug tests per month during the term of supervision, unless otherwise ordered by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (check if applicable)
4. ☐ The defendant must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. (check if applicable)
5. ☒ The defendant must cooperate in the collection of DNA as directed by the probation officer. (check if applicable)
6. ☐ The defendant must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where the defendant resides, works, is a student, or was convicted of a qualifying offense. (check if applicable)
7. ☐ The defendant must participate in an approved program for domestic violence. (check if applicable)

The defendant must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

16CR2609-BEN

4

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page 4 of 6 |
| CASE NUMBER: | 16CR2609-BEN | |

## STANDARD CONDITIONS OF SUPERVISION

As part of the defendant's supervised release, the defendant must comply with the following standard conditions of supervision. These conditions are imposed   because they establish the basic expectations for the defendant's behavior while on supervision and identify the minimum tools needed by probation   officers to keep informed, report to the court about, and bring about improvements in the defendant's conduct and condition.

1. The defendant must report to the probation office in the federal judicial district where they are authorized to reside within 72 hours of their release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when the defendant must report to the probation officer, and the defendant must report to the probation officer as instructed.

3. The defendant must not knowingly leave the federal judicial district where the defendant is authorized to reside without first getting permission from the court or the probation officer.

4. The defendant must answer truthfully the questions asked by their probation officer.

5. The defendant must live at a place approved by the probation officer. If the defendant plans to change where they live or anything about their living arrangements (such as the people living with the defendant), the defendant must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, the defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. The defendant must allow the probation officer to visit them at any time at their home or elsewhere, and the defendant must permit the probation officer to take any items prohibited by the conditions of their supervision that he or she observes in plain view.

7. The defendant must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment the defendant must try to find full-time employment, unless the probation officer excuses the defendant from doing so. If the defendant plans to change where the defendant works or anything about their work (such as their position or their job responsibilities), the defendant must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. The defendant must not communicate or interact with someone they know is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, they must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If the defendant is arrested or questioned by a law enforcement officer, the defendant must notify the probation officer within 72 hours.

10. The defendant must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. The defendant must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines the defendant poses a risk to another person (including an organization), the probation officer may require the defendant to notify the person about the risk and the defendant must comply with that instruction. The probation officer may contact the person and confirm that the defendant notified the person about the risk.

13. The defendant must follow the instructions of the probation officer related to the conditions of supervision.

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page **5** of **6** |
| CASE NUMBER: | 16CR2609-BEN | |

## SPECIAL CONDITIONS OF SUPERVISION

1. Submit your person, property, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2. Not enter or reside in the Republic of Mexico without permission of the court or probation officer, and comply with both United States and Mexican immigration law requirements.

3. Report all vehicles owned or operated, or in which you have an interest, to the probation officer.

4. Participate in a program of drug or alcohol abuse treatment, including drug testing and counseling, as directed by the probation officer. Allow for reciprocal release of information between the probation officer and the treatment provider. May be required to contribute to the costs of services rendered in an amount to be determined by the probation officer, based on ability to pay.

5. Resolve all outstanding warrants within 60 days.

16CR2609-BEN

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page **6** of **6** |
| CASE NUMBER: | 16CR2609-BEN | |

### FINE

The defendant shall pay a fine in the amount of     $500.00       unto the United States of America.

This sum shall be paid      immediately.
                    X     as follows:

Forthwith or through the Inmate Financial Responsibility Program (IFRP) at the rate of not less than $25.00 per quarter during the period of incarceration.

The Court has determined that the defendant     does      have the ability to pay interest. It is ordered that:

 X   The interest requirement is waived.
      The interest is modified as follows:

16CR2609-BEN

7

# NOTICE OF APPEAL (AFTER REMAND)

date filed: July 5, 2019

Attorney Name and Address:

ATTORNEY GREGORY D. OBENAUER
1901 1ST AVE 213
SAN DIEGO, CA 92101

PHONE: 619 230-1523
_____ RETAINED ___X___ APPOINTED

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

TRIAL JUDGE ROGER BENITEZ       COURT REPORTER Cynthia Ott

UNITED STATES OF AMERICA        )
                                )   CASE NO. 16 CR 2609 BEN
                                )
                                )   NOTICE OF APPEAL      (Criminal)
        vs.                     )
                                )
DELGADO-Vega, Arturo            )
                                )
_____)

Notice is hereby given that Arturo DELGADO-Vega,
defendant/plaintiff above named, hereby appeals to the United States Court of Appeals for the
Ninth Circuit from the:        (check one)
(X) Final Judgment
(X) Sentence Only (sentence imposed) 7/1/19  110 months 5 years supervised release
( ) Order (describe) _____
entered in this proceeding on the ___1___ day of JULY , 2019
If a government appeal: Was the filing of this appeal approved in accordance with 18 U.S.C.
§3742(b)(4) _____ Yes _____ No

Date: 7/3/19                         Signature Arturo DELGADO-Vega

Transcripts required* ___X___ Yes _____ No

Date (X) Indictment   (X) Information Filed: • 11/10/2016
Bail status Custody
Will there be a request to expedite the appeal? _____ Yes ___X___ No
(Note: This does not alleviate the requirement of filing a motion to expedite which must be done in
accordance with FRAP 27).

* If transcript(s) required, a transcript designation and ordering form must be completed and the
court reporter(s) contacted to make arrangements for transcription.

K:\COMMON\CSA\forms\2005\appeal_crim.wpd Nov 16, 2009

9

# REPORTER'S TRANSCRIPT: SECOND RESENTEING HEARING

date held: July 1, 2019

1                    UNITED STATES DISTRICT COURT

2                FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,          )
                                        )
5          Plaintiff,                   )  No. 16-CR-2609-BEN
                                        )
6               v.                      )  July 1, 2019
                                        )
7    ARTURO DELGADO-VEGA,               )  2:32 p.m.
                                        )
8          Defendant.                   )  San Diego, California
     _____   )

9

10              TRANSCRIPT OF SENTENCE ON REMAND HEARING
                 BEFORE THE HONORABLE ROGER T. BENITEZ
11                  UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  CHARLOTTE KAISER, ESQ.
14                           880 Front Street
                             San Diego, California  92101
15
     For the Defendant:      LAW OFFICE OF GREGORY D. OBENAUER
16                           By:  GREGORY D. OBENAUER, ESQ.
                                  ADAM DOYLE, ESQ.
17                           1901 First Avenue, Suite 213
                             San Diego, California  92101
18

19
     Court Reporter:         CYNTHIA R. OTT, RDR, CRR
20                           District Court Clerk's Office
                             333 West Broadway, Suite 420
21                           San Diego, California, 92101
                             cynthia_ott@casd.uscourts.gov
22

23

24

25   Reported by Stenotype, Transcribed by Computer

2

```
1          SAN DIEGO, CALIFORNIA, JULY 1, 2019, 2:32 P.M.

2                            * * * *

3          THE CLERK:  Four on calendar, 16-CR-2609, USA versus

4     Arturo Delgado-Vega, sentencing on remand with a presentence

5     report.

6          MR. OBENAUER:  Good afternoon, Your Honor.  Greg

7     Obenauer for Mr. Delgado.

8          THE COURT:  Good afternoon.

9          MR. OBENAUER:  And also with associate Adam Doyle.

10          MR. DOYLE:  Good afternoon, Your Honor.

11          THE COURT:  Hopefully you're not charging the Court

12     for associate time for this case, are you?

13          MR. OBENAUER:  Associate time?

14          THE COURT:  Because I certainly have not approved it.

15          MR. OBENAUER:  We were billing it.  I thought -- I

16     checked with CJA finance, and that's what they said.

17          THE COURT:  Well, this is not a complicated case.  It

18     doesn't require two lawyers.

19          MR. OBENAUER:  Well, this is as a result of the appeal

20     that he -- he worked on the appeal with me.

21          THE COURT:  Yeah, well, that's great, but the appeal

22     is over.

23          MR. OBENAUER:  Right.  But -- I'll pay for him.

24          THE COURT:  Okay.

25          MR. OBENAUER:  That's fine.  If you want me to do
```

12

```
1    that --
2            THE COURT:  Well, no.  It's just that I'm not aware
3    of -- I mean, Mr. Obenauer, this is not that complicated a case
4    that the Court should -- and the taxpayers should have to bear
5    the burden of paying for multiple lawyers in a case like this.
6    I just don't see it.  So, anyway.
7            All right.  So you're welcome to stay, Mr. Doyle.
8    You're welcome to spend as much time here as you wish or no
9    time at all.  But I just wanted to make sure that we all
10   understood where we were.
11           MR. DOYLE:  Understood, Your Honor.
12           MR. OBENAUER:  One moment, please.
13           THE COURT:  Sure.  All right.
14           So, Mr. Obenauer, last time we were here, I was asking
15   you some questions.  You didn't really seem to be too well
16   prepared to answer my questions.  So I continued the matter and
17   asked you to go back and review your file.
18           One of the questions that I had for you was the
19   question having to do with the two -- what is it -- 2D1.5
20   enhancement.  I may have that number wrong, but, anyway, the
21   enhancement that provides that a defendant's sentence should be
22   increased by two levels -- or, to be precise, if the -- yeah,
23   2D1.1(b)(5), which says, if the offense involved the
24   importation of amphetamine or methamphetamine or the
25   manufacture of amphetamine or methamphetamine from illicit
```

4

1   chemicals that the defendant knew were imported unlawfully, the

2   defendant is not subject to an adjustment, increase by two

3   levels.

4          And you seemed to not be -- to understand what I was

5   talking about, but I hope you've had a chance to go back and

6   look at your file.  And you understand that, given the state of

7   this case at the time that I imposed sentence, with the

8   understanding, of course, that I know you disagree with my

9   finding that the defendant should not be given minor role, you

10  do agree that the information that was before this Court at the

11  time that I imposed a sentence, that that enhancement did, in

12  fact, apply, correct?

13         MR. OBENAUER:  Well, of course, I believe I was

14  prepared, and I will explain, again.  I think that I can't

15  answer -- we did this last time.  I can't answer why

16  probation --

17         THE COURT:  No.  Forget probation.  Forget probation.

18  I don't even want to talk about that.  We do know why they

19  could recommend it, because they had no idea that your client

20  had brought the drugs in from Mexico, because you hadn't told

21  them, your client hadn't told them.  He'd never told the

22  government.  So they had no idea.

23         But that's not the question.  The question is, when

24  you took it up on appeal, I think you said to the Court of

25  Appeals something like, you know, there wasn't enough -- there

14

5

1    wasn't evidence, or the judge didn't make any findings, or

2    whatever, right?

3              MR. OBENAUER:  No.

4              THE COURT:  No.

5              MR. OBENAUER:  What I said was that I didn't -- I

6    couldn't speak for either probation or the government as to why

7    they didn't add plus two, but there was no plus two on the plea

8    agreement.

9              Furthermore, the Court -- this Court, Your Honor, knew

10   about the importation before the sentencing because I included

11   it in the Stevens report that you filed --

12             THE COURT:  That's right.  That's right.

13             MR. OBENAUER:  So you knew about the crossing.

14             THE COURT:  That's right, which is why I increased the

15   sentence by two levels.

16             MR. OBENAUER:  Also, the Court of Appeals -- I'm not

17   playing any hide the ball here -- the Court of Appeals also

18   knew about the importation because it was included in the

19   excerpt of record.

20             THE COURT:  Well, I kind of assumed that maybe they

21   just hadn't had a chance.  They decided a lot of cases.  I

22   don't know if you noticed, but -- how many cases they decided

23   that day on November 27th.  They decided a lot of cases, and

24   this was one of them.  And so I kind of assumed that maybe they

25   hadn't been able to see the excerpt of record.

15

6

1       But in your -- in your brief, in your brief, you

2   essentially argued that the Court improperly increased the

3   sentence by two levels.

4       And, in fact -- right?  Didn't you make that argument?

5       MR. OBENAUER:  The sentence was something like neither

6   the -- neither probation nor the government asked for a plus

7   two for importation.  That's the gist of it.  And they had not.

8       So -- and since I had already disclosed to everybody,

9   and since the government knew that he had crossed because, in

10  fact, he had been debriefed, and that had come out during the

11  debriefing, as it should have and did, that all parties were

12  aware that there was -- that there was importation of

13  methamphetamine.

14      It was not included --

15      THE COURT:  Just a second.  I have probation here.

16      Who prepared this report?

17      PROBATION OFFICER:  Your Honor, Dave Forten with

18  probation.  This report was prepared by Officer Steven Evert.

19      THE COURT:  Is there anything in your -- in your

20  report, first of all, that indicates whether the

21  defendant -- whether you had enough information to recommend

22  minor role or not recommend minor role?

23      PROBATION OFFICER:  Regarding the minor role, Your

24  Honor, the assessment the officer made was that this defendant,

25  post-arrest, he denied knowledge of the drugs found in the

16

1   vehicle.  Also, during the presentence interview, he adopted

2   the factual basis of the plea agreement as his statement of the

3   offense, made no other substantive comments regarding the facts

4   of the offense.

5        So the officer, who had very little to work with in

6   making an assessment as to whether a minor role or, for that

7   matter, an aggravated role was appropriate, so simply

8   recommended no adjustments upward or downward.

9        THE COURT:  That's right.  So they said, we don't have

10   enough information to recommend one way or the other.

11        PROBATION OFFICER:  Correct.

12        MR. OBENAUER:  I believe that there's a sentence in

13   there that says that it appears as if he was not, you know,

14   that involved.  That's my recollection.

15        THE COURT:  Well, I don't know what that means, but

16   let me ask you this.  Now, you've got your records in front of

17   you.  Was it communicated to you -- so the interview with

18   probation occurred on July 5th of 2017.

19        Is that right?

20        PROBATION OFFICER:  Yes, Your Honor.

21        THE COURT:  Did the defendant convey to you, do you

22   have any information that the defendant conveyed to you that on

23   July 7th, that is, two days after your interview, he met with

24   the government, and then, at that point in time, he told the

25   government that the drugs had come from Mexico?

17

8

```
1          PROBATION OFFICER:  Let me -- I can check one other
2    database, if you give me a second here, Your Honor.
3          I can say off the surface, if that information became
4    available two days after the interview, the report was not
5    filed until a much later date beyond July 7th.
6          THE COURT:  So would it be a fair assumption to make
7    that at the time that the report was prepared nobody had
8    conveyed to you the fact that the defendant sometime, I
9    believe, around July 7th met with the government and at that
10   time told them that the government -- told them that he had
11   brought the drugs in from Mexico?  Would that be a fair
12   assumption?
13         PROBATION OFFICER:  Your Honor, I see no indication
14   that that information was provided to that officer.
15         THE COURT:  How's your -- how's your crystal ball over
16   there at probation?  Is it working okay?
17         PROBATION OFFICER:  No, Your Honor.
18         THE COURT:  No.  And your monthly, weekly seances by
19   which you are able to derive information from the universe, are
20   those working pretty good?
21         PROBATION OFFICER:  No, Your Honor.
22         THE COURT:  No.
23         PROBATION OFFICER:  There is one note in here, okay.
24   It's a fairly lengthy note.  If I could just read it, just to
25   see if there's any information in there.
```

18

1          THE COURT:  Okay.  Go ahead.

2          PROBATION OFFICER:  Well, Your Honor, it would appear

3     on July 17th the officer that prepared this report had a

4     conversation with the case agent.  And at that time, the case

5     agent advised that the vehicle was picked up in Mexicali,

6     Mexico, already loaded with methamphetamine, and he drove the

7     vehicle from Mexico until his arrest at the U.S. border patrol

8     checkpoint.

9          It would appear, based on that conversation, the

10    officer had that information available to him and, for reasons

11    unknown to me, did not include that in the presentence report.

12         THE COURT:  All right.  So it appears that you folks

13    knew that the drugs might have come over from Mexico, but it

14    was not reported?

15         PROBATION OFFICER:  Based on the information I have in

16    front of me, yes.

17         THE COURT:  All right.  Okay.  Well, then, in that

18    case, that certainly appears to be -- it certainly appears that

19    probation had the information, but that information was not

20    made available to me, that is, that probation had the

21    information at any time.

22         But, of course, that doesn't really matter, does it,

23    in any event, because what's really important is that I made a

24    decision or made a finding that the drugs had come from Mexico,

25    right?  And that's what you appealed.  You didn't appeal the

1    fact that probation had not recommended -- because that's not

2    an appealable order, right?

3           MR. OBENAUER:  I think my appeal speaks for itself,

4    that neither party recommended, and it was not part of the plea

5    agreement.

6           THE COURT:  Well, I'm trying to understand -- I'm

7    trying to understand why that's relevant in any event.

8           Because what's really relevant is that I imposed a two

9    level increase as required by 2.1 -- 1.1, right?  That's what

10   was really relevant, isn't it?  It's not whether the government

11   recommends it.  It's not whether the probation recommends it.

12   It's whether or not, under the facts of the case, the

13   enhancement is warranted, right?

14          MR. OBENAUER:  Or whether it's part of the plea

15   agreement or not.

16          THE COURT:  Well, but, Mr. Obenauer, you make it very

17   difficult for me sometimes.  The plea agreement doesn't bind

18   the Court --

19          MR. OBENAUER:  Right.

20          THE COURT:  -- right?

21          MR. OBENAUER:  Sure.

22          THE COURT:  In fact, the plea agreement is completely

23   silent on the issue of minor role, it's completely silent on

24   the 2D1.1, right?

25          MR. OBENAUER:  The Court can order plus two for

1  importation of methamphetamine if it so finds.  I'm not arguing

2  that.

3          If the Court is going to give plus two today, then

4  that is -- that is within the Court's power.

5          THE COURT:  Because what troubled me was I read this

6  sentence in the Court of Appeals' mem dispo.  It says:  If on

7  remand the district court again denies Delgado-Vega's request

8  for minor role reduction, it shall consider whether the

9  government has met its burden to establish that the offense

10  involved the importation of methamphetamine as is necessary to

11  impose an enhancement under 2D1.1(b)(5).

12          And I'm trying to figure out -- and that sentence

13  troubles me.  It troubles me because it leads me to conclude

14  that either somebody didn't tell the Court of Appeals about the

15  document that I just ordered unsealed, right, or that in

16  your -- in your briefing -- I'm not going to go through your

17  briefing, but that in your briefing you were telling the Court

18  of Appeals that there wasn't evidence to support that finding.

19          MR. OBENAUER:  I didn't say that in the appeal.  And I

20  gave to the Court of Appeals evidence that there was

21  importation.

22          THE COURT:  Why would they -- why would they put that

23  into their mem dispo?

24          MR. OBENAUER:  I don't know -- Your Honor, I'm not in

25  a position to speak for the Court of Appeals, really.

1          THE COURT:  So let's get this cleared up right now

2     then.  Maybe we can kind of cut to the chase.

3          You two agree, do you not, that there's sufficient

4     evidence in the record to find that the drugs that your client

5     had in his possession on the date that he was arrested at the

6     Highway 86 checkpoint, that he brought those drugs over from

7     Mexico?

8          MR. OBENAUER:  Sure.  It's in the Stevens report.

9          THE COURT:  Good.  We don't have to belabor that point

10    anymore.

11         MR. OBENAUER:  Thank you.

12         THE COURT:  Thank you.  I appreciate that.

13         MR. OBENAUER:  You're welcome.

14         THE COURT:  All right.  Now, I will admit that I was a

15    little peeved because you or whoever wrote this report

16    represented to the Court of Appeals that I don't grant minor

17    role reductions.

18         And you laugh.

19         MR. OBENAUER:  No, no, I'm not laughing.

20         THE COURT:  You laugh.

21         MR. OBENAUER:  No.  Because we visited that last time,

22    and I'm prepared to address that.

23         THE COURT:  Go ahead.

24         MR. OBENAUER:  The -- first of all, I looked through

25    the -- I looked through the appeal.  There's nothing in there

1   that says that you don't give minor role.  There -- but -- and

2   as you pointed out, but it's either -- it may be implied.

3            Now where that came from, in the Court of Appeals you

4   were talking about other performers or other persons and what

5   they did.  For instance, I think, you know, the person who was

6   a loader and the false compartment -- you remember that

7   hypothetical you gave, the false compartment creator and the

8   methamphetamine mixer.

9            THE COURT:  Right.

10           MR. OBENAUER:  Right?  And so what happened, I

11  deducted from that that the -- there would always -- the driver

12  would always be a step above.  A driver would always be not

13  your average.  He would be more culpable than those other

14  persons that you mentioned.

15           That being the case, the conclusion could be that,

16  using that criteria, your hypothetical, that no one would get

17  minor role.  Now, I never said factually, he doesn't give minor

18  role.  I didn't say anything stronger than that.  I just said

19  that the implication is -- the implication is that no one would

20  get minor role.  That's what I said.  That's just an argument,

21  a legal argument.  And it wasn't personal, and I didn't mean to

22  be personal about it.

23           THE COURT:  If that were so, though, if -- okay.

24  Fine.  I'll accept your argument because I don't want to

25  belabor that point either.

1      MR. OBENAUER:  Thank you.

2      THE COURT:  But your argument essentially was that if

3   you look at this H1 attachment to the Congressional report that

4   you referred to in your sentencing memorandum and which you

5   referred to in your appeal, if you adopt that as the bases,

6   then your argument is that a so-called courier would always get

7   minor role because everybody would be up above him or her, with

8   the possible exception of the mule.

9      So you're essentially chastising me, if you will, for

10  the very same thing that you were doing, only I was trying to

11  explain to you why, in my opinion, in my opinion, just simply

12  because you're a courier or, you know, a drug smuggler doesn't

13  mean that you're necessarily entitled to minor role.

14     But when I read your brief -- I'm not going to go back

15  and try to find it, but it seemed to me that you were saying

16  that I don't grant minor role, and that's just not true.  It's

17  just not true.

18     MR. OBENAUER:  Okay.  I didn't say that, and I hope

19  that you didn't take that.

20     THE COURT:  Okay.  Well, I did take that, but, fine,

21  I'll accept your version.

22     Now let's talk about H1.  So what I was saying to you

23  was this, look, your argument was -- and you spent a lot of

24  time on it, on this H1 attachment -- which, by the way, let me

25  just tell you.  I just came back from Chicago.  I was just at

1    the sentencing commission.  And I talked to one of the lawyers

2    about this.  Why?  Because you're not the first lawyer who's

3    come up with this idea that, well, if you look at this H1, this

4    H1 attachment to the Congressional report, that it puts, quote,

5    couriers -- which, of course, I don't think your client is just

6    a courier -- but, anyway, puts couriers sort of at the bottom

7    of the culpability list.  And so, therefore, ipso facto, if

8    you're a courier, you have -- you're substantially less

9    culpable than everyone else.  That basically was your argument.

10            And what I was trying to say to you is that, no, I

11   don't think that's true because I have yet to have anyone

12   explain to me why, for example, the person who builds a false

13   compartment for a car, if the car doesn't have any drugs put

14   into it, and the car isn't driven across the border, why is

15   that person more culpable than a drug smuggler who brings in

16   13 kilos of methamphetamine?  The same thing for the scout.

17   The same thing for the person who actually procures the

18   precursors for methamphetamine.  Why are they more culpable?

19            And your argument is, yeah, but, look, you look at H1,

20   and H1 says they're at the bottom of the rung, which, by the

21   way, is not correct, but --

22            Anyway, so I asked the lawyer at -- the lawyer for the

23   sentencing commission about that H1 document.  And I said, hey,

24   tell me something, what was the purpose of that -- of that

25   document -- or that report?  And he said, look, what that is,

1    is we're trying to come up with coding, coding, in order to

2    make certain reports to Congress.  And we have to code, and we

3    have to give various scenarios, and so we arrived at this

4    coding system.

5            But it was never intended to say that if you happen to

6    be a person who is labeled as a courier on that H1 attachment,

7    that that means that, you know, you have less culpability, much

8    less that you're substantially less culpable than anyone else.

9    And that's all that I was trying to point out to you was, look,

10   just because that H1 --

11           MR. OBENAUER:  Yes.

12           THE COURT:  -- report is there doesn't mean that

13   simply because you're a courier that -- I mean, again, I'm

14   using -- look, I'm being overly generous to your client

15   because, to me, when you look at 3B1.2, and it looks at the

16   five, quote, nonexhaustive factors, you know, there are

17   couriers, and there are couriers.  Of course, the Ninth Circuit

18   has told us that we can't compare courier to courier.  But what

19   you can do is compare, for example, the degree of culpability,

20   right?  The degree of planning.

21           And so there are people who are drug smugglers, right,

22   but who are less culpable than other people because they've

23   been involved in less planning.  You understand what I'm

24   saying?

25           MR. OBENAUER:  Yes.  There's different degrees of -- I

1  can understand your concern that it's a blank check to get a

2  minor role, to use my language, you know, in terms of the minor

3  role designation, that all drivers get a blank check to

4  be -- to get a minor role.  I understand that.

5          THE COURT:  Okay.

6          MR. OBENAUER:  But where we disagree, and I think it

7  seems -- I don't know if we're headed that way today -- is I

8  think that, according to 3B1 commentary and the criteria that

9  they use, and as -- and as applied to my client, he qualifies

10 for minor role status.

11          Now, that's probably where we -- you know, applying

12 those factors to this case, he's clearly a driver, a minor role

13 person.  And that's where we disagree.

14          THE COURT:  But therein lies the problem.  I mean, so

15 what you're saying is that because he's a driver that he's

16 entitled to minor role.

17          MR. OBENAUER:  No.  No.

18          THE COURT:  No?  No.  Okay.

19          MR. OBENAUER:  No, I'm not saying that.

20          THE COURT:  All right.  I guess I'm not understanding

21 your argument.

22          MR. OBENAUER:  Well, I'm saying, according to the

23 criteria -- and it's used in the government's support of minor

24 role classification -- I won't have to read these things -- the

25 nonexhaustive list of factors.  And if you plug Mr. Delgado

1   into this, he didn't understand the scope and structure, he

2   wasn't involved in planning and organizing, he was told where

3   to drive the car, he was told how to do it, he --

4           THE COURT:  Okay.  All right.  Okay.

5           MR. OBENAUER:  You understand where --

6           THE COURT:  I do.  I do.

7           MR. OBENAUER:  Okay.

8           THE COURT:  I understand.  But the problem is so much

9   of your appellate brief was devoted to that H1 attachment,

10  rather than focusing on the 3B1.2, that I kind of got lost.  So

11  I thought maybe -- well, maybe I misunderstood your appellate

12  brief.

13          So -- so the H1 report is not really something that

14  you're hanging your hat on?

15          MR. OBENAUER:  I'm hanging my hat on 3B1.2.

16          THE COURT:  All right.  But you do agree that you

17  spend substantial amount of time, both in your sentencing

18  memorandum and in your appeal, talking about the H1 report and

19  the levels of culpability of other people besides, quote,

20  couriers, end of quote, right?

21          MR. OBENAUER:  Well, we devoted time to it, Your

22  Honor.

23          THE COURT:  Okay.  The reason why I mention that is

24  because in a few minutes I'm going to point out something

25  that's kind of odd.  And in another case, the appellate lawyer

1    in that case -- or, in fact, the lawyer at the sentencing in

2    that case made the same arguments.  And I've heard that

3    argument now so many times --

4            MR. OBENAUER:  My argument?

5            THE COURT:  Well, the argument about the H1 attachment

6    sort of being the gospel by which we determine the level of

7    culpabilities of couriers, frankly.  And so in that other case

8    the lawyer made the same arguments.  And, interestingly enough,

9    the Court of Appeals didn't buy it there.

10           And so I -- it's an interesting argument that's been

11   made to me, time and time and time and time and time and time,

12   again, that we, the Court, should look to that attachment, the

13   H1 attachment, the report to Congress, and that that attachment

14   somehow or another helps us determine the level of culpability

15   of an individual, even though, of course, we all know that it's

16   not the level of culpability, that what's really relevant is

17   whether or not he or she was substantially, not just less

18   culpable, but substantially less culpable.  Anyway.

19           All right.  So can we agree that that H1 attachment,

20   that ranking, whatever it is, whatever it was that you were

21   arguing to me, is really not something that I need to spend a

22   lot of time or --

23           MR. OBENAUER:  One moment, please.

24           It's an argument, Your Honor.  I don't think

25   it -- it's just an argument.

1          THE COURT:  Well, if it's an argument, I'd like to

2   hear the bases for the argument.  I'd like to hear -- you've

3   obviously read the context in which that --

4          MR. OBENAUER:  My -- my argument for role and for

5   Mr. Delgado is best repeated in the government's sentencing

6   memorandum, page eight -- page seven, where they applied the

7   facts to the criteria.  And rather than read it to the Court --

8   I think you're familiar with it -- I'll just reference that,

9   where they talk about his limited understanding and minimal

10  participation in decision-making, on page seven of the

11  memorandum, 81 of the appellant -- my excerpt of record.

12         THE COURT:  Well, the reason why I mention that is,

13  look, I don't want to get sandbagged.  If I deny minor role

14  this time, and the case goes up on appeal, I don't want -- I

15  don't want your co-counsel there to go to the Court of Appeals

16  and say, well, look, the judge didn't address our culpability

17  levels as reflected in the H1 attachment to the Congressional

18  report.

19         So if, in fact, you're going to say that that's

20  something that I should take into account in deciding whether

21  or not the defendant should get minor role, let's get it out in

22  the open, and let's talk about it.  Otherwise, you know, I

23  think you should tell me that it's not an issue.

24         Because, Mr. Obenauer, I don't see sentencing -- well,

25  I have -- from the day I became a superior court judge, the

1    first sentencing I ever did, I became convinced that the most

2    important thing that any judge, and I mean any judge, can ever

3    do is to sentence a defendant.

4         It's something that no other judge -- nobody else can

5    do.  You can rent a judge to do a lot of things, but there's

6    nobody else who can deprive an individual of his or her liberty

7    other than us, the trial court judges.  And I take it very

8    seriously and very -- you know -- I look at these cases pretty

9    carefully before I decide on a sentence that I'm going to

10   impose.  And then I listen to you folks, I listen to the

11   defendants, and then I decide what the sentence should be.

12        But I don't like having -- you know, having issues

13   raised, the case goes up on appeal, and somebody, so, for

14   example, says, well, you know, the probation didn't recommend

15   it, and the government didn't recommend it, and my -- you know,

16   I would think, if I was the Court of Appeals, I would say,

17   well, what the heck difference does that make?  What really

18   matters is was there evidence in the record to support the

19   judge's finding on that issue, right?

20        And I don't want to get to a point where the case goes

21   up -- I mean, I don't want to have to redo this again -- the

22   case goes up on appeal, and your co-counsel says, look, the

23   judge didn't address the H1 issue.

24        So if it's going to be an issue, let's talk about it.

25        MR. OBENAUER:  One moment.

1          THE COURT:  Yeah.

2          MR. OBENAUER:  Well, Your Honor, I think -- and

3    Attorney Doyle reminds me that it was a paragraph on that H.

4    And I think that I don't want to waive it, but it's not the

5    heart of -- we don't particularly consider that law or -- isn't

6    that -- it's just a report to Congress, isn't it?

7          THE COURT:  That's what it is.  It's a coding report.

8          MR. OBENAUER:  Right.

9          THE COURT:  It was never meant by the sentencing

10   commission to imply any kinds of level of culpability or how we

11   determine whether or not someone is a --

12         MR. OBENAUER:  Well, you know, it's not law, so, I

13   mean, I don't consider it persuasive.  You know, if we only

14   used it once, well, that's probably the extent of it.  I don't

15   anticipate using it again.

16         THE COURT:  All right.  Well, okay.  Well, just to

17   respond to that, I'm going to tell you that, in my opinion,

18   first of all -- as I said, I talked to the sentencing

19   commission.  Those lawyers who helped the sentencing commission

20   draft these guidelines told me, no, that was never our intent,

21   first of all.

22         Secondly, I think there's a real problem with that.

23   For example, it would seem to indicate, as I mentioned

24   previously, that someone who builds a false compartment for a

25   car in Mexico may be getting paid, you know, 25 pesos or

1   whatever, that somehow he or she is more culpable than someone

2   who drives 13 kilos of this poison into the United States, or,

3   someone who's out on the street selling, you know, a gram of

4   methamphetamine for purposes of supporting his or her own

5   addiction.  And somehow or another, if you look at that H1, if

6   you were to accept that as being the scale for culpability,

7   that person would be more culpable than the person who brings

8   13 kilos of that meth into the United States.  That doesn't

9   make any sense to me at all.

10          I think, when they were trying to draft that, they

11  were trying to do what they could in order to come up with a

12  coding to be able to provide information to Congress, and

13  nothing more than that.

14          So, before I forget, let me ask -- let me ask

15  Ms. Kaiser a question.

16          MS. KAISER:  Yes, sir.

17          THE COURT:  Now, Ms. Kaiser, when I read Mr. Stevens'

18  report, I noted that he said that you said, as you were leaving

19  the meeting, that you did not think that you could recommend

20  minor role.

21          And I'm curious what it was that happened between the

22  time that you left that meeting and the time that you submitted

23  your sentencing memorandum that caused you to change your mind?

24          MS. KAISER:  Which paragraph are you referring to,

25  Your Honor?

1      THE COURT:  Oh, I don't know.  I'd have to find it.

2      MS. KAISER:  On paragraph seven -- I will raise

3   something here because in a discussion earlier, and I think

4   this is important, Your Honor, paragraph seven of the PSR says

5   that the AUSA stated the government will stand by the plea

6   agreement, which we do, and provided no further information.

7      She indicated there was no evidence to prove the

8   methamphetamine was imported from Mexico.  Moreover, the

9   undersigned was provided the DEA lab report from the AUSA.

10     That sentence there about no evidence to prove there

11  was methamphetamine imported from Mexico, according to my notes

12  I would have first learned about this on a debrief --

13     THE COURT:  July 7th.

14     MS. KAISER:  -- July 7th.  That's correct, Your Honor.

15  I cannot recall when I would have spoken with the probation

16  officer.

17     This report came out on July 20th.  The case agent,

18  according to probation's notes, spoke on July 17th.  The case

19  agent, according to their notes, would have been correct

20  because we already had the debrief.

21     But the fact of the matter is, is if I had that

22  information, I would not say that there's no evidence.  I would

23  have refrained from speaking further about whether or not.

24  Because our plea agreement does not include an enhancement for

25  importation of methamphetamine.

1    THE COURT:  Does it -- does it prohibit it?

2    MS. KAISER:  It doesn't necessarily prohibit, Your

3  Honor.  We've had litigation at times about breach of a plea

4  agreement, issues such as that.  And in our -- in the filing I

5  provided with the Court for the first sentencing, I provided

6  all the information up front about it, indicating about the

7  prior crossings.

8    THE COURT:  Yeah.

9    MS. KAISER:  So I just want to make sure that there's

10  an understanding that -- I don't recall when I spoke with the

11  probation officer or what explicitly I said, but if I knew that

12  there was evidence of importation, I wouldn't have said to the

13  probation officer that there's no evidence of importation, Your

14  Honor.  I just want to make that clear.

15    THE COURT:  But when did you speak with probation?

16    MS. KAISER:  I don't recall when.  I don't have it in

17  my notes.

18    THE COURT:  So is it possible, Ms. Kaiser, that you

19  spoke with probation before your debrief hearing on July 7th?

20    MS. KAISER:  It's possible, or it's possible I could

21  have made a mistake, or it's possible that probation could have

22  made a mistake.

23    I just -- I'm concerned, Your Honor, because obviously

24  I'm not going to make a statement such as that if I had

25  information to the contrary, Your Honor.

1          THE COURT:  Well, I would hope so.  I would hope that.

2          Now, I was kind of troubled by something.  In

3   Mr. Stevens' report, he attached a document.  It's dated

4   August 11th.  It's an agreement.  It's an agreement that -- I

5   don't know who drafted it, but it caused me some real concerns.

6          As you can see, there are some issues in this case,

7   and they're very troubling, but one of the things that that

8   agreement says is that you're not to disclose to the Court

9   anything that is revealed in a debrief, which, of course,

10  caused me to wonder.

11         So Mr. Obenauer argues --

12         MS. KAISER:  Mr. Stevens' report.  You know, Your

13  Honor -- oh, okay, I see.  You're talking about the notes from

14  the investigator, Your Honor, Mr. Stevens.

15         THE COURT:  Yes.

16         MS. KAISER:  I'm sorry.  I was looking at the

17  probation report.

18         THE COURT:  No, no.  Mr. Stevens, who was apparently

19  at the debrief --

20         MS. KAISER:  Your Honor --

21         THE COURT:  -- wrote a report.  And the report was

22  what Mr. Obenauer submitted to me and asked me to file it under

23  seal --

24         MS. KAISER:  Okay.

25         THE COURT:  -- which was what I relied upon in making

1  my finding, besides the fact that his client clearly said to

2  me -- and I appreciated that -- he said, the day I crossed, I

3  knew what I had in my vehicle.

4          MS. KAISER:  Right.

5          THE COURT:  And he wasn't talking about crossing from

6  Imperial County to San Diego County or from Imperial County to

7  Riverside County.  We all knew he was talking about crossing

8  from Mexico into the United States.

9          So, anyway, in that report that I received from

10  Mr. Stevens --

11          MS. KAISER:  Okay, Your Honor.

12          THE COURT:  -- there's a document that's attached to

13  it.

14          MS. KAISER:  Right.

15          THE COURT:  And it's a document that says that the

16  government will not, will not disclose to the Court anything

17  that is said in the debrief unless -- and there's another

18  little catch to it, but it's not relevant to this particular

19  discussion.

20          MS. KAISER:  Oh, you're talking about --

21          THE COURT:  -- unless the Court asked directly.  So if

22  the Court were to ask -- now, that's troubling to me.  Boy, is

23  that troubling to me on a whole lot of bases.  Because I don't

24  know what you folks talked about, but if he told you during

25  that debrief that he knew where --

1          MR. OBENAUER:  Jimmy Hoffa was buried.

2          THE COURT:  -- yeah, Jimmy Hoffa was buried, I would

3    find it very, very troubling that the government would not

4    disclose that information to me.  And I wonder how many times

5    I've imposed sentence now over the years where information has

6    been not disclosed to me that should have been disclosed to me.

7          But you see -- so the reason why I ask that question

8    is because your plea agreement is silent on the minor role

9    issue altogether.  It doesn't say, we're going to recommend it.

10   It doesn't say, we're going to not recommend it.

11         MS. KAISER:  Your Honor, that's correct.  And in some

12   cases we recommend minor role, and in other cases we do not.

13         THE COURT:  Right.  So if -- in cases in my

14   experience, Ms. Kaiser, very, very often, you have that

15   agreement, but then you come in -- because implied in that

16   agreement, if there's no minor role recommendation, right, it

17   is assumed that there will not be minor role to be recommended,

18   right, because there's no reduction in the base offense level.

19         So if you come in and you say, Judge, we've decided

20   not to recommend minor role, then, of course -- and if there

21   was evidence that the defendant had imported the drugs from

22   Mexico -- then the Court should, at a minimum, consider whether

23   to increase the sentence by the two levels, right?  That would

24   not be a breach of the plea agreement.

25         MS. KAISER:  Your Honor, in this plea agreement --

1    THE COURT:  Yes.

2    MS. KAISER:  -- in our plea agreements where we have

3  the importation, we always include the importation of

4  meth -- well, not always, I guess, if there's a mistake or

5  something -- but generally we include that enhancement there

6  because it's part of the calculus of minor role, right?  If you

7  recommend minor role, you're not going to recommend

8  importation.  If you don't recommend minor role, typically it

9  goes with importation.

10    For a lot of these checkpoint cases -- and at the

11  time, I didn't negotiate the agreement, but based on my

12  information, the AUSA at the time who did wouldn't have had any

13  further information about evidence being imported -- it was

14  standard not to --

15    THE COURT:  And I thought I mentioned that last time.

16    MS. KAISER:  You did, Your Honor.  You did.

17    THE COURT:  Okay.

18    MS. KAISER:  I'm just making sure I touch on that

19  issue as you're asking me here about it.  The plea agreement

20  does not include that enhancement.  So we are not recommending

21  that.  We stand by the plea agreement.

22    If Your Honor asks us if we have information, the fact

23  of the matter is, is we provided that information.  We provided

24  that information under seal.  We made very clear, before we

25  filed it, with defense counsel what information we were going

1  to provide.  You know --

2          THE COURT:  So can we agree on this?  The fact that

3  you did not recommend a two level enhancement was part of the

4  following:  A, that in your plea agreement it had not been

5  included; and, B, that it was not included because at the time

6  that the plea agreement was negotiated you did not know that

7  the drugs had come from Mexico?

8          MS. KAISER:  I can recommend as to A and B as to this

9  case.  It does not mean --

10          THE COURT:  Yeah, I'm talking about this case.

11          MS. KAISER:  Yeah.

12          THE COURT:  This case.

13          MS. KAISER:  This case, yes, Your Honor.

14          THE COURT:  Right.  So the fact is that when you did

15  not recommend a two level increase under 2D1.1, it was because

16  it was not included in the plea agreement.  And the reason why

17  it was not included in the plea agreement was because the

18  defendant had not told you that he had brought the drugs over

19  from Mexico until July 7th, which was way after the plea

20  agreement had been executed.  Is that a fair statement?

21          MS. KAISER:  That's a fair statement, Your Honor.

22          THE COURT:  Okay.  Good.  Well, that's kind of what I

23  thought.  I mean, when I was looking at this thing, I thought,

24  okay, so when Mr. Obenauer says that probation didn't recommend

25  it, it appears that apparently probation might have had

1    information by which they might have raised the issue, but,

2    again, they didn't have any information with which to recommend

3    minor role or not recommend minor role.

4         And you didn't recommend it because the plea agreement

5    did not include it, and you had no idea that the -- that's not

6    a fair statement -- you did not know that the drugs had come

7    from Mexico until after the plea agreement had been executed.

8         MS. KAISER:  Yes.  But, again, I want to make it very

9    clear when you qualify you, you mean the government because --

10        THE COURT:  Yes, yes.  Of course.  Of course.  Of

11   course.  Of course.

12        MS. KAISER:  Right.  And, Your Honor, and as -- I

13   know, again, you understand for this specific case, but my

14   concern is, is I have other colleagues in my office with other

15   plea agreements, and in some cases they may have that

16   information but they may choose not to recommend that

17   enhancement.

18        I can't speak as to that, but I can only speak as to

19   this case right now, Your Honor, and say that we stand by the

20   plea agreement.

21        I also would -- I've been in other debriefs before

22   with the investigator, Mr. Stevens.  And, frankly, I review

23   these memos with a grain of salt.  This memo was typed shortly

24   after our first debrief.  We had several other debriefs and

25   interactions with defense counsel after that.

1          They were very much of the mindset that we should be

2    considering 5K, even though that wasn't part of the agreement.

3    We explained we were meeting regarding minor role and the

4    other -- the other issues related to it.

5          We looked at it further.  We made our own assessment.

6    And, again, we filed the memo under seal, where we provided the

7    information that we deemed pertinent.  If Your Honor asks me

8    any questions about it, I'm happy to answer.  I understand --

9          THE COURT:  No, no, I don't need to because I had the

10   information at the time that I imposed sentence.

11         MS. KAISER:  Yes, Your Honor.

12         THE COURT:  But that was the troubling part, is that,

13   you know, when I read the mem dispo, and I read that sentence

14   in it, and then you superimpose upon that Mr. Obenauer's appeal

15   brief and his reply brief, I'm sort of left shaking my head and

16   wondering -- I've been doing this now, what, 15 years --

17         MS. KAISER:  As a district court judge.

18         THE COURT:  -- as a district court judge, and I've

19   never had a mem dispo before that said something like, and if

20   you decide to not grant minor role, you're going to state the

21   evidence produced by the government to justify the 2D1.1

22   enhancement, when, in fact, we both knew, both the government

23   and the defense knew precisely why I was imposing that two

24   level enhancement.  And I don't know, I'm just kind of left

25   shaking my head and wondering.

1      So, anyway, getting back to my point, though, that I

2  asked you earlier, Ms. Kaiser, according to Investigator

3  Stevens, when you left the meeting you said you did not think

4  you could recommend minor role.  And I'm wondering what caused

5  you to change your mind.

6      MS. KAISER:  That was the initial threshold, Your

7  Honor.  I don't remember all the specifics of this.  I don't

8  know if I said if I would be unable to offer or if it looked

9  like it was unlikely that I would offer minor role.  So --

10      THE COURT:  So, either way --

11      MS. KAISER:  Either way --

12      THE COURT:  -- what would have caused you to change

13  your mind?

14      MR. OBENAUER:  Look, may I -- this may or may not

15  help, but that was only -- that -- at that particular time,

16  there were -- I was asking for two things.  One was minor role,

17  and the other was 5K1.  Maybe that's what you were referring to

18  at that time, so.

19      MS. KAISER:  Well, Your Honor, look, it was defense's

20  decision to submit this memo to the Court and to do that.

21      THE COURT:  I know.  I know.

22      MS. KAISER:  So the fact of the matter is, is,

23  frankly, that was their decision.

24      I don't remember the exact words I would use.  I say

25  it not to sound like I'm trying to dance around an issue, Your

1    Honor, but most cases I'll either make it very clear, or I'll

2    say it's unlikely, or it's likely but it's subject to

3    supervisory approval, because all of these are subject to

4    supervisory approval.

5         At the time, I think, given the information he had

6    about his crossing history, that was a concern of mine.  That

7    made it look like -- and the amount that he had received, that

8    that was a concern of mine that weighed in minor role.

9         THE COURT:  I'm sorry, I lost you.

10        MS. KAISER:  That weighed against minor role at that

11   initial meeting, when I look at this and it refreshes my

12   recollection.

13        So I'm not disputing that we talked about minor role.

14   I just don't remember if I said that I was not going to

15   recommend it, period, or if I just said it's unlikely, okay.

16        MR. OBENAUER:  And I don't agree --

17        THE COURT:  I think you said it was unlikely.  I don't

18   have the report in front of me.  I don't think it was --

19        MS. KAISER:  I have it in front of me, and it says

20   that I was unable to recommend minor role.

21        THE COURT:  I see, okay.

22        MS. KAISER:  So it sounds like it was completely in

23   the negative.  And I may have said that, or I may have said

24   most -- what I normally say is it's unlikely.  Either I'm more

25   likely to recommend it or unlikely.  Again, it's all subject to

**44**

1    supervisory approval.

2         THE COURT:  So it may be that in his writing the

3    report he might have chosen the wrong word, perhaps.  That's a

4    possibility.

5         MS. KAISER:  But, Your Honor, I'm not -- I'm saying,

6    though, that the thing is, is the rest of it, though, in

7    substance makes perfect sense to me because of why I would have

8    had reservations about recommending minor role.  And I could

9    have been that direct.

10        But the fact of the matter is, is that was in July.

11   And after that, I had, I believe, other discussions with

12   defense counsel, multiple conversations with the investigator.

13   At that point when we first met, we hadn't learned about this

14   other investigation in the Los Angeles area, DEA, where the

15   name popped up.

16        And then, in looking at all of that and putting it in

17   the context is then what made us lead to make the

18   recommendation of minor role for this case.

19        THE COURT:  Okay.  Explain that further to me because

20   I'm not sure I follow you.

21        MS. KAISER:  Sure.  Your Honor, at the first meeting

22   when we met with defendant, we were not aware that the DEA up

23   in, I think -- I think it's the DEA up in Los Angeles

24   area -- and when I would have made that sentence would have had

25   some familiarity with this Lares, L-A-R-E-S, individual.

1        THE COURT:  Yeah.  Right.

2        MS. KAISER:  So the fact of the matter is, is I just

3   said to our agent here, let's look at it further, let's find

4   out further information we can find.

5        He took several steps, and we then received that

6   information.

7        THE COURT:  What did you receive?

8        MS. KAISER:  Just very limited information, Your

9   Honor.  And the limited information --

10       THE COURT:  What, that he was a drug dealer?

11       MS. KAISER:  No, not that specifically, but that he

12  had been identified as part of some larger investigation in the

13  DEA area, but that they were not interested in meeting with

14  defendant further and exploring it further with defendant.

15       THE COURT:  Okay.

16       MS. KAISER:  And so the thing is, is then we looked at

17  that.  We took it into context of the information that

18  defendant provided with us.  And we determined that, in our

19  opinion, as to this case compared to others, it was a close

20  call, but we were willing to consider minor role for this case.

21       THE COURT:  What was the close call?

22       MS. KAISER:  The close call is because he had done

23  multiple crossings --

24       THE COURT:  Yes.

25       MS. KAISER:  -- and he had gotten paid.

1          THE COURT:  Yes.

2          MS. KAISER:  Your Honor has concerns about the fact

3    that he was then recruited to, I think, take drugs further.

4          THE COURT:  To Chicago.

5          MS. KAISER:  To Chicago.  For us, the fact that he had

6    said no indicated to us that he was further trying to minimize

7    his role and not take it further.

8          We have recommended minor role in other cases where

9    people have crossed before, since we had individuals who were

10   more identifiable, they were real to us.  It wasn't just based

11   on defendant's statements, but that they were a real person.

12         THE COURT:  So the fact that he was able --

13         MS. KAISER:  Right.

14         THE COURT:  I laugh because, you see, sitting up here

15   is very different than where you all are, and it's very

16   different than where the Court of Appeals sits, right.

17         MS. KAISER:  Sure.

18         THE COURT:  So in the one place, the Court of Appeals

19   says, oh, well, the fact that he can't identify other people,

20   that should work in favor of his getting minor role.

21         MS. KAISER:  Right.

22         THE COURT:  And what you're telling me is the fact

23   that he's able to identify other people works in favor of minor

24   role.  So which is it?

25         MS. KAISER:  I know, Your Honor.  And I'd have to say

1    it's a very fact specific inquiry.

2              THE COURT:  You know what that means.

3              MS. KAISER:  My head gets wrapped around it too, Your

4    Honor.

5              So I appreciate that.  And I can -- I don't stand in

6    your shoes, Your Honor, but I can understand why Your Honor is

7    frustrated here.

8              THE COURT:  So let me get back to the question --

9              MS. KAISER:  Sure.

10             THE COURT:  -- that I asked earlier, that I still

11   haven't gotten an answer to.

12             MS. KAISER:  I thought I answered it.

13             THE COURT:  This agreement that you had that you would

14   not disclose information during the debrief unless the Court

15   asked you about it, I find that very troubling, very, very,

16   very troubling, because I don't know unless I drag you into

17   court and say to you, tell me what you know that I don't know

18   about this case, which, I guess, is something that all of us

19   district judges who are interested in finding out all the facts

20   of a case before we impose sentence perhaps should be asking,

21   but I've never had to ask that before.  And I had no idea that

22   there were agreements that said that the government was going

23   to -- I'm sorry, I don't really mean -- I'm not -- I'm not

24   impugning you --

25             MS. KAISER:  No, it's fine, Your Honor.

39

1          THE COURT:  -- but it almost sounds like the

2    government is obstructing justice by not telling us, the

3    judges, information that we judges ought to know -- I mean, if

4    Mr. -- if Mr. Obenauer had not filed the report from

5    Mr. Stevens, and you had not filed your sentencing memorandum

6    under -- under seal, I would have never known.  I might have

7    suspected, because I heard the motion to suppress, I might have

8    suspected that the drugs came over from Mexico, but I would

9    have never known.  And I think that's a pretty important fact

10   in imposing sentence.

11          MS. KAISER:  So, Your Honor, with all due respect,

12   when you explain this, and you said it earlier, I thought you

13   were making a comment, not a question.  So I apologize if you

14   thought that I wasn't answering --

15          THE COURT:  Well, it is a question.  Is that something

16   that's regularly done by the U.S. Attorney's office?  You guys

17   enter into agreements with defendants, and you agree not to

18   provide that information to the Courts?

19          MS. KAISER:  Your Honor, I'd have to compare

20   this -- we have standard proffer agreements, and I would have

21   to compare it to the most recent one.

22          This looks to me like a pretty standard -- it was a

23   standard proffer agreement.  There wasn't anything

24   individualized on it that we wrote.

25          Your Honor, I can't speak, again, to every case, but I

49

1    certainly can raise your concerns to my supervisor about it.

2           I can tell you that, Your Honor, if there's a concern

3    about us not following a duty of candor, then that's certainly

4    a valid concern.  But if there's a concern of the fact that we

5    make a plea agreement, we negotiate it, and that there's

6    nothing contradictory that comes up before the Court for

7    sentencing, then we do not have to disclose that additional

8    information.

9           THE COURT:  Assume, hypothetically, if you will, that

10   I had found that the defendant should not get minor role, okay.

11   Let's just assume that I found that.  But Mr. Obenauer had not

12   filed Mr. Stevens' report, and you had not given me your

13   sentencing memorandum alerting me to the fact that the drugs

14   had come across from Mexico.  That's a pretty important fact

15   that I would have not known about, important enough that the

16   sentencing guidelines have actually -- I mean, you know,

17   they've included it in their sentencing memorandum, so they

18   think it's important.

19          So it strikes me that -- it's one thing for us to

20   agree, say, the three of us, to agree that, okay, okay, I've

21   looked at the report, I'm going to file it under seal, we're

22   not going to let the public know about this.  I've gotten your

23   sentencing memorandum from the government.  I can understand

24   why you don't want it to be made public because of whatever

25   reason, so we're not going to tell the public.  And as a result

1   of that, I'm not going to use it in my sentencing.

2          But it's a completely different thing for -- for two

3   parties to litigation before me to agree to not disclose to me

4   information that is relevant and important.  I find that --

5   boy, I tell you what, when I saw that, man, my head was about

6   to explode because I thought, I can't believe that this

7   actually happens.

8          But, anyway.  All right.

9          MS. KAISER:  Your Honor, I will pass that along and

10  Your Honor's concerns.  I don't know what kind of redress or

11  answer.

12         THE COURT:  Yeah.

13         MS. KAISER:  But I can tell you for this specific

14  case --

15         THE COURT:  Right.

16         MS. KAISER:  -- and, Your Honor, for, in fact, any

17  case that I go in front of Your Honor, if there's information I

18  deem relevant, I'm going to follow through and provide that

19  information.  And if you're going to ask me a question, I'm

20  going to answer the question, Your Honor, to the best of my

21  abilities.

22         THE COURT:  I think you have to.  You don't have any

23  choice.  I think the case law is pretty clear that it's not a

24  breach of the plea agreement if I ask you a question and you

25  answer it.

42

1          MS. KAISER:  Your Honor, it's not just as a question

2   of choice, Your Honor.  It's also a question of my duty of

3   candor to the Court, Your Honor.

4          THE COURT:  Okay.

5          MS. KAISER:  I've been in front of Your Honor for over

6   10 years, so.

7          THE COURT:  You've never led me down the -- yeah,

8   you've never caused me to not trust you.  And, frankly, I don't

9   know that Mr. Obenauer hasn't either, until I got the

10  impression that he was telling the Court of Appeals that I

11  don't grant minor role, and that I included a two level

12  increase when there was no evidence to support it.  I've always

13  had -- enjoyed having Mr. Obenauer before me.

14         By the way, Mr. Obenauer, I know I've granted minor

15  role in some of your cases in the past.  As a matter of fact, I

16  know that.  So --

17         MR. OBENAUER:  Well, I wish you --

18         THE COURT:  -- let's --

19         MR. OBENAUER:  -- continue that practice today.  And

20  in keeping with that --

21         THE COURT:  Well, don't count your chickens before

22  they're hatched.

23         MR. OBENAUER:  -- I have a couple of comments to make.

24  First of all, my client, the first opportunity to tell his

25  story, he told it, and he told the entire story.

```
1              THE COURT:  No, that's not true.

2              MR. OBENAUER:  What?

3              THE COURT:  That's not true.  It wasn't the first

4    opportunity.

5              MR. OBENAUER:  In the debriefing.  He was under my

6    direction not to discuss the facts of the case in the probation

7    report.

8              THE COURT:  That's right.

9              MR. OBENAUER:  That's right.

10             THE COURT:  So he had that opportunity.  He also

11   had --

12             MR. OBENAUER:  Well, no, I wouldn't -- I didn't -- I

13   said no, so that's why he didn't.

14             THE COURT:  I understand.

15             MR. OBENAUER:  OKAY.

16             THE COURT:  But he also had another opportunity, which

17   is an opportunity that I run into constantly, which is that a

18   defendant is arrested at the border, they find the drugs, they

19   bring the defendant into the interview room, and the defendant

20   says, yeah, by golly, I brought drugs across the border.  It

21   was Pablo or Jose or El Gordo or whoever that talked me into

22   bringing the drugs across the board.  And so that's really the

23   first opportunity.

24             Of course, he has a right not to incriminate himself.

25   I understand that.
```

53

```
1            MR. OBENAUER:  A constitutional right, yeah.

2            THE COURT:  Of course.  I understand that.

3            MR. OBENAUER:  The other thing I wanted to mention was

4   that it's a good thing when he said, no, I don't want to do any

5   trips to Chicago.

6            THE COURT:  I agree.

7            MR. OBENAUER:  When he said that, that's a good thing.

8            THE COURT:  I agree.

9            MR. OBENAUER:  And the other thing is that -- with

10  respect to the minor role, he didn't know the type or the

11  quantity of the drug.  He had limited understanding of the

12  scope and structure of the organization.  He didn't know where

13  or when the car was loaded.  He didn't have -- he didn't plan

14  it.  He didn't organize it.  He had no authority.

15            He drove the car.  And he drove multiple loads.  And

16  he was under the direction -- under directions of the other two

17  about where to drop it off.  The car was not registered to him.

18  It was registered to Lares, L-A-R-E-S, and another individual.

19  He was paid well, but he didn't have a proprietary interest.

20  Under the totality of the circumstances, he was a minor

21  participant for the specific case.  This is from the

22  government's own memorandum.

23            That's my argument for why he deserves minor role.

24  I'd like to move on to some very happy news, if the Court would

25  let me.
```

1          THE COURT:  Sure.

2          MR. OBENAUER:  He's 26 years old, grew up in Compton,

3     a high crime area, a lousy childhood.  His father ran off, had

4     another family.  His mother had a stroke.  She was unable to

5     work.  His father had -- without working adult in the family,

6     he and his siblings survived on very limited money.  When he

7     was 13, his mother was diagnosed with a brain tumor, and she

8     passed away one year later.  He didn't graduate from high

9     school.  He's always lived with his sister Jennifer.

10         He's -- he committed this offense to support his

11    family, which included Jennifer, his girlfriend, and his

12    daughter by that same girlfriend.  He's -- it's included in his

13    exhibits a declaration of why he believes that he

14    is -- deserves minor role classification.

15         And I'm so proud of Mr. Delgado.  I just fell over

16    when I found out he learned -- he earned his GED in prison.  He

17    says he took every course that he could possibly take in order

18    to not only spend the time, but also to improve himself.  He

19    learned how to repair wheelchairs.  He took courses on AIDS and

20    how to avoid it.  He learned -- this is before he was moved

21    over here.  He began education on building solar panels.

22         Most important, he addressed his drug problem, and he

23    completed 362 hours of drug rehabilitation.  And all of

24    his -- well, there's one fair, I should -- there's a couple of

25    fairs in here, but most of all his participation was good, and

1    his homework was satisfactory.

2            Not only that, after he finished the 300-plus hours,

3    he took another course about drug avoidance and how to avoid

4    criminal lifestyle, and he completed that.  He's done

5    absolutely outstanding considering his circumstances growing

6    up.

7            I've asked that the Court consider a variance of five

8    points for outstanding rehabilitation performance.  And he's

9    going to keep doing this.  He's an absolute pleasure to work

10   with.

11           I remember one day I was having a particularly bad

12   day.  And it wasn't in here, by the way.  Let's just make that

13   clear.  And I went -- I had to go over to MCC to see him.  And

14   it was uplifting to go see this man.  He's got tremendous

15   potential.  He deserves a minor role classification.  He

16   deserves to have his sentence reduced.  And I would ask the

17   Court to do that.

18           And I think he wishes to address the Court.

19           THE COURT:  All right.  Before I forget, Mr. Obenauer,

20   I expect that good lawyers will, as they often do, at the

21   conclusion of this hearing, if I have failed to address to your

22   satisfaction any issue, that you will bring it to my attention

23   so that hopefully we can cure the issue here rather than curing

24   it later.  Because it's a waste of time, and it's a waste of

25   taxpayer dollars, and it's a waste of resources.

1          So you've made your argument on behalf of your client,

2     and so I just want to make sure that we understood each other.

3          Now, Mr. Delgado, you have -- you have a right to

4     address the Court.  I know I heard you the last time.  I heard

5     everything that you had to say.  I've read the sentencing

6     transcript from the last time that we were here.  So I'm more

7     than happy to listen to you.

8          My concerns about some of the things that have

9     happened in this case -- by the way, I want you to know, they

10    have absolutely no bearing with you because I can

11    compartmentalize between my concerns about -- I mean, I've been

12    doing -- you know, I was a lawyer for 20 years.  I've been a

13    judge now for 22 years.  So I can understand that sometimes

14    lawyers, in their zealous advocacy, can do things that I may

15    not agree with, but it has nothing to do with you.  What has to

16    do with you is the facts of this case and the law that applies

17    to you, okay, to make sure that we understand each other.

18         So, listen, if there's anything else that you want me

19    to know, anything else that you think I should consider in

20    imposing my sentence, now is the time for you to tell me.

21    Okay.  And Mr. Obenauer says you have something to say to me.

22         THE DEFENDANT:  Well, I won't take a lot of your time.

23    It's just that I know what I did.  I know what I had.  I know

24    I'm not going to put my -- I'm not going to say my mistake or

25    any excuses to everything that I did.

1          Prior to me being incarcerated, spending that time in
2    Victorville, I have grown a lot.  And I just know, since the
3    time remaining that I have here, or whatever the sentence is,
4    is going to continue the time that I still have serving, I've
5    been growing, and I just been learning and trying to better
6    myself to be a productive father and productive citizen to the
7    United States of America.
8          And I'm not going to put my -- I'm not going to
9    say -- I'm not going to put the excuse on my financial problems
10   or problems growing up, because I'm a man, I should have known
11   the decisions that I was making prior to the criminal activity
12   that I was doing.
13         And I could have said, no, but, you know, I
14   mean -- and I'm not even going to say my drug habit either.
15   But I feel like, with this decision, I let myself down, I let
16   my family down, and I know I'm better than this.  And I'm just
17   hoping that you can find it in your heart to give me another
18   chance.  That's all.
19         THE COURT:  Okay.  Does probation have anything?
20         PROBATION OFFICER:  Your Honor, nothing further to
21   add.
22         THE COURT:  I'm not sure if whoever wrote that
23   probation report is still with you.  I can't keep track of all
24   you folks.  But you might want to let them know that
25   information like the one that you found in your note that was

1    not put into the presentence report would be very helpful to

2    the Court to have.

3              PROBATION OFFICER:  Your Honor, and just listening to

4    Ms. Kaiser speak and, obviously, the dialogue today, for our

5    purposes, more often than not, frankly, that information is not

6    even provided to us until long after the presentence report is

7    filed.

8              THE COURT:  But an addendum could be prepared or a

9    phone call made to the judge or something to alert them.

10             PROBATION OFFICER:  Right.  Actually, I'm going to

11   rephrase that.  The debrief meetings typically don't even occur

12   until after we file our reports --

13             THE COURT:  Right.

14             PROBATION OFFICER:  -- and that information is not

15   presented to us.

16             THE COURT:  Right.

17             PROBATION OFFICER:  So I should make sure I'm clear on

18   that.

19             THE COURT:  Sure.  I understand.

20             PROBATION OFFICER:  Yeah.

21             THE COURT:  And that troubles me a lot, to be honest

22   with you.

23             PROBATION OFFICER:  And what occurred here, I'm not in

24   a position to speak to.  This was obviously several years ago,

25   and I'd have to go back and retrace steps with the people that

1    were involved.

2           THE COURT:  Well, I just think -- I just think it

3    ought to be office policy, that if information is conveyed to

4    probation that would be relevant and possibly important to the

5    judge, that an addendum or a phone call or something to alert

6    us.  Because, again, but for the fact that, you know,

7    Mr. Obenauer submitted a report, and the government felt that

8    they had to provide that information to me, I would have never

9    known that these drugs came from Mexico, which is something

10   that I think is pretty important.

11          So, anyway, just convey that to your folks over there.

12   Something happens after the probation interview that's relevant

13   or important to the Court's decision-making, I think you should

14   let us know about it, okay.

15          PROBATION OFFICER:  Understood.  Understood, Your

16   Honor.

17          THE COURT:  Good.  Great.  Thanks.

18          Okay.  And -- Ms. Kaiser?

19          MS. KAISER:  Nothing further, Your Honor, unless Your

20   Honor has any additional questions.

21          THE COURT:  Okay.  Well, look, you know, this

22   is -- this is a troubling case for me because -- let me assure

23   you that when I sentence someone to prison for 10 years, I

24   don't go home that night and do a happy dance, okay.  I never

25   have.  I never will.  I consider sentencing to be a pretty

1  important thing for us judges to do, in fact, the most

2  important thing that any judge can ever do.

3  　　　　And, frankly, I've sent an awful lot of people to

4  prison.  Some people, I've sent them -- because of minimum

5  mandatories, I've sent them to prison for a lot longer than I

6  would have otherwise.  And I've gone on record as explaining

7  that I do not like minimum mandatories, even though I have been

8  accused many a time of not having a heart, or at least a very,

9  very small one.

10  　　　　So I don't enjoy sending people to prison, sending

11  them to prison for a long time.  But, but, I'm here to do a

12  job, and the job, I believe, we've concluded some time ago that

13  drugs are a problem.

14  　　　　And as I read to you the other day, Mr. Obenauer,

15  methamphetamine in the Southern District of California is a

16  big, big, big, big problem.  I think I read somewhere that

17  about 93 percent of the methamphetamine that comes into the

18  United States comes through the Southern District of

19  California.  And my experience tells me that that's probably

20  true.

21  　　　　So it's a problem, and we've got to deal with it.  And

22  we've got to find a way to deal with it.  And the way we deal

23  with it is by, sadly enough, when people smuggle drugs into the

24  United States or distribute drugs in the United States, what we

25  have to do is -- you know, I mean, that's what we do.  We put

1   them in prison, because it's the only solution that we have

2   found to date.

3          So it's troubling because I find myself with

4   Mr. Delgado, who I do believe has -- I think -- has tried to

5   improve his -- his lot in life.  Doesn't change my analysis one

6   wit, not one wit from my analysis originally.  I still do not

7   believe that he should get minor role.

8          Why?  Well, it's rather -- it's rather simple.  The

9   standard, the standard that I have to apply, is I have to

10  decide whether or not the defendant -- not the government, not

11  the Court, not probation -- but whether the defendant has, by a

12  preponderance of the evidence, proven with evidence that has a

13  sufficient indicia of reliability that he is substantially, not

14  just less culpable, but substantially less culpable than the

15  average participant.

16         Now, the average participant, we know, we know, we

17  know is not to be a hypothetical participant because we can all

18  come up with all sorts of theories and hypotheses about things

19  that can happen.  We know that it doesn't have to be anyone

20  who's named.  So, in other words, he doesn't have to know the

21  names of the participants.  We know they don't have to be

22  co-indicted, but we know that they have to be likely

23  participants that are known.

24         This is where that whole H1 thing comes in.  And, you

25  know, I think your argument was that, well, those are likely

1   participants.  Well, they're not really, because if one were to

2   assume that H1 to be true, what it would require that we find,

3   that all drug organizations are the same, and they're not.

4   There are mom and pop drug organizations, and then there are

5   the Pablo Escobar and Arellano Felix organizations, who are

6   the, you know, Amazon and Walmarts of the drug trade, and then

7   there are the mom and pop drug organizations.

8          So, number one, we know that not all organizations are

9   alike.  So in order to try to figure out who's a likely

10  participant, who's a likely participant, you have to figure

11  out, well, what's the organization.

12         Over the years, I've had cases where I've been able to

13  ascertain the structure of the organization, the people

14  involved, and so on, but you can't do that in this case because

15  we don't know.

16         So what we do know is that there was this fellow named

17  Lares, who, according to Mr. Stevens, and Mr. Stevens says your

18  client said, was the kingpin, right?  Now, as Judge Silverman

19  pointed out in Hurtado, you know, those are the people that

20  would probably get an aggravating role.  They wouldn't be an

21  average participant.  They would get an aggravating role.

22         Then what else do we know?  Well, we know that there

23  was a receiver, the person that was receiving the drugs.  That

24  was Randy, the son.  He too probably would get an aggravating

25  role increase, not a reduction.  So those are the people that I

1    know that exist.

2         We also know that apparently Mr. Lares' brother was

3    also a drug smuggler, but he doesn't really fit into the -- he

4    appears to be on about the same level as Mr. Delgado.

5         So when I imposed sentence in this case, I did

6    precisely, precisely what Rojas-Milan requires us to do.  In

7    the Rojas-Milan case, what the Court said was, look, we don't

8    look to some vague drug organization.  I think that was in a

9    footnote, if I'm not mistaken.  But what the sentencing judge

10   in that case did not do, that I did, was to say, you didn't

11   consider the supplier in Los Angeles, and you didn't consider

12   the receiver in Las Vegas.

13        Well, I'm looking at the people that I know and that

14   are likely participants in this case.  It's Mr. Lares, his son

15   Randy, the defendant and Mr. Lares' brother, who's a drug

16   smuggler, runner, courier, whatever you want to call them,

17   who's at the same level.

18        So I look at those people, and I say to myself, okay,

19   how can I possibly -- what evidence is there, what evidence is

20   there that the defendant is substantially less culpable than

21   the average participant?  And there isn't any.  There just

22   isn't.

23        Now, even if I gave your client the benefit of the

24   doubt, okay -- so, by the way, in meth cases, let me just say,

25   I mentioned previously that, you know, meth cases, to me, are

1     sort of a bit of a different animal because of the fact that

2     there's that reduction we wind up with that's in so many

3     different levels.  But meth cases are also very different, and

4     let me tell you why.

5           Okay.  Fine.  Let us just all assume, if you will,

6     that cocaine, heroin cannot be manufactured unless you have a

7     big drug organization, you know, the Pablo Escobar, Arellano

8     Felix cartel, etc.  Well, that's not true of meth cases,

9     because you can make meth in a bathtub.  So you don't have to

10    have all those --

11          Let's take a little break.  Let's take a 10-minute

12    recess.  Let's be back at five minutes at four.  Okay.

13      (Whereupon, a recess was taken from 3:54 p.m. to 4:02 p.m.)

14          THE COURT:  Let's go back on the record.

15          So, as I started to say, you know, the -- if we

16    assume, for example, that all drug organizations are the same,

17    and they're all the Pablo Escobar, Arellano Felix cartel types,

18    that's an erroneous assumption to make, number one.  And,

19    number two, as we know with methamphetamine, you can make

20    methamphetamine in your bathtub.  It happens all the time.  So

21    you can actually have the same person who is the manufacturer

22    of the drugs, who is the recruiter, who is the courier, who is

23    the distributor of the drugs.  So he or she can have all of

24    those functions, which is why the H1 attachment is really

25    meaningless as far as when we're dealing on an individualized

56

1    case.

2         So, as I said, I know that there are four

3    people -- well, I failed to mention the girlfriend, but there's

4    no indication whatsoever that Mr. Delgado's girlfriend -- by

5    the way, is that who he's married to, that he was talking about

6    the kid, that he has a child?

7         MR. OBENAUER:  No.

8         THE COURT:  No.  Oh, that's a good thing.  Anyway.

9         So now -- so I've told you, I know the law requires

10   that I assess his culpability for the instant offense relative

11   to known participants and likely participants.  Of course, I

12   don't know what likely participants would be, except for -- in

13   this particular case, except for those people that we do know

14   about.

15        There's no evidence.  And that's important.  That's an

16   important word that surfaces throughout the jurisprudence,

17   including the guidelines, where they talk about evidence,

18   evidence.  So we have to look at evidence, not something that

19   we conjure up or dream up.

20        So I've looked at the evidence in this case.  Now, so

21   what evidence do I have?  Let's assume -- let's assume that I

22   have evidence to support the defendant's minor role.  What

23   evidence might that be?

24        Well, the only evidence that I have, if you want to

25   call it that, is the defendant's statements.  He has told us

1    that he knew nothing about the drugs.  He wasn't involved in

2    planning.  He didn't put the drugs in the car.  He didn't

3    manufacture the drugs.  He didn't own the drugs.  He was

4    ordered to do this, and he was ordered to do that.  But those

5    are all self-serving statements by the defendant.

6            Now, assuming that you consider it evidence, which, by

7    the way, we all know, unless we now want to change the

8    standard, the Ninth Circuit has said over and over and over

9    again that we don't have to accept self-serving statements.

10   Why?  Because we all know, we all know that it's -- that the

11   indicia of reliability of those statements is almost none.

12   Kind of takes us to the reason why I mentioned the eight level

13   reduction.

14           So in evaluating the defendant's evidence, if you

15   will -- it's his burden, his burden to prove, to convince me

16   that what he is saying is, in fact, true.  So I do some things

17   when I'm evaluating -- evaluating evidence, right.  And I look

18   to see if there's a sufficient indicia of reliability.  So what

19   sorts of things do I look at in testing the defendant's

20   statements?

21           What's the defendant's interest in the outcome of the

22   case?  The greater the interest in the outcome of the case,

23   right, the more I think I need to be skeptical about what it is

24   that he or she is saying.  Because the greater the interest in

25   the outcome of the case, the greater the probability that what

1    he or she is telling me is not necessarily so.

2            Again, that takes me back to my discussion about the

3    eight level reduction as I mentioned last time.  We're talking

4    about a two level reduction.  Nobody is going to get heartburn,

5    really.  I mean, you're going to -- obviously, you're going to

6    pay attention to it.  You're going to be -- hopefully, you're

7    going to scrutinize it critically.  But when you're talking

8    about an eight level reduction, that's a whole lot of interest

9    in the outcome of the case.

10           So one might ask, would someone who's seeking to get

11   an eight level decrease in their guideline sentence, would they

12   be more likely to fabricate a story or to paint the story in

13   such a way as to make him or her look good.  And I think, you

14   know, unless you've been living your life under a rock, you

15   understand that the answer is of course they will.  They're

16   more likely to try to paint a better picture for themselves.

17   It's a given.

18           So we look and we ask ourselves, has the defendant

19   lied before?  Well, I know on at least two occasions, two

20   occasions, this defendant lied.  The first time, he came across

21   primary, he was asked, do you have anything to declare?  He

22   said no.  And then when he was taken into secondary, I believe

23   he was asked again.  And then when they found the drugs, he

24   said, I don't know anything about these drugs, or something to

25   that effect.  So we know he wasn't candid then.

1               As I mentioned before, you know, clearly the defendant

2      has a right not to incriminate himself.  There's no question

3      about that.  That's a constitutional right.  But, by the same

4      token, I've had I don't know how many cases over the years

5      where the defendants are stopped, they catch the drugs in the

6      car, and when they're taken in for an interview the defendant

7      begins to tell the story of what happened.  To me, that cuts in

8      the favor of the defendant because -- because it shows that

9      once -- once they've been caught, they're inclined to accept

10     and to be more truthful and candid.  And so, you know, were

11     they candid?  Did they speak freely?  The answer is no.

12              What about when they go before probation?  You know,

13     here's probation.  Probation is trying to prepare a report.

14     They help us.  Sometimes the reports they write make me, you

15     know, think about the case one way or think about the case the

16     other way.

17              Now, I understand that lawyers -- and, frankly, I've

18     never agreed, never agreed with the idea that lawyers would

19     keep their clients from talking to probation, particularly if

20     later on they're going to try and get some benefit out of, say,

21     for example, a 5K1.1.  I think it's counterproductive.  But did

22     they talk to probation?  Did they give probation a chance to

23     probe and test whether their statements, the statements that

24     they were making, were true?

25              Take, for example, in this case.  In this case, if the

```
1    defendant had talked to probation at the very first time on

2    July 5th and said, yeah, let me tell you what happened, here's

3    what happened, I had this girlfriend, and this girlfriend, her

4    dad was a big drug dealer, and the drug dealer guy asked me if

5    I would drive some drugs across the border, and so I did, and

6    I'm so sorry that I did that, that would go a long way towards

7    causing me to think that perhaps he was being credible.  Right?

8              But he chose not to do that.  I understand he did that

9    on advice of counsel.  That's fine.  I mean, he's got a right

10   not to speak.  I understand that.  And he certainly can -- and

11   your co-counsel there can be taking notes and -- you know,

12   because this will probably be his next issue is that the judge

13   refused to acknowledge the defendant's right to not incriminate

14   himself.  It has nothing to do with him incriminating himself.

15   It has to do with how I judge credibility.

16             And why is that important?  Because one of the things

17   that I always look at is did the defendant have time to

18   fabricate the story.  The sooner that the defendant tells the

19   story to law enforcement or to anyone, the less time that he or

20   she has to fabricate the story.  The more time that goes by and

21   the more opportunities that he has to tell the story, but that

22   he doesn't tell the story, leads me to conclude that there's a

23   great probability that the defendant is fabricating something

24   or another.

25             What else do I look to?  I look to see if there's
```

```
1   corroborating evidence.  So, for example, in some cases I've
2   had two people in a car, right, or someone in a car and a
3   scout.  And then I have some corroborating statements when they
4   talk, when -- I can look, and I can compare, and I can figure
5   out whether or not, you know, is there corroborating evidence
6   for the statements that the defendant has made.
7            Is there any other information that may weigh in on
8   the credibility of the defendant?  For example, his demeanor.
9   I wish I could remember the defendant's demeanor when he was
10  before me at the first sentencing.  I know what it's like
11  today.  But I don't remember.
12           I don't remember his -- I mean, I've read the
13  allocution, but I don't know -- I do remember -- actually, now
14  that I say that, I do remember something -- something odd about
15  his allocution.  I remember him saying something to the effect
16  that -- the pitch, the pitch that he was making to me.  I seem
17  to recall he used that word, which caused me to -- that's not a
18  word that's very commonly used, except for, you know, when the
19  used car salesman is trying to get you to buy that car that was
20  just totalled and they've just rebuilt it, they're making a
21  pitch to you to buy the car.  It's not the kind of language
22  that people normally used.
23           And so now, as I'm sitting here, I remember that he
24  may have used that word, which, you know, it's not a big deal,
25  it's not determinative.  You know, it doesn't cause me to say
```

 1   because of that I'm denying minor role.  But it does cause me

 2   to question the reliability of the -- and I'm going to use air

 3   quotes, which I hate, but I'm going to use air

 4   quotes -- reliability of the, quote, evidence, end of quote,

 5   that the defendant is providing to me that would cause me to

 6   believe that there's sufficient indicia of reliability that I

 7   should believe it and, therefore, find that he is substantially

 8   less culpable than the average participant.

 9          So, in determining minor role, I look at other things,

10   things that the Ninth Circuit has said over the years are

11   things that we should consider and that make perfectly good

12   sense.  And it makes perfectly good sense to a judge like me,

13   who's -- you know, as I said before, I've had over 1800 drug

14   cases in my career.

15          For example, the quantity of drugs.  The quantity of

16   drugs.  This is almost 13 kilos of methamphetamine.  When I

17   started back in 19- -- or 2004, you know, we used to see

18   quantities of one, two, three kilos.  13 kilos is a lot of

19   methamphetamine.  It's a lot of methamphetamine.

20          And why is that important?  Well, as the Court said in

21   Davies -- I think it was the case, I could be wrong but I think

22   it was Davies -- said, look, you're not likely to entrust a lot

23   of -- a high quantity of drugs to someone unless you've got

24   quite a bit of trust in them, you know them, they're part of

25   your organization.

1      What else do I look at?  Well, I look to see how many
2  times has the person done it.  So, for example, I've had cases,
3  it's the first time, one time, one time.  I've had cases like
4  this case, where the defendant had done it three, four times.
5  The more times they do it, the more likely it is that that
6  person doesn't really have a minor role.  I believe that the
7  Court of Appeals has so acknowledged.

8      Are they getting paid?  I've had cases where people
9  are getting paid 500 bucks.  In this case, I believe the
10  defendant was being paid 1500 to $2000 each time.  That's a big
11  different.  That's a lot of money.

12      What else do I look at?  Well, I look to see, for
13  example, did the defendant burn plates.  That's not typical
14  courier conduct.  I'm sorry, it's not typical.  I've had many,
15  many, many, many cases over the years where the defendants did
16  not burn plates.  I've had many, many, many, many cases where
17  the defendants did not drive a car across the border with a
18  false compartment, to verify that they could get across the
19  border with car that had a false compartment, as this defendant
20  did.

21      So when I look at all those things -- and I think I
22  mentioned the last time, you know, over the years I've had many
23  defense lawyers say to me, look, Judge, you know my client only
24  had a minor role, and you know that because, look, all he or
25  she did was drive the car across the border and park it at

1    the -- what is it -- Plaza of the Americas or at McDonald's or

2    whatever.  They didn't drive it into the heartland of the U.S.

3    When you drive it into the heartland of the U.S., it shows that

4    you have more trust by the organization.

5         I believe, as my good colleague Judge Burns has

6    pointed out, you know, when you drive that car across the

7    border, you know you're going to be facing a lot of scrutiny.

8    You're going to be facing dogs.  You're going to be facing

9    X-ray machines.  You're going to be facing people that are

10   trained to detect whether your hands are shaking, your voice is

11   shaking, et cetera.

12        You're not just driving drugs from, say, east LA to

13   Compton, like a courier would.  Like I've had those cases,

14   where the wiretaps have disclosed that that's what the person

15   was doing.  They were driving the drugs from, say, San Diego to

16   Encinitas, right.  But here, not only was this fellow trusted

17   enough to know that he could drive this car across the

18   international border, but, on top of that, he was trusted

19   enough, trusted enough that he had to drive them into the

20   heartland.  In order for him to get from where he started in

21   Calexico, to get those drugs to LA, he not only had to go

22   through the Calexico port of entry, where they're well trained

23   to find drugs, but then, on top of that, he had to either -- he

24   had to get past the Interstate 5 checkpoint.  And I understand

25   some of these may be closed from time to time, but, still, he

65

1    had to get through the Highway 5, 15, 86, 111, 94, or 8

2    checkpoints.  So he has to go through that double jeopardy not

3    once, but twice.

4            And on top of that, what else do we know?  We know he

5    was asked to drive drugs to Chicago.  You don't just give

6    someone 13 kilos of methamphetamine and say, hey, take these

7    drugs to Chicago for me, unless you're someone who's trusted in

8    the organization.  It's just not going to happen, not in my

9    experience in all the years being on the bench.

10           So I look at the 3B1.2 factors, by the way, which I'm

11   very, very familiar with.  I look at those, and I say to

12   myself -- oh, yeah, I told you that I was going to point out

13   something that was kind of interesting.

14           So I like to learn about what I'm doing right and what

15   I'm doing wrong.  So I read the mem dispos that are issued by

16   the Court of Appeals, particularly the ones that are issued

17   from our district.  And then I like to draw relationships

18   between things that I do and things that I've done and cases

19   that I've been in and other cases.  And I like to draw those

20   relationships so that I can, you know, hopefully not stub my

21   toe and not do something that I shouldn't be doing, right?

22           So I told you I was going to point out something to

23   you that's rather odd, if not absolutely -- well, it's just

24   interesting.  Let's put it that way.

25           So on the day that this case was decided, which I

1    believe was November 27th, the Court of Appeals decided another

2    case.  And that was a case called the United States of America

3    versus Daniel Marquez.  It's out of the Southern District of

4    California.  Now, I've read the sentencing memorandum in that

5    case.  I read the presentence report in that case.  I've read

6    the appellant's opening brief in that case.  By the way, in

7    that case, they made the same argument about the H1 attachment.

8    I read the government's opening brief, I read the reply, then I

9    read the memorandum disposition.

10           Now, let me read to you what the Court of

11    Appeals -- oh, oh, that's not what makes it odd.  That's not

12    what makes it odd.  What makes it odd is that -- here's what

13    the Court said in their mem dispo in that case.  I understand

14    it's not precedential, but we like to think that our reasoning

15    is somewhat consistent with -- you know, I mean, right?

16           Here's what the Court said:  The defendant argues that

17    the district court improperly failed to compare his culpability

18    to that of other likely participants in his drug smuggling

19    activity and misapplied or disregarded some of the factors

20    listed in the commentary to the guidelines.

21           The Court then said:  Notwithstanding the fact that it

22    was his burden to demonstrate his entitlement to a minor role

23    adjustment.

24           Again, the Court said:  Notwithstanding the fact that

25    it was his burden to demonstrate his entitlement to a minor

1    role adjustment, the record shows that Marquez did not identify

2    any other likely participants in his offense.

3          Actually, but in this case, there were other

4    coparticipants identified, and I've discussed them and analyzed

5    them and compared them to this defendant.

6          In that case, they also argued that we should

7    determine the likely participants by looking at this H1

8    attachment.  Oh, these are the other likely participants.  And

9    so, therefore, our client had to have a minor role, which is

10   essentially the same argument -- or one of the arguments that

11   you made and presented.

12         The Court then goes on to say, again, I quote:  In

13   light of the facts, including Marquez's multiple prior drug

14   crossings, the Court did not abuse its discretion in concluding

15   that Marquez had failed to show that he was substantially less

16   culpable than the average participant.  Moreover, Marquez's

17   assertion that he was merely a courier did not alone entitle

18   him to the adjustment.

19         Now, again, I have looked at the sentencing transcript

20   in that case, the sentencing memorandum, the presentence

21   report, all the appellate briefs in that case.  And so, in

22   essence, what the Court of Appeals in this case said, that was

23   decided on the same day, I'm reasonably certain of that, was

24   that it was the defendant's burden to prove that he was

25   entitled to minor role, that he had not identified any other

1   likely participants, and one of the things that they took into

2   consideration was his multiple prior crossings.

3          Now I will tell you that there is a slight difference.

4   In that case, the defendant had said that he had smuggled the

5   drugs five or six times.  But what else do we know about that?

6   The fact is he was being paid $500 per trip.  Your client was

7   being paid 1500 to $2000 a trip.  And why is that important?

8   Because if he was being paid $500 per trip, that means that he

9   was bringing across less drugs.  Your client is being paid

10  more.  He's bringing across more drugs.

11         But if you're still sitting here wondering, why is

12  Judge Benitez -- I mean, what's the matter with this guy?  Why

13  does he think that's so unusual?  Well, I'll tell you why it's

14  so unusual, because that was the very same panel, the very same

15  panel that decided this case.  So, in essence, they -- the very

16  same things that I have essentially alluded to, they found was

17  not an abuse of discretion, but in this case they thought it

18  was an abuse of discretion.

19         So I have considered the likely participants.  I know

20  who the people are that were involved in this case.  I've

21  compared them to the defendant.  The only other likely

22  participants are those that are conjectural and hypothetical in

23  an H1.

24         This defendant was driving drugs across the border and

25  had made multiple trips.  He was being paid.  He was being paid

1    a substantial amount.  And, frankly, I don't believe his story,

2    because I don't believe that he was really dating this girl for

3    five years, I think was -- I think that's what I recall, that

4    he'd been dating this girl for a long time, and, you know, he

5    was just -- all of a sudden, just somebody said to him, hey,

6    you want to drive some drugs, and, you know, that was it.  And

7    he didn't know anything else about the organization except for

8    that he knew the guy was a kingpin in a drug organization.

9           So, anyway, so to make a long story short, I've taken

10   a look at the 3B1.2 factors.  The degree to which he -- there

11   was planning.  Well, here's what we know.  We know that he

12   drove a vehicle.  It wasn't his vehicle.  We know that he drove

13   the vehicle several times across the border in order to burn

14   the plates.  We know that.  Now, was that planning?  You bet

15   you.

16          Now, I noticed -- you noticed -- or I noticed that in

17   your -- I think it was your appellate brief, or maybe it was

18   your reply brief, you included a definition of Merriam

19   Webster's for planning.  But for whatever reason, there was

20   one -- one part of the definition of Merriam Webster that you

21   did not include.

22          MR. OBENAUER:  Your Honor, could I ask that we be

23   seated --

24          THE COURT:  Oh, sure.  Of course.

25          MR. OBENAUER:  -- including my client?

1      THE COURT:  Sure.  One of the -- one of the things

2  that Merriam Webster says is that planning includes something

3  like arriving at a course of action in order to accomplish a

4  goal.  Well, it doesn't say that you have to be the planner.

5  It says the degree to which you participated in planning.

6      So this defendant agreed with Mr. Lares that he would

7  drive a car across the border in order to burn the plates.

8  That's planning.

9      Then he agreed that he would bring the car back across

10  the border, and he drove it back across the border, this time

11  with a false compartment.  And Randy showed him, here's a false

12  compartment, and, see, there's nothing in it.  That's planning.

13      Then he drove the car across the border again, and

14  this time they put drugs in the false compartment.  And then he

15  drove it back across the border.  That's planning.

16      And then he drove it back across the border again, and

17  they put more drugs in the vehicle, and he drove it back across

18  the border again.  All of that is planning.

19      Under any kind of definition of planning, that is

20  planning.  You have planned to accomplish a goal.  What is the

21  goal?  The goal is to smuggle the drugs across the border.  To

22  what degree did this defendant engage in planning?  A lot.  A

23  lot.  A lot more than many of the cases that I've had before me

24  over the years.

25      So -- so it seems to me that clearly he participated

1   in the act or process of making or carrying out plans.  There's

2   no question that he helped in carrying out the plans.  There is

3   absolutely no evidence that anyone held a gun to his head.

4   Nobody threatened his family.  Nobody threatened him.  He

5   wasn't acting under compulsion.

6           So if you look at the second factor under iii, did he

7   exercise discretion?  Of course, he did.  He exercised, first

8   of all, discretion to do it.  He exercised discretion in

9   driving the car back and forth and back and forth and back and

10  forth.  And we know that he could exercise discretion.  I know

11  that, you know, it's very common for people to say, well, he

12  was ordered to do this.  Well, no, he agreed to do this.  And

13  we know that he agreed to do it because he was asked to do

14  it -- to take the cars to Chicago, and he said no.  So he

15  wasn't being compelled to do this.  He exercised discretion.

16  He said, I'm going to do this with you in order to get the

17  drugs in.

18          Nature and the extent of his participation.  You know,

19  I don't know.  What's the crime?  What's the real relevant

20  evidence of this crime?  And that is that this fellow was

21  participating in the -- in bringing across a large quantity of

22  drugs into the United States.

23          I guess you could say maybe that might cut in his

24  favor, but, as we all know, the Ninth Circuit has said that

25  simply because one or more of these may cut in favor of the

1    defendant, that's not determinative.

2          The degree he stood to benefit.  You know, I don't

3    know, $2000 a trip, that's a considerable benefit.

4          So, you know, I'm pretty satisfied that, looking at

5    the totality of the facts and the evidence, the real evidence

6    that's before me, he should not get minor role, and I'm not

7    going to give him minor role.

8          So that gets us to -- to the guidelines.  And the

9    guidelines I calculate as follows -- give me just a second.  I

10   misplaced my guidelines calculation.  I never lose anything.  I

11   just can't find it when I'm looking for it.  Well, I think I

12   can do it without the benefit of the chart.

13         Ms. Kaiser, I don't suppose you have a copy of your

14   sentencing memorandum, do you?  I know you had recommended, I

15   believe it was 97 months.

16         MS. KAISER:  Yes, Your Honor.

17         THE COURT:  And I think I can probably get to it.

18         MS. KAISER:  Well, Your Honor, we recommended that

19   based on minor role.  But we also recommended that the Court do

20   the calculation, the alternative calculation.

21         THE COURT:  I know.  I'm going to get there.  I'm

22   going to get there.

23         MS. KAISER:  Okay.

24         THE COURT:  Trust me, I'm taking my time on this case

25   because --

73

1          MS. KAISER:  But if Your Honor's -- I can look up the

2     guidelines.

3          THE COURT:  I think this was a base offense level 38,

4     if I'm not mistaken.

5          MS. KAISER:  It is, Your Honor.

6          THE COURT:  Increased by two levels under 2D1.1, which

7     gets us to 40.  Minus three is 37.  And I believe the defendant

8     is in a -- has six criminal history points, which puts him in a

9     criminal history category III.

10         And I know I made an error last time that nobody

11    corrected me on, which, you know -- I think I used a criminal

12    history category I, rather than a criminal history category

13    III.  And if I'm not mistaken, that should lead to around a

14    233 --

15         MS. KAISER:  Your Honor, an adjusted offense level of

16    37, criminal history category III is 262 to 327, Your Honor.

17         THE COURT:  Right.  Were there any other reductions,

18    anything else that I missed, other than the minor role?

19         MS. KAISER:  No, Your Honor.  However, this case is

20    limited by a statutory maximum of 20 years.

21         THE COURT:  20 years, right.

22         MS. KAISER:  So I'm not sure if Your Honor necessarily

23    was incorrect.

24         PROBATION OFFICER:  Your Honor, I'm just reviewing the

25    notes that our officer took at the original sentencing hearing.

1   It doesn't explain the reason for it, but there is an

2   indication of a one level departure.

3          THE COURT:  Yeah, that was a 3553 -- 3553(a)

4   variance --

5          PROBATION OFFICER:  Okay.

6          THE COURT:  -- the government had asked me to give

7   because of his attempted -- attempted cooperation.

8          PROBATION OFFICER:  Very good.

9          THE COURT:  So I'm aware of that.  Okay.

10          So the guidelines in this case are 262 to 327 months.

11   Now, the 3553(a) variance, I would grant him a one level

12   3553(a) variance.  Why?  Because it's discretionary.  I don't

13   have to grant that, but I certainly would grant that if I found

14   that there was no minor role.  Why?  Because in the end, what

15   we are required to do is to impose a sentence based on 3553(a)

16   factors, right?

17          So I think that to impose a sentence for this

18   defendant of 262 months to 327 months would be unconscionable.

19   I would never do that.  So, yes, I would grant the one level

20   variance in the 3553(a).  In fact, I probably would grant many,

21   many, many more levels because, in the end, when I do a 3553(a)

22   calculation, I think that 120 months was the reasonable

23   sentence.  And I think that's what I imposed, wasn't it?

24          MS. KAISER:  It is, Your Honor.  Again, just a matter

25   of semantics because of the record, and I think, Your Honor,

1  you understand, but, again, I want to make this very clear, he

2  is -- he has a statutory maximum of 20 years, so he cannot --

3          THE COURT:  Yeah.  That's 240 months.

4          MS. KAISER:  -- he can go no higher than 240 months,

5  Your Honor.

6          THE COURT:  Yes, I know.  But, frankly, I would never

7  impose 240 months in this case.

8          MS. KAISER:  Correct, Your Honor.

9          THE COURT:  Never.

10         MS. KAISER:  Your Honor did not do that last time

11 either.

12         THE COURT:  No, I would never do that.  In fact, I

13 varied down considerably in order to get myself down to

14 120 months, which, as the saying goes, no good deed goes

15 unpunished.

16         So those are my calculations.  Now, if I gave him

17 minor role, the calculations would be as follows -- which I'm

18 not.  I'm not.  Glenn, don't write this down.

19         THE CLERK:  I'm not.

20         THE COURT:  All right.  The calculations would be

21 38 -- base offense level of 38, reduced down to 34 under

22 2LD1.1(c)(1) and (a)(5).  Reduced by further two levels for

23 role, three levels for acceptance.  He has a criminal history

24 score of six, criminal history category III.

25         Now, that guideline range would be 108 months to

1    135 months.  So the sentence that I imposed of 120 months was

2    consistent with the guidelines.  It was a mid-range sentence

3    for someone who is in a criminal history category III, so 108

4    months to 135 months.  I believe 120 months is pretty close to

5    mid range.

6            Now, because I believe that 120 months is a reasonable

7    sentence to impose, there would be no reason for me to give him

8    a 3553(a) variance at that point in time.

9            Now, if I don't give him minor role, then I believe

10   that the sentence would be too high.  And so I would give him a

11   3553(a) variance.  But if I give him minor role, then I think

12   the guideline range is spot on, 108 to 135 months.  And that's

13   what I would give him is 120 months.

14           Now, in deciding whether or not -- my sentence, as we

15   all know, what I do is I take a look at the 3553(a) factors.

16   So the 3553(a) factors require that I look at the seriousness

17   of the offense.

18           Now, let me tell you about the seriousness of the

19   offense.  This gentleman was importing into the United States

20   pretty close to 13 kilos of methamphetamine.  As I pointed out

21   last time, methamphetamine is a serious issue, and it's a

22   serious offense.  13 kilos of methamphetamine.

23           Let me point out to you just how serious this is.  If

24   we assume, hypothetically, that a meth user uses anywhere

25   between a quarter of a gram to half a gram of meth.  13 kilos

1    of methamphetamine, if I look outside my window, normally I see

2    two aircraft carriers parked outside my window.  Between the

3    crew and the air wings that those aircraft carriers carry,

4    that's about five people -- 5,000 people.  If you got 13 kilos

5    of methamphetamine into the United States, you would have

6    enough methamphetamine to get five aircraft carriers high.  You

7    could give methamphetamine to every member of the crew, every

8    member of the air detachment on those aircraft carriers, and

9    they would all be high.

10          If he'd gotten that 13 kilos of methamphetamine into

11   the United States, every person in the city of Brawley would be

12   high.  Every person in the city of Imperial Beach would be

13   high.  If you figured out the average attendance at a Padres

14   game, 13 kilos of methamphetamine, you could have every Padre

15   fan high on that much methamphetamine.

16          That's a lot of methamphetamine.  So is this a serious

17   offense?  You betcha.

18          I look at the defendant's history and characteristics.

19   Yeah, so he had a tough background, and he had financial

20   difficulties.  So did the guy in the Marquez case.  As I told

21   you previously, he had a difficult upbringing.  He had

22   financial difficulties.  Almost every defendant that appears

23   before me that's a drug smuggler says, oh, my gosh, I had a

24   terrible upbringing.  I had -- I needed the money.  I've

25   considered that.  I don't think there's anything about that

1   that's extraordinary.

2           Deterrence, another factor that we consider in the

3   3553(a) factors.  I'm trying to remember -- I think,

4   Mr. Obenauer, you'd asked for like 57 months or something?

5           MR. OBENAUER:  Yes.

6           THE COURT:  Yeah.  57 months, that wouldn't deter

7   anyone from bringing 13 kilos of methamphetamine into the

8   United States.  That's not deterrence.  Deterrence is a

9   sentence that is sufficiently significant that will cause this

10  defendant and possibly others who learn of it to not do what he

11  has done.

12          Now, we spend a lot of money and a lot of time and a

13  lot of effort with the sentencing commission.  As I said, I

14  just came back from a sentencing commission seminar.  Here are

15  these people who are charged with trying to tell us what they

16  think a reasonable sentence is for a reasonable -- for a

17  certain offense, and they concluded that the reasonable

18  sentence, if I don't give him minor role, is 262 months.  Why?

19  Because they say 262 months will deter people from committing

20  these types of offenses.

21          Well, I think that's excessive.  I do.  I think it's

22  excessive.  57 months, no way.  No way.  And I'll show

23  you -- I'll show you that I'm right in just a couple minutes.

24  So the deterrence factor, in my opinion, fully, fully satisfies

25  a 120-month sentence.

1        Protection of the public.  As I said, we could have

2   every person in the city of Imperial Beach high with this much

3   methamphetamine.  We need to protect the public.  I've told you

4   what's happening in San Diego County with methamphetamine, the

5   number of deaths that we're having, the number of people

6   admitted to emergency rooms, the number of juveniles that are

7   being arrested and how it's growing.  Do we need to protect the

8   public?  You betcha.

9        The types of sentences available to me, yeah, I can go

10  262 months.  I would be willing to bet dollars to doughnuts

11  that the Ninth Circuit wouldn't -- you know, wouldn't affirm

12  that, and I wouldn't blame them.

13       57 months, no way.  I've done 57 months for people

14  with a lot less methamphetamine, who've maybe done it the first

15  time or whatever, but there's no way that I'm going to do that

16  in this case.

17       So I've considered -- you know, I've looked at the

18  3553(a) factors, and I think a 120-month sentence is perfectly,

19  perfectly justified in this case.

20       Now, if I used minor role, I'd get to the 120-month

21  sentence.  If I don't give him minor role, I get to the

22  120-month sentence.  Either way.  And they're both reasonable.

23  Either way, either way, however you calculate it, 120 months is

24  reasonable.

25       Now there was something else that was odd about the

1   mem dispo in this case.  In the mem dispo in this case, the
2   Court said:  We're not going to decide whether 120 months is
3   substantively reasonable.
4           Well, I'm going to see if I can explain why I think it
5   is.  So in the other case that I was telling you about that
6   they decided on the very same day, from the same district, with
7   the same factual scenario, almost identical, almost identical,
8   the sentence that was upheld in that case was 78 months.
9           Now, you say, ooh, 78 months, 120 months.  Now, you
10  get a law clerk -- one law clerk looks at this sentence, says,
11  oh, 120 months, oh, look at this sentence, this is 78 months.
12  Oh, well, this one's got to be unreasonable.  Well, that's be
13  true if you were not very experienced at sentencing.  Because
14  if you were experienced at sentencing, here's what you'd find.
15  You'd find that in a case where the 78-month sentence was
16  imposed, it was -- the amount of methamphetamine that was being
17  brought in was 8.72 kilograms.  The amount of methamphetamine
18  that was being brought in, in this case was 12.9 kilograms.
19          Now, if you do a calculation, I mean, you figure that
20  out, which I suspect you probably could or should, that's
21  approximately 48 percent more methamphetamine in this case than
22  there was in the other case.  And we all know that amount,
23  although some people say, oh, amounts shouldn't matter, but
24  they do matter.  They matter in all sorts of sentencings that
25  we do.  For example, in financial crimes, we always take amount

1    into account.  And we know amount counts -- or is something

2    that we should consider.  And how do we know that?  Well, we

3    know that because Congress has used amounts, right?

4            For example, in minimum mandatories, they use amounts.

5    In determining the sentence under 960, amounts count.  The

6    sentencing guidelines, you know, all that work, all that

7    effort, they just rewrote those not too long ago.  They went

8    through all of that exercise, and, again, they concluded that

9    amount matters.

10           The Ninth Circuit has said so, that amount matters,

11   it's important.  Amounts greater than one kilo, for example,

12   means that you can make certain findings.  So we know that

13   amounts matter.  So here, we have this defendant is bringing in

14   48 percent more methamphetamine than the defendant who is

15   sentenced to 78 months, that the very, very same panel found to

16   be reasonable.

17           But that's not where the inquiry ends.  Because if we

18   look at the guideline calculations in that case, we find that

19   that defendant was eligible for safety valve.  That's a two

20   level reduction right off the top, right off the top.  What

21   else do we know?  The defendant was eligible for fast track.

22   That's a four level reduction.

23           Now, this defendant is not eligible for safety valve,

24   and he's not eligible for fast track either.  There's six

25   levels off from the base offense level of 38, right off the

82

1    top, six levels off.

2            It doesn't end there, though, because, on top of that,

3    that defendant was in a criminal history category I.  This

4    defendant is in a criminal history category III.  This

5    defendant had been convicted of a 273.5, something which I

6    believe the Ninth Circuit has said is a violent aggravated

7    offense.  That defendant had not.

8            Then, lastly, this defendant was on probation.

9    Something we know about this defendant, the defendant was

10   originally put on probation for something -- I can't remember

11   what it was -- I think that was in 2014.  Before his

12   probationary period was over, he committed another offense, the

13   273.5.  And he was sentenced to 180 days in that offense.

14           He was put on probation.  He was admonished by the

15   state court judge.  I know that.  And the state court judge

16   said, hey, you're not to commit any other state, federal, or

17   local crime.  Before that probation was done, he committed this

18   doozy of an offense.

19           So when you take all those factors that I've just laid

20   out for you, you look at them, and you say, okay, so this very

21   same panel, the very same panel that wanted me to -- to explain

22   or who wants to decide whether or not my sentence is

23   substantively unreasonable, said that 78 months was reasonable

24   for a fellow who had no prior criminal history, was eligible

25   for safety valve, was eligible for fast track, was not on

1  probation.

2  When you put all those things together, you say to

3  yourself, well, is 120 months reasonable?  If you looked at the

4  variance from the guidelines, the actual guidelines -- if you

5  looked at the variance, I believe the guideline range was

6  approximately 120 months on that other case.  I think that was

7  the low end.  And the judge varied down to 78 months.

8  And I, on the other hand, am willing to vary down from

9  262 months -- I understand, I know, I know, Ms. Kaiser, I know

10  the maximum is 240 months -- but I'm willing to vary down to

11  120 months.

12  So those are my reasons for imposing a 120-month

13  sentence.

14  Now, I'm not totally indifferent to your arguments,

15  Mr. Obenauer, that this defendant has, in my opinion -- so my

16  view is this.  Look, you go to prison, you should make use of

17  going to prison.  You shouldn't necessarily be rewarded for

18  doing that which is probably in your best interest to do.

19  But, perhaps this defendant has gone that little extra

20  mile.  He's done a little more than he should have in this

21  amount of time.  And so I understand that he's worked, and he's

22  done things while he's in prison.  I understand that Pepper

23  instructs us that we can and should perhaps look at those

24  things.

25  So although previously I imposed a sentence of

1    120 months, I'm going to vary down to 110 months.  I'll give

2    him credit for 10 months for the work that he's put into

3    the -- into this case -- or into his sentence.

4              Now, I believe I imposed five years of supervised

5    release last time, right?

6              PROBATION OFFICER:  Correct, Your Honor.

7              THE COURT:  Okay.  And I believe the maximum is life.

8    I believe the -- at least, the minimum, since he's not safety

9    valve eligible, I think it's five years, right?

10             PROBATION OFFICER:  We're talking about supervised

11   release, right?

12             THE COURT:  I'm sorry?

13             PROBATION OFFICER:  Supervised release we're talking

14   about?

15             THE COURT:  Yes.

16             PROBATION OFFICER:  Yes, five years to life, with no

17   safety valve.

18             THE COURT:  Right.  And I believe I gave him five

19   years, which was the minimum, the minimum supervised release

20   that I could give him last time.  And I'm going to reimpose the

21   same term of supervised release this time, on the same terms

22   and the same conditions that I imposed previously.

23             Glenn, do you have those conditions for me?  Because I

24   better read them on the record.  Otherwise, it'll be argued

25   that I didn't --

1          MS. KAISER:  Your Honor, again, this is a 20-year

2    imprisonment sentence, so it's at least three years to life

3    imprisonment for supervised release.

4          PROBATION OFFICER:  That's actually correct, Your

5    Honor.  My apologies.

6          THE COURT:  All right.

7          MS. KAISER:  It's not a minimum at five years, just to

8    make sure --

9          THE COURT:  Okay.  Al right.  Well, thank you for

10   correcting me on that.

11         All right.  So I could impose three years.  I could

12   impose life.  I think five years is -- for 13 kilos of

13   methamphetamine, somebody who's in a criminal history category

14   III, I think we need to do what we can in order to try to

15   encourage this gentleman when he is released from custody to

16   become a law-abiding, productive member of society.  And I

17   think supervised release helps considerably in that regard.

18   So, I believe that five years supervised release is

19   appropriate.

20         So, as a condition of supervised release, you'll

21   comply with all standard and mandatory conditions of supervised

22   release, including the following:  He will not enter or reside

23   in the Republic of Mexico without permission of the Court or

24   the probation officer.  He'll participate in a program of drug

25   or alcohol abuse treatment, including drug testing and

1    counseling as directed by the probation officer.  And he'll

2    allow for reciprocal release of information between the

3    probation officer and the treatment provider.

4            He'll be required to contribute to the cost of

5    services rendered in an amount to be determined by the

6    probation officer based on his ability to pay.

7            He'll report all vehicles owned or operated or in

8    which he has an interest to the probation officer.  And he'll

9    resolve all outstanding warrants within 60 days.

10           Furthermore, he'll submit his person, his property,

11   his residence, his office or his vehicle to a search conducted

12   by a United States probation officer at a reasonable time and

13   in a reasonable manner based upon reasonable suspicion of

14   contraband or evidence of a violation of a condition of

15   release.  Failure to submit to a search may be grounds for

16   revocation.  And he shall warn any other residents that the

17   premises may be subject to searches pursuant to this condition.

18           Now, the guideline range for a fine is $40,000 to one

19   million dollars.  Apparently, I did not impose a fine last

20   time; is that right?

21           THE CLERK:  No, you did.

22           THE COURT:  I did.  How much?

23           THE CLERK:  5,000.

24           MR. OBENAUER:  I believe it was $500, Your Honor.

25           THE CLERK:  500.

```
1                    THE COURT:  How much?

2                    THE CLERK:  500.

3                    THE COURT:  500?

4                    THE CLERK:  Yeah.

5                    THE COURT:  Well, I must have been in a good mood that

6       day.  Well, all right.  I'll impose a fine of $500 payable

7       through the financial responsibility program, payable at the

8       rate of no less than $25 per quarter.  And I'll further impose

9       a hundred dollar special assessment, also to be paid, along

10      with the fine, on the same terms and conditions I just

11      mentioned.

12                   All right.  I've imposed a sentence that I believe to

13      be sufficient but not greater than necessary.

14                   Mr. Obenauer, is there anything that I have missed?

15      Anything that I have overlooked?  Anything that you would like

16      for me to address further?

17                   MR. OBENAUER:  Just western regional as a designation,

18      western regional.

19                   THE COURT:  Sounds fair.  I'll so recommend.  Anything

20      else?

21                   THE CLERK:  Are there any appellate rights or

22      anything, Judge?

23                   THE COURT:  Yeah, just a second.  Just a second.

24                   Anything else?  Going once.  Going twice.  Going three

25      times.  All right.
```

88

1        Mr. Obenauer, do me a favor, deliver the conditions of

2   supervised release to Mr. Delgado-Vega.

3        Mr. Delgado-Vega, you have in your possession a copy

4   of the supervised release conditions.  If you violate any of

5   those conditions, sir, you can be placed in custody for up to

6   an additional five years, and that's five years over and above

7   the 110 months that I've imposed today, and over and above any

8   other sentence that you might receive for any other offense

9   that you might commit.

10       Now, sir, I wish to tell you I've imposed a sentence

11  that's greater than the hundred months that you had agreed

12  would be a waiver of your appeal rights.  Since I imposed

13  110 months, sir, you have a right to appeal if you wish to

14  appeal.

15       If you wish to appeal, you must file a notice to

16  appeal with this Court, not with the Ninth Circuit.  The notice

17  must state specifically what it is that you're appealing from.

18  You do have a right to have a lawyer, and I assume that

19  either -- well, Mr. Obenauer, as the attorney of record, will

20  continue to represent you, at least through the filing of the

21  notice of appeal.  The notice must state specifically what it

22  is that you are appealing from, and it must be filed within

23  14 days from the date of the judgment.

24       Is there anything else that I have failed to address?

25  If not, thank you very much.  It's been a pleasure.  Concludes

98

1    this hearing.  Thank you.  We're in recess.

2         (The proceedings concluded at 5:00 p.m., July 1, 2019.)

3              COURT REPORTER'S CERTIFICATE

4

5         I, CYNTHIA R. OTT, Official Court Reporter, United States

6    District Court, Southern District of California, do hereby

7    certify that pursuant to 28 U.S.C. §753 the foregoing is a

8    true, complete and correct transcript of the stenographically

9    reported proceedings had in connection with the above-entitled

10   matter and that the transcript page format is in conformance

11   with the regulations of the Judicial Conference of the United

12   States.

13

         DATED at San Diego, California, October 8, 2019.

14

15

16              _____/s/ CYNTHIA R. OTT_____
                CYNTHIA R. OTT, RDR, CRR
17

18

19

20

21

22

23

24

25

# ORDER UNSEALING DOUCUMENTS

date filed: June 10, 2019

**FILED**

Jun 10 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____s/ darcig_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 16cr2609 BEN |
|---|---|
| Plaintiff, | **ORDER UNSEALING DOCUMENTS** |
| v. | |
| ARTURO DELGADO-VEGA, | |
| Defendant. | |

It is ordered that the following documents filed in this case shall be unsealed and accessible on cm/ecf:

Defendant's Sentencing Summary Chart (filed 10/20/17) (docket no. 57);

Defendant's Sentencing Memorandum (filed 10/20/17) (docket no. 56); and

Defendant's Ex Parte Application to Seal Sentencing Memorandum and Sentencing Summary Chart (filed 10/20/17) (docket no. 54).

Dated: June /0, 2019

Hon. Roger T. Benitez
United States District Judge

# REPORTER'S TRANSCRIPT: FIRST RESENTEING HEARING

date held: May 28, 2019

```
14:31:33   1              UNITED STATES DISTRICT COURT

           2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

           3

           4   UNITED STATES OF AMERICA,          .
                                                  .
           5        PLAINTIFF,                    . NO.16-CR-2609
                                                  .
           6             V.                       . MAY 28, 2019
                                                  .
           7   ARTURO DELGADO-VEGA,               . SAN DIEGO, CALIFORNIA
                                                  .
           8        DEFENDANT.                    .
               . . . . . . . . . . . . . . . . . .

           9

14:31:33  10

          11              TRANSCRIPT OF PROCEEDINGS
                     BEFORE THE HONORABLE ROGER T. BENITEZ
          12              UNITED STATES DISTRICT JUDGE

          13   APPEARANCES:

          14   FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                                       BY: CHARLOTTE E. KAISER
          15                           880 FRONT STREET, ROOM 6293
                                       SAN DIEGO, CALIFORNIA  92101
          16
               FOR THE DEFENDANT:      LAW OFFICE OF GREGORY D. OBENAUER
          17                           BY: GREGORY D. OBENAUER
                                       1901 FIRST AVENUE, SUITE 213
          18                           SAN DIEGO, CALIFORNIA  92101

          19   COURT REPORTER:         JULIET Y. EICHENLAUB, RPR, CSR
                                       USDC CLERK'S OFFICE
          20                           333 WEST BROADWAY, ROOM 420
                                       SAN DIEGO, CALIFORNIA  92101
          21                           JULIET_EICHENLAUB@CASD.USCOURTS.GOV

          22

          23

          24
               REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER
          25
```

14:31:33    1          SAN DIEGO, CALIFORNIA; MAY 28, 2019; 2:31 P.M.

            2                            -OOO-

            3          THE CLERK:  FOUR ON CALENDAR, 16CR2609, USA VS.

            4  ARTURO DELGADO-VEGA, SENTENCE ON REMAND WITH A PRESENTENCE

            5  REPORT.

            6          MR. OBENAUER:  GOOD AFTERNOON, YOUR HONOR.  GREG

            7  OBENAUER ON BEHALF OF MR. DELGADO.

            8          THE COURT:  BEFORE WE GET STARTED, I NEED TO GO GET

            9  SOMETHING IN MY CHAMBERS.  I'LL BE RIGHT BACK.

           10          MR. OBENAUER:  OKAY.

           11          (PAUSE IN THE PROCEEDINGS.)

           12          MR. OBENAUER:  MR. DELGADO IS PRESENT IN COURT.  MAY

           13  I HAVE A MOMENT, YOUR HONOR?

           14          THE COURT:  SURE.

14:33:21   15          (PAUSE IN THE PROCEEDINGS.)

           16          THE COURT:  OKAY.  THIS MATTER IS SET FOR A

           17  RESENTENCING THIS AFTERNOON.  LET ME START OUT BY MAKING A

           18  COUPLE COMMENTS.  FIRST OF ALL, WITH REGARDS TO THE LAW, I

           19  UNDERSTAND THAT THE GUIDELINES ARE ADVISORY, THAT I'M TO IMPOSE

           20  SENTENCE BASED ON 3553(A).  NOW I NOTE THAT THE DEFENDANT HAS

           21  ADMITTED TO SMUGGLING, I BELIEVE IT'S PRETTY CLOSE TO 13 KILOS

           22  OF METHAMPHETAMINE, IF I'M NOT MISTAKEN.

           23          NOW I ALSO NOTE, FOR THE RECORD, THAT IN IMPOSING

           24  SENTENCE THE COURT IS TO CONSIDER WHETHER OR NOT THE DEFENDANT

           25  HAD A MINOR ROLE IN THIS SMUGGLING OFFENSE AND THAT I'M TO

14:34:11    1   CONSIDER THE FIVE SO-CALLED NON-EXHAUSTIVE FACTORS IN 394 --

            2   I'M SORRY, 794 OF THE GUIDELINES, BUT I NOTE THAT THEY ARE

            3   NON-EXHAUSTIVE.  AND AS I SAID, I NOTE THAT THE GUIDELINES ARE

            4   NOT BINDING ON THE COURT.  THEY'RE SIMPLY ADVISORY GUIDELINES

            5   AND THAT'S WHAT THEY WERE MEANT TO BE AND HAVE ALWAYS BEEN HELD

            6   TO BE, NOT CONTROLLING.

            7        SO IN DECIDING WHETHER OR NOT THE DEFENDANT SHOULD

            8   RECEIVE A MINOR ROLE, UNDER 3B1.2, MY UNDERSTANDING OF THE LAW

            9   IS THAT THE COURT IS TO CONSIDER OTHER KNOWN PARTICIPANTS.

           10   THEY DON'T HAVE TO BE NAMED.  THEY DON'T EVEN HAVE TO BE

           11   CO-INDICTED OR CO-DEFENDANTS, BUT THEY CAN'T BE AND ARE NOT TO

           12   BE HYPOTHETICAL.  I ALSO NOTE THAT THE DEFENDANT HAS THE BURDEN

           13   OF PROOF ON THE ISSUE OF MINOR ROLE, NOT THE GOVERNMENT AND NOT

           14   THE COURT, BUT THE DEFENDANT HAS THAT.  SO WITH THAT -- BEFORE

14:35:45   15   I GO ANY FURTHER, I WANTED TO ASK THE GOVERNMENT, WHAT'S THE

           16   GOVERNMENT'S RECOMMENDATION IN THIS CASE?

           17        MS. KAISER:  OUR FINAL RECOMMENDATION IS 97 MONTHS

           18   CUSTODY, YOUR HONOR.  THAT WAS OUR PREVIOUS RECOMMENDATION.  AT

           19   THE TIME, THOUGH, HE HAD NOT SERVED PARTS OF HIS SENTENCE.  SO

           20   AS ONE OF THE CONSIDERATIONS THE COURT MAY TAKE INTO ACCOUNT --

           21        THE COURT:  YEAH, YOU'RE GOING TO MENTION PEPPER, BUT

           22   YOU KNOW, IT SOUNDS LIKE HE'S BEEN DOING WHAT HE'S EXPECTED TO

           23   DO WHICH IS TO BE A GOOD DEFENDANT AND PARTICIPATE IN PROGRAMS

           24   THAT MIGHT ASSIST HIS, HOPEFULLY, REHABILITATION WHEN HE GETS

           25   OUT.  IS THAT WHAT YOU'RE REFERRING TO?

14:36:27  1                MS. KAISER:  YES, YOUR HONOR.

          2           THE COURT:  I NOTICED MR. OBENAUER RAISED THAT IN HIS

          3    BRIEF.  BY THE WAY, I DIDN'T SEE A REPLY OR OPPOSITION BRIEF

          4    FROM THE GOVERNMENT.

          5           MS. KAISER:  WE FILED A SENTENCING MEMORANDUM EARLIER

          6    ON.

          7           THE COURT:  BUT NOT FOLLOWING MR. OBENAUER'S LAST

          8    BRIEF, RIGHT?

          9           MS. KAISER:  NO.  WE FILED ONE ON FEBRUARY 19, 2019;

         10    AND THE OTHER BRIEFS, WE DIDN'T FILE ANYTHING IN RESPONSE TO

         11    THOSE BECAUSE WE DIDN'T HAVE ANYTHING FURTHER TO ADD, YOUR

         12    HONOR.

         13           THE COURT:  ALL RIGHT.  WELL, I HAVE CONSIDERED HIS

         14    BEHAVIOR WHILE HE'S IN PRISON, AS RAISED BY MR. OBENAUER.  NOW

14:37:11 15    BEFORE I GO ANY FURTHER, MR. OBENAUER, DID YOU WRITE -- BY THE

         16    WAY, MS. KAISER, LET ME JUST SAY THAT I THOUGHT THAT WHOEVER

         17    WROTE THE BRIEF, THE GOVERNMENT'S OPPOSITION BRIEF, IN THIS

         18    CASE DID ONE EXCELLENT JOB.  WHEN I SAW THAT BRIEF, I THOUGHT

         19    THIS IS POSSIBLY THE BEST BRIEF THAT I'VE SEEN COME OUT OF THE

         20    GOVERNMENT'S, THE AUSA'S, OUT OF YOUR OFFICE EVER.  I THOUGHT

         21    IT WAS SUCCINCT.  I THOUGHT IT WAS TO THE POINT.  I THOUGHT IT

         22    ADDRESSED ALL OF THE ISSUES IT NEEDED TO ADDRESS.  SADLY,

         23    APPARENTLY, THE NINTH CIRCUIT DIDN'T AGREE.  NOW, MR. OBENAUER,

         24    DID YOU WRITE YOUR BRIEF, YOUR APPELLATE BRIEF?

         25           MR. OBENAUER:  I WROTE IT IN CONJUNCTION WITH

```
14:38:05    1  ATTORNEY DOYLE.

            2          THE COURT:  WELL, I'M A LITTLE CONCERNED ABOUT A

            3  COUPLE OF THINGS IN THAT BRIEF.  LET ME TELL YOU WHAT THEY ARE.

            4  THE FIRST THING IS THAT SOMEWHERE IN THAT BRIEF YOU EITHER

            5  IMPLIED OR EXPRESSED THAT I DO NOT GRANT MINOR ROLE.

            6          MR. OBENAUER:  I DON'T RECALL THAT SPECIFIC SENTENCE,

            7  YOUR HONOR.

            8          THE COURT:  ONE OF YOU HAS TO REMEMBER THAT AT A

            9  MINIMUM YOU IMPLIED IT, IF YOU DID NOT EXPRESSLY SAY IT.

           10          MR. OBENAUER:  COULD HAVE BEEN ME, YOUR HONOR.  I

           11  DON'T KNOW.

           12          THE COURT:  WHY WOULD YOU SAY THAT?  WHY WOULD YOU

           13  SAY THAT?

           14          MR. OBENAUER:  WELL, THAT'S WHAT YOU DO.  YOU DON'T

14:38:48   15  GIVE OUT MINOR ROLE.

           16          THE COURT:  THAT'S NOT TRUE.

           17          MR. OBENAUER:  OKAY.  WELL, GOOD.

           18          THE COURT:  YOU KNOW, IN 20 YEARS AS A LAWYER -- I'LL

           19  SAY I WAS PROBABLY AT LEAST AS GOOD A LAWYER AS YOU ARE, IF NOT

           20  BETTER.  IN 20 YEARS, I NEVER, EVER DARED SAY ANYTHING ABOUT A

           21  JUDGE THAT WASN'T TRUE.  I PRESIDED OVER AT LEAST 1800 DRUG

           22  CASES IN MY CAREER.  NOW, IF YOU GO AND LOOK, AS YOU PROBABLY

           23  KNOW, FOR A LONG, LONG, LONG, LONG TIME THE GOVERNMENT HAD AN

           24  ESCAPE CLAUSE IN THEIR PLEA AGREEMENTS -- IN FACT, THIS MAY BE

           25  ONE OF THOSE CASES, IF I'M NOT MISTAKEN -- THAT ALLOWED THE
```

5
107

14:39:30  1  DEFENDANT TO APPEAL IF THE COURT DID NOT GRANT MINOR ROLE.

2      NOW, I WOULD LIKE FOR YOU TO GO BACK AND LOOK AT THE

3  NUMBER OF CASES -- I'VE BEEN AFFIRMED ON SOME, I'VE BEEN

4  REVERSED ON SOME -- I'D LIKE YOU TO FIND OUT HOW MANY OF THOSE

5  CASES OUT OF THOSE 1800 CASES I HAVE DENIED MINOR ROLE.  I'LL

6  BET YOU'LL FIND IT'S ACTUALLY A VERY, VERY SMALL NUMBER.  I

7  WOULD NEVER, EVER DARE SAY SOMETHING ABOUT A JUDGE THAT I

8  DIDN'T KNOW WAS TRUE.  I DON'T UNDERSTAND WHY YOU WOULD DO

9  THAT.

10      NOW MS. KAISER, ARE YOU GOING TO TELL ME THIS IS NOT

11  ONE OF THE MINOR ROLE ESCAPE CASES?

12      MS. KAISER:  NO, IT'S NOT, YOUR HONOR.

13      THE COURT:  OKAY.  THEN I STAND CORRECTED ON THAT.

14      MS. KAISER:  IT WAS 100 MONTHS.

14:40:16  15      THE COURT:  THAT'S WHAT IT WAS.  IT WAS A 100-MONTH

16  CAP ON THE -- BUT THE GOVERNMENT DID USED TO HAVE THAT AS A

17  STANDARD CLAUSE IN YOUR PLEA AGREEMENTS THAT SAID THAT IF THE

18  COURT DID NOT GRANT MINOR ROLE THE DEFENDANT RESERVED THE RIGHT

19  TO APPEAL; RIGHT?

20      MS. KAISER:  THAT'S CORRECT, BUT THAT'S NOT WHAT THIS

21  IS.

22      THE COURT:  THAT'S NOT ONE OF THOSE.  OKAY.  SO IF

23  YOU LOOK, MR. OBENAUER, AT THE NUMBER OF CASES THAT I'VE

24  SENTENCED AND THE NUMBER OF TIMES THAT I'VE DENIED MINOR ROLE,

25  I'D BE WILLING TO BET THAT IT'S A VERY, VERY, VERY SMALL

14:40:42  1  NUMBER.  NOW YOU ALSO APPARENTLY TOOK ISSUE WITH THE FACT THAT

          2  I RAISED THE FACT THAT IN A CASE LIKE THIS A MINOR ROLE RESULTS

          3  IN AS MUCH AS AN 8-LEVEL REDUCTION IN THE GUIDELINES.  YOU

          4  RAISED THAT ISSUE.  YOU SAID THAT.  AND APPARENTLY YOU DIDN'T

          5  UNDERSTAND WHY I SAID WHAT I SAID.  NOW I'M SURE YOU WILL

          6  AGREE -- HOW MANY CASES HAVE YOU TRIED, BY THE WAY, MR.

          7  OBENAUER, HERE IN FEDERAL COURT?

          8          MR. OBENAUER:  JUDGE, IN FEDERAL COURT, NOT THAT

          9  MANY, YOUR HONOR.

         10          THE COURT:  HOW MANY?

         11          MR. OBENAUER:  I GUESS A HALF DOZEN.

         12          THE COURT:  AND HOW LONG HAVE YOU BEEN PRACTICING?

         13          MR. OBENAUER:  WELL, I DON'T RECALL OFFHAND WHEN I

         14  STARTED.  I STARTED IN THE '90S.

14:41:34 15          THE COURT:  SO SINCE 1990, YOU TRIED SIX CASES IN

         16  FEDERAL COURT, MORE OR LESS?

         17          MR. OBENAUER:  THAT'S RIGHT.

         18          THE COURT:  NOW, YOU WOULD AGREE WITH ME, WOULD YOU

         19  NOT, MR. OBENAUER, THAT BOTH IN YOUR FEDERAL CAREER AND IN YOUR

         20  STATE CAREER, THAT YOU'LL FIND THAT THERE ARE SOME CASES THAT

         21  ARE MORE SERIOUS THAN OTHER CASES; WOULD YOU AGREE WITH THAT?

         22          MR. OBENAUER:  THERE ARE SOME CASES THAT ARE MORE

         23  SERIOUS THAN OTHER CASES, YES.

         24          THE COURT:  SO FOR EXAMPLE, YOU WOULD TAKE, SAY, A

         25  CAPITAL CASE MORE SERIOUSLY -- EVEN THOUGH THEY'RE ALL

14:42:10  1   IMPORTANT, WE ALL AGREE THEY'RE ALL IMPORTANT -- BUT SURELY,

       2   YOU'LL AGREE THAT A CAPITAL MURDER CASE IS A MORE SERIOUS CASE

       3   THAN SAY A RUN-OF-THE-MILL PETTY THEFT CASE, WOULDN'T YOU?

       4          MR. OBENAUER:  WELL, I HAVE A PHILOSOPHY, YOUR HONOR,

       5   THAT ALL MY CASES ARE IMPORTANT AND I TRY --

       6          THE COURT:  I SAID THEY'RE ALL IMPORTANT.  BUT I'M

       7   WILLING TO BET YOU DOLLARS TO DONUTS THAT IF YOU SUBMIT

       8   VOUCHERS TO OUR COURT, FOR EXAMPLE, ON SAY A 1325(A)

       9   MISDEMEANOR AND THAT VOUCHER IS FOR AS MUCH MONEY AS WE WOULD

      10   EXPECT SOMEONE TO SUBMIT, FOR EXAMPLE, IN A 21 841(A) CASE, I'D

      11   BE WILLING TO BET THAT A JUDGE LOOKING AT THAT VOUCHER WOULD

      12   PROBABLY SAY, NO, THAT'S NOT REASONABLE; DO YOU AGREE WITH ME?

      13          MR. OBENAUER:  YES.  I'M REALLY KIND OF CONCERNED

      14   ABOUT WHERE THIS IS GOING, YOUR HONOR.  I'M HAVING TROUBLE

14:43:12 15   TRACKING IT.

      16          THE COURT:  WELL, I'LL TELL YOU WHERE IT'S GOING.

      17   BECAUSE WE ALL KNOW -- SAY, FOR EXAMPLE, AT THE NINTH CIRCUIT,

      18   A CASE GOES UP ON APPEAL; WHAT HAPPENS IS THE STAFF ATTORNEYS

      19   REVIEW IT, AND THEN DEPENDING ON THE CASE, THEY MAY WRITE A

      20   MEMORANDUM, AND THE JUDGES REVIEW IT AND THEY AGREE WITH IT,

      21   AND THAT'S PRETTY MUCH THE END OF THE CASE.  IN OTHER CASES,

      22   THEY WILL SEND IT TO THE JUDGES; THE JUDGES WILL HAVE THEIR LAW

      23   CLERKS LOOK AT IT, THEY'LL LOOK AT IT, AND THEN THEY'LL DECIDE

      24   WHETHER THEY'RE GOING TO DO A MEM. DISPO. ON THE CASE.  OTHER

      25   TIMES THEY'LL LOOK AT A CASE AND THEY'LL SAY THIS CASE DESERVES

14:43:59  1  MORE ATTENTION, IF YOU WILL, AND THEY'LL WRITE A PUBLISHED

2  OPINION.  THEN IN SOME CASES, THEY'LL DO AN EN BANC REVIEW.

3  RIGHT?  AND IT'S ALL DEPENDANT UPON THE NATURE OF THE CASE AND

4  THE FACTS OF THE CASE.  EVERY CASE IS IMPORTANT.  WE KNOW THAT.

5  BUT SOME CASES REQUIRE, PERHAPS, A LITTLE MORE ATTENTION THAN

6  OTHER CASES DO.

7          NOW, THE POINT I WAS TRYING TO MAKE TO YOU, WHICH

8  APPARENTLY I DIDN'T MAKE AS CLEARLY AS I SHOULD HAVE, IS THAT

9  SOME PEOPLE HAVE THE MISTAKEN NOTION THAT BY SIMPLY GRANTING A

10  MINOR ROLE REDUCTION ALL YOU'RE DOING IS GRANTING A TWO-LEVEL

11  REDUCTION.  SO IF YOU'RE GRANTING A TWO-LEVEL REDUCTION, YOU

12  KNOW, I WOULDN'T GET HEARTBURN ABOUT WHETHER I'M GOING TO GO

13  ALONG WITH IT OR NOT GO ALONG WITH IT BECAUSE IT'S A TWO-LEVEL

14  REDUCTION IN THE GUIDELINES.  DO YOU UNDERSTAND?  BUT IN A CASE

14:45:03 15  LIKE THIS, A METH CASE, WE'RE LOOKING AT 8 LEVELS, 8 LEVELS.

16  THAT'S BIG.  THAT MEANS IT REQUIRES A LITTLE MORE SCRUTINY,

17  THAT WE BE A LITTLE MORE CIRCUMSPECT, A LITTLE MORE CAREFUL,

18  ABOUT WHETHER OR NOT WE'RE GOING TO GRANT MINOR ROLE.  THAT'S

19  WHAT I WAS TRYING TO CONVEY TO YOU AT THE TIME THAT YOU WERE

20  HERE LAST TIME.  NOT THAT I WAS SAYING I DON'T GRANT MINOR

21  ROLE, BUT THAT I'M GOING TO BE A LITTLE MORE CAREFUL BECAUSE

22  IT'S AN 8-LEVEL REDUCTION.

23          SO THAT'S WHAT I MEANT, AND IF I WASN'T VERY CLEAR

24  ABOUT IT, THEN I APOLOGIZE.  BUT THERE'S A REASON WHY I'M VERY

25  CAREFUL ON THESE METH CASES.  LET ME TELL YOU WHY.  LET ME TELL

14:45:53   1   YOU WHY.  NOW I BET YOU THAT I PROBABLY -- NOT SINCE I WENT

  2   SENIOR BUT BEFORE I WENT SENIOR I PROBABLY SAW AS MANY METH

  3   CASES AS PROBABLY MORE THAN 90 PERCENT OF THE JUDGES ACROSS THE

  4   COUNTRY.  THE COURT OF APPEALS JUDGES PROBABLY SEE A MINOR ROLE

  5   ISSUE MAYBE ONCE, TWICE, THREE TIMES A YEAR MAYBE.  I SEE THEM

  6   -- BEFORE I WENT SENIOR, I'D SEE THEM EVERY DAY OR EVERY

  7   SENTENCING DAY, EVERY SENTENCING CALENDAR.  AND IN THE METH

  8   CASES, I TAKE THOSE CASES VERY SERIOUSLY.  NOT BECAUSE I WANT

  9   TO BE MEAN, NOT BECAUSE I DON'T HAVE ANYTHING ELSE TO DO, BUT

 10   HERE IS THE REASON WHY:  SO THE LAST NUMBERS THAT I HAVE, IN

 11   2016, THE NUMBER OF PEOPLE THAT DIED IN SAN DIEGO COUNTY, WHICH

 12   IS THE HIGHEST EVER, WAS 377.  I KNOW LAST YEAR WAS EVEN

 13   HIGHER.  IN 2012, THAT NUMBER WAS 217.  THE DEATH RATE FOR METH

 14   CASES IN SAN DIEGO COUNTY HAS GONE UP FROM 7.9 PERCENT IN 2012

14:47:20  15   TO 11.5 PERCENT.  YOU SEE METH IS A REAL PROBLEM.  IT'S NOT A

 16   THEORETICAL PROBLEM.  IT'S NOT A HYPOTHETICAL PROBLEM.  IT'S A

 17   REAL PROBLEM.

 18          NOW THE NUMBER OF PEOPLE THAT SHOWED UP IN EMERGENCY

 19   ROOMS IN 2012 BECAUSE OF METHAMPHETAMINE ISSUES WAS 5,508.  IN

 20   2015, WHICH WAS THE LAST YEAR THAT I HAVE, IT WAS 12,595

 21   PEOPLE.  THAT MEANS THAT IS A HUGE COST TO OUR HEALTH CARE.  SO

 22   JUST THINK ABOUT THAT.  IN THREE YEARS, IN THREE YEARS, THE

 23   NUMBER OF PEOPLE WHO REPORTED TO EMERGENCY ROOMS IN SAN DIEGO

 24   WENT FROM 5,508 TO 12,595.

 25          NOW THE PEOPLE THAT HAVE BEEN ARRESTED IN SAN DIEGO

14:48:32  1   COUNTY FOR WHATEVER CRIME, IN 2012, 36 PERCENT OF THEM TESTED

        2   POSITIVE FOR METHAMPHETAMINE.  IN 2016, 56 PERCENT OF THEM

        3   TESTED POSITIVE FOR METHAMPHETAMINE.  THAT'S A HUGE PROBLEM.

        4   THIS IS NOT THEORETICAL.  THIS IS NOT HYPOTHETICAL.  THIS IS A

        5   REAL PROBLEM.  NOW IF THAT DOESN'T CAUSE THE HAIR ON THE BACK

        6   OF YOUR NECK TO STAND UP, LISTEN TO THIS STATISTIC:  JUVENILES,

        7   JUVENILES ARRESTED WHO TESTED POSITIVE FOR METHAMPHETAMINE IN

        8   2012, FOUR PERCENT.  IN 2016, 14 PERCENT, 14 PERCENT OF

        9   JUVENILES ARRESTED IN SAN DIEGO COUNTY TESTED POSITIVE FOR

       10   METHAMPHETAMINE.

       11           SO WHEN WE'RE TALKING ABOUT WHETHER OR NOT I'M GOING

       12   TO GRANT SOMEONE MINOR ROLE, I TAKE THIS SERIOUSLY.  NOW AS YOU

       13   PROBABLY KNOW, SINCE YOU'VE TRIED SIX CASES IN FEDERAL COURT

       14   SINCE 1990, YOU PROBABLY KNOW THAT WE HAVE A JURY INSTRUCTION

14:49:55 15   AND THAT JURY INSTRUCTION TELLS US OR TELLS THE JURY HOW WE ARE

       16   TO ASSESS THE TESTIMONY OF A WITNESS.  ARE YOU FAMILIAR WITH

       17   THAT INSTRUCTION?

       18           MR. OBENAUER:  YES.

       19           THE COURT:  OKAY.  AND YOU KNOW THAT INSTRUCTION

       20   INCLUDES LANGUAGE THAT SAYS THAT ONE OF THE THINGS WE'RE TO

       21   CONSIDER IN DETERMINING THE CREDIBILITY OF A WITNESS IS WHETHER

       22   OR NOT THAT WITNESS HAS A BIAS OR AN INTEREST IN THE OUTCOME;

       23   DO YOU AGREE WITH THAT?

       24           MR. OBENAUER:  THAT IS THE, THAT IS THE RULE.

       25           THE COURT:  THIS IS THE RULE, AND IT'S A COMMON-SENSE

14:50:37   1    RULE THAT EVERYBODY SHOULD BE ABLE TO ABIDE BY.  NOW, LOOK, IF

           2    YOU'RE ASKING FOR A TWO-LEVEL REDUCTION IN THE GUIDELINES, YOU

           3    KNOW, MAYBE YOU DON'T HAVE AS MUCH OF A TEMPTATION TO WANT TO

           4    PAINT A ROSY PICTURE, A PICTURE OF -- YOU'RE NOT REALLY HAVING

           5    ANY, YOU KNOW, LESS CULPABILITY.  ON THE OTHER HAND, IF YOU'RE

           6    SEEKING AN 8-LEVEL REDUCTION, THE INTEREST IN THE OUTCOME

           7    BECOMES MUCH GREATER, DOESN'T IT?

           8              MR. OBENAUER:  YEAH.

           9              THE COURT:  THAT'S WHAT I WAS TRYING TO GET AT, MR.

          10    OBENAUER.  IT'S NOT THAT I DON'T GRANT MINOR ROLE.  I GRANT IT

          11    IN THOSE CASES WHERE I THINK IT'S APPROPRIATE AND SUPPORTED BY

          12    THE EVIDENCE, SUPPORTED BY THE EVIDENCE.  NOW I WANT TO TAKE

          13    ISSUE WITH SOMETHING ELSE THAT YOU SAID IN YOUR APPELLATE BRIEF

          14    WHICH, FRANKLY, I FIND ABSOLUTELY ASTONISHING.  IN YOUR

14:51:47  15    APPELLATE BRIEF, YOU SAID THAT I INCREASED YOUR CLIENT'S

          16    GUIDELINE RANGE BY TWO LEVELS FOR IMPORTATION FROM MEXICO.  YOU

          17    SAID THAT, DIDN'T YOU?

          18              MR. OBENAUER:  YES.

          19              THE COURT:  YOU DID.

          20              MR. OBENAUER:  YEAH.

          21              THE COURT:  AND YOU ALSO SAID THAT THE GOVERNMENT HAD

          22    NOT ASKED FOR IT AND THAT PROBATION HAD NOT RECOMMENDED IT.

          23    YOU SAID THAT, DIDN'T YOU?

          24              MR. OBENAUER:  YES.

          25              THE COURT:  NOW YOU KNOW FULL WELL THAT PROBATION

14:52:20  1    COULD NOT HAVE RECOMMENDED IT, DON'T YOU?

         2            MR. OBENAUER:  NO.

         3            THE COURT:  YES, YOU DO.

         4            MR. OBENAUER:  WHY?

         5            THE COURT:  BECAUSE YOUR CLIENT DIDN'T MAKE A

         6    POST-ARREST STATEMENT.  YOUR CLIENT DIDN'T SAY A WORD ABOUT HOW

         7    HE GOT INVOLVED IN THIS WHOLE TRANSACTION UNTIL AFTER, AFTER HE

         8    HAD MET WITH PROBATION.  SO PROBATION HAD NO IDEA OF WHERE

         9    THESE DRUGS CAME FROM.

        10            MR. OBENAUER:  I DON'T KNOW WHY PROBATION DIDN'T MAKE

        11    THE RECOMMENDATION.  I DIDN'T TALK TO THEM ABOUT THEM NOT

        12    MAKING THE RECOMMENDATION.

        13            THE COURT:  BUT CORRECT ME IF I AM WRONG -- YOU WERE

        14    THERE AT THE INTERVIEW, WEREN'T YOU?

14:53:03 15            MR. OBENAUER:  SURE.

        16            THE COURT:  AND YOU DIDN'T TELL PROBATION THAT YOUR

        17    CLIENT BROUGHT THE DRUGS ACROSS FROM MEXICO, DID YOU?

        18            MR. OBENAUER:  I DON'T REMEMBER WHAT I SAID DURING

        19    THE PROBATION INTERVIEW THAT WAS IN 2017, I GUESS.  I DON'T

        20    REMEMBER.

        21            THE COURT:  IN FACT, I'M NOT SURE -- GIVE ME A

        22    MINUTE, BUT I HAVE A FEELING -- DO YOU HAVE YOUR PROBATION

        23    REPORT, YOUR PSR?

        24            PROBATION OFFICER:  YES, YOUR HONOR.

        25            THE COURT:  CAN YOU TELL ME WITH REGARDS TO ANY

14:53:37  1    STATEMENTS MADE BY THE DEFENDANT TO PROBATION AT THE TIME OF

2    THE INTERVIEW?

3              PROBATION OFFICER:  THE DEFENDANT STIPULATED TO THE

4    FACTUAL BASIS, PER COUNSEL'S ADVICE, AND HE STATED HE HAD

5    FINANCIAL ISSUES AT THE TIME OF HIS ARREST, AND HE WAS LIVING

6    IN COMPTON AND THERE'S A LOT OF VIOLENCE.  HE ALSO STATED HE

7    COMES FROM A LOW INCOME FAMILY, AND WHEN HIS MOTHER PASSED AWAY

8    HE HAD TO TAKE CARE OF HIMSELF, DO WHATEVER HE HAD TO DO TO

9    SUPPORT HIMSELF, HIS FAMILY AND DAUGHTER.  HE FURTHER STATED HE

10    REGRETS AND ACCEPTS THE RESPONSIBILITY OF THE SMUGGLING JOB

11    BECAUSE HE'S NOW IN CUSTODY AND AWAY FROM HIS DAUGHTER.

12    LASTLY, HE SAID HE WAS WORRIED HIS DAUGHTER WILL NOT RECOGNIZE

13    HIM WHEN HE'S RELEASED, AND HE'S DISAPPOINTED IN HIMSELF AND

14    APOLOGIZED TO HIS SISTER AND FAMILY.  THAT'S IT.

14:54:27  15             THE COURT:  NOW, MR. OBENAUER, CAN YOU TELL ME, FROM

16    THAT INFORMATION, CAN YOU TELL ME HOW PROBATION WOULD HAVE EVER

17    KNOWN THAT YOUR CLIENT SMUGGLED THESE DRUGS IN FROM MEXICO?

18             MR. OBENAUER:  I DON'T KNOW.  MAYBE THEY COULD HAVE

19    READ THE DISCOVERY.

20             THE COURT:  WHAT DISCOVERY?

21             MR. OBENAUER:  WHATEVER DISCOVERY WAS PRODUCED BY THE

22    GOVERNMENT.

23             THE COURT:  I SEE.  BUT YOU CERTAINLY DIDN'T TELL

24    THEM, DID YOU?

25             MR. OBENAUER:  I SAID THAT WE WOULD ABIDE BY THE

14:54:54  1    FACTS IN THE PLEA AGREEMENT.

2              THE COURT:  THE FACTUAL BASIS IN THE PLEA AGREEMENT.

3    DOES THE PLEA AGREEMENT SAY THAT MR. --

4              MR. OBENAUER:  DELGADO, YOUR HONOR, DELGADO.

5              THE COURT:  -- DELGADO SMUGGLED THE DRUGS FROM

6    MEXICO?

7              MR. OBENAUER:  I DON'T RECALL RIGHT NOW.  I DON'T

8    RECALL WHAT IT SAID.

9              THE COURT:  WELL, IT DOESN'T SAY THAT, DOES IT?

10             MR. OBENAUER:  I DON'T KNOW.  I WILL BELIEVE THAT AND

11   TAKE YOUR WORD FOR IT, OF COURSE.

12             THE COURT:  WELL, YOU SHOULD BECAUSE IT DOESN'T.  SO

13   THE FACT OF THE MATTER IS THERE'S NO WAY THAT PROBATION KNEW

14   YOUR CLIENT SMUGGLED THESE DRUGS IN FROM MEXICO.  BUT YOU KNEW,

14:55:31  15   AND HE KNEW.  NOW YOU ALSO SAID THE GOVERNMENT DIDN'T RECOMMEND

16   IT.  BUT OF COURSE, THE GOVERNMENT WASN'T GOING TO RECOMMEND IT

17   BECAUSE THE GOVERNMENT WAS RECOMMENDING A MINOR ROLE, AND AS

18   YOU KNOW, IF YOU RECOMMEND A MINOR ROLE AND YOU GET MINOR ROLE,

19   THEN YOU DON'T GET THAT EXTRA TWO-LEVEL INCREASE FOR

20   IMPORTATION OF METHAMPHETAMINE FROM MEXICO.  RIGHT?  AM I

21   RIGHT?

22             MR. OBENAUER:  YES.

23             THE COURT:  I AM RIGHT, AREN'T I?  MS. KAISER, YOU

24   STOOD UP.  I'M SORRY.

25             MS. KAISER:  WELL, YOUR HONOR, WE DIDN'T INCLUDE THAT

14:56:14   1   ENHANCEMENT IN OUR PLEA AGREEMENT.

           2        THE COURT:  OF COURSE YOU DIDN'T BECAUSE IN THE END,

           3   AS VERY OFTEN HAPPENS, YOU FOLKS DON'T KNOW UNTIL IN THE END

           4   YOU MAY COME IN AND RECOMMEND THAT INCREASE FOR TWO LEVELS OR

           5   YOU MAY NOT BECAUSE YOU DON'T KNOW AT THE TIME WHETHER OR NOT

           6   YOU'RE GOING TO RECOMMEND MINOR ROLE.

           7        MS. KAISER:  WELL, YOUR HONOR, NORMALLY IN PLEA

           8   AGREEMENTS WE DO PLACE IT AS AN ENHANCEMENT, PARTICULARLY IN

           9   OUR IMPORTATION PLEA AGREEMENTS.  IN THIS CASE, IN THE PLEA

          10   AGREEMENT, BECAUSE IT'S A DISTRIBUTION AT A CHECKPOINT,

          11   POSSESSION WITH INTENT TO DISTRIBUTE AT A CHECKPOINT, WHEN THE

          12   PRIOR AUSA NEGOTIATED THE PLEA AGREEMENT, THEY NEGOTIATED IT,

          13   AS FAR AS I UNDERSTAND, BASED ON THE FACTS AVAILABLE.  SO THEY

          14   DIDN'T INCLUDE THE ENHANCEMENT OF IMPORTATION.

14:57:03  15        THE COURT:  IS THAT BECAUSE YOU HAD NOT MET WITH THE

          16   DEFENDANT UNTIL AFTER THE PLEA AGREEMENT WAS EXECUTED?

          17        MS. KAISER:  SO YOUR HONOR, I BELIEVE I WAS THE THIRD

          18   AUSA ON THIS CASE.  I HAVEN'T REVIEWED ALL AVAILABLE DISCOVERY

          19   RECENTLY; HOWEVER, THERE WAS PRIOR LITIGATION ABOUT THIS BEING

          20   A CHECKPOINT CASE --

          21        THE COURT:  YES, I REMEMBER.  WE DID THAT.  SO ONE

          22   COULD DRAW AN INFERENCE, GIVEN THE AMOUNT OF TIME THAT ELAPSED

          23   BETWEEN THE TIME HE WAS REPORTED TO CROSS THE BORDER AND THE

          24   TIME THAT HE WAS STOPPED AT THE HIGHWAY 86 CHECKPOINT, ONE

          25   COULD DRAW THE INFERENCE THAT HE DIDN'T STOP SOMEWHERE IN

14:57:46   1    BETWEEN AND LOAD HIS CAR UP WITH THE DRUGS.  ONE COULD DRAW

          2    THAT INFERENCE PERHAPS, RIGHT?

          3             MS. KAISER:  YOUR HONOR, THAT'S NOT THE INFERENCE WE

          4    DREW AT THAT POINT, YOUR HONOR.

          5             THE COURT:  SO WHAT YOU'RE TELLING ME IS THAT AT THAT

          6    TIME YOU DID NOT BELIEVE OR DID NOT KNOW THAT THE DRUGS HAD

          7    COME ACROSS THE BORDER; IS THAT WHAT YOU'RE SAYING?

          8             MS. KAISER:  I WAS NOT THE AUSA WHO HANDLED THE CASE.

          9    HE'S ON MILITARY DUTY.  BUT BASED ON I KNOW HOW CIRCUMSPECT HE

         10    IS, I DON'T THINK HE WOULD HAVE INCLUDED THAT ENHANCEMENT

         11    UNLESS HE HAD THE EVIDENCE TO PROVE IT UP.

         12             THE COURT:  WHAT KIND OF EVIDENCE WOULD HE NEED TO

         13    PROVE IT UP?

         14             MS. KAISER:  THERE'S VARIOUS PIECES OF EVIDENCE, YOUR

14:58:25  15    HONOR.

         16             THE COURT:  LIKE?

         17             MS. KAISER:  IT COULD BE THE CROSSING THROUGH A PORT

         18    OF ENTRY.  AS PART OF THE NEGOTIATION OF A PLEA AGREEMENT

         19    THOUGH, I WANT TO MAKE THIS VERY CLEAR:  WE STAND BY THE PLEA

         20    AGREEMENT.

         21             THE COURT:  YES; I KNOW YOU STAND BY IT.  OKAY.

         22    GREAT.

         23             MS. KAISER:  IT COULD BE INFORMATION ABOUT CONTACTS

         24    BEFORE, THAT KIND OF INFORMATION, ACCESSORY AFTER THE FACT,

         25    CONSPIRACY, WHAT HAVE YOU, BUT THE PLAIN FACT OF THE MATTER IS

```
14:58:54   1   THAT FOR THIS SPECIFIC CASE THERE WAS NO INCLUSION OF

           2   ENHANCEMENT IN THIS PLEA AGREEMENT.

           3         THE COURT:  RIGHT.  I UNDERSTAND THAT.  I KNOW WHY

           4   MR. OBENAUER WOULD NOT HAVE TOLD PROBATION THAT THE DRUGS HAD

           5   COME ACROSS THE BORDER, BUT WHAT I'M TRYING TO FIND OUT IS WHY

           6   THE GOVERNMENT DIDN'T RECOMMEND IT.

           7         MS. KAISER:  THAT IS NORMALLY BECAUSE IN OUR

           8   CHECKPOINT CASES WE DON'T HAVE THAT TYPE OF INFORMATION, OR WE

           9   GENERALLY, JUST BECAUSE IT IS A CHECKPOINT CASE WITH A

          10   POSSESSION, WE MAKE RECOMMENDATIONS WITHOUT THAT ENHANCEMENT.

          11         THE COURT:  DID YOU NEGOTIATE THIS PLEA AGREEMENT?

          12         MS. KAISER:  I DID NOT, YOUR HONOR.  BUT AT THE SAME

          13   TIME, I WOULD HAVE NEGOTIATED IT THE SAME WAY AS MY

          14   COLLEAGUE.

14:59:49  15         THE COURT:  OKAY.  HERE IS WHAT I'M TRYING TO FIND

          16   OUT:  SO THERE WAS APPARENTLY A SAFETY VALVE DEBRIEF AT SOME

          17   POINT IN TIME; DID YOU PARTICIPATE IN THAT?

          18         MS. KAISER:  DID I PARTICIPATE IN THAT DEBRIEF, YOUR

          19   HONOR?

          20         THE COURT:  YES.

          21         MS. KAISER:  YES.

          22         THE COURT:  WAS THAT BEFORE OR AFTER THE AGREEMENT

          23   HAD BEEN NEGOTIATED?

          24         MS. KAISER:  THAT WAS AFTER THE AGREEMENT HAD BEEN

          25   NEGOTIATED AND HE PLEAD GUILTY.
```

15:00:12  1         THE COURT:  OKAY.  SO THE FACT OF THE MATTER IS, MR.

2  OBENAUER, THAT I'VE JUST HEARD FROM GOVERNMENT COUNSEL THAT

3  THEY WOULD NOT HAVE RECOMMENDED THAT TWO-LEVEL INCREASE BECAUSE

4  AT THE TIME THE PLEA AGREEMENT WAS NEGOTIATED, THE BEST THEY

5  COULD POSSIBLY DO IS COME UP WITH THIS INFERENCE THAT THE DRUGS

6  HAD IN FACT BEEN LOADED INTO MEXICO AND THEN DRIVEN ACROSS THE

7  BORDER AND HE WAS STOPPED AT HIGHWAY 86.  BUT THEY DIDN'T HAVE

8  ANY INFORMATION AT THE TIME THAT THE PLEA AGREEMENT WAS

9  NEGOTIATED TO SHOW THAT, IN FACT, YOUR CLIENT HAD BROUGHT THE

10  DRUGS ACROSS FROM MEXICO.

11         SO WHEN YOU TOLD THE COURT OF APPEALS THAT THE

12  GOVERNMENT DIDN'T RECOMMEND IT AND PROBATION DIDN'T RECOMMEND

13  IT, YOU KNEW FULL WELL THAT THE GOVERNMENT DID NOT HAVE THE

14  INFORMATION ON THE FACT THAT YOUR CLIENT HAD SMUGGLED THE DRUGS

15:01:12  15  ACROSS THE BORDER UNTIL AFTER THE PROBATION INTERVIEW AND AFTER

16  THE PLEA AGREEMENT HAD BEEN NEGOTIATED.

17         MR. OBENAUER:  NO, I DISAGREE.

18         THE COURT:  WELL, TELL ME HOW YOU DISAGREE.  EXPLAIN

19  THAT TO ME.

20         MR. OBENAUER:  BECAUSE I HAVE NO IDEA WHAT THE

21  GOVERNMENT HAS AND DOESN'T HAVE.  THE GOVERNMENT IS A VERY,

22  VERY LARGE ENTITY.  SOMETIMES THEY DON'T EVEN GET THEIR

23  INFORMATION CORRECT OR EVEN ON TIME FROM THE AGENTS SO...

24         THE COURT:  HERE IS WHAT I WANT TO KNOW FROM YOU:

25  RATHER THAN SPECULATING, TELL ME WHAT INFORMATION, OTHER THAN

15:01:44  1    THE FACT THAT THEY MIGHT HAVE ASSUMED OR DRAWN THE INFERENCE

2    THAT BASED ON YOUR CLIENT'S CROSSING TIME AND THE TIME HE WAS

3    STOPPED AT HIGHWAY 86 -- WHICH BY THE WAY, I LOOKED AT THE

4    TIMELINE AND I'M FAMILIAR WITH, I'VE PRESIDED OVER ENOUGH

5    CASES, I KNOW WHAT THE TIMELINE IS BETWEEN THOSE TWO, WHERE I

6    DOUBT YOUR CLIENT WOULD HAVE STOPPED AND HAD HIS CAR LOADED

7    WITH THE DRUGS BETWEEN THE TIME HE CROSS FROM MEXICO TO THE

8    TIME HE STOPPED AT HIGHWAY 86 -- BUT THE FACT OF THE MATTER IS

9    THAT THEY DIDN'T KNOW YOUR CLIENT CROSSED THESE DRUGS UNTIL

10   AFTER THE DEBRIEF.

11            MR. OBENAUER:  I DON'T KNOW.  I DON'T KNOW WHAT THEY

12   KNOW.

13            THE COURT:  YEAH, YOU DON'T KNOW.  BUT YOU DO KNOW

14   THAT THEY DIDN'T RECOMMEND IT AND --

15:02:34 15            MR. OBENAUER:  AND I CITED THAT, AND THAT'S MY JOB.

16            THE COURT:  AND YOU DO KNOW THE DEBRIEF DIDN'T HAPPEN

17   UNTIL AFTER THE PLEA AGREEMENT HAD BEEN NEGOTIATED, RIGHT?

18            MR. OBENAUER:  I APPEALED THE CASE.  I MADE THE

19   ARGUMENT ABOUT THE PLUS-TWO SHOULD NOT HAVE HAPPENED.  I

20   MENTIONED THAT THE GOVERNMENT DID NOT RECOMMEND IT AND

21   PROBATION DID NOT.

22            THE COURT:  BOTH OF WHICH WERE TRUE.

23            MR. OBENAUER:  YEAH, AND THAT'S WHAT I SAID.

24            THE COURT:  BUT IN NEITHER ONE OF THOSE TWO

25   STATEMENTS DID YOU LAY OUT THE REALITY.  AND THE REALITY IS

15:03:12   1   THAT YOUR CLIENT SAID NOTHING ABOUT BRINGING THE DRUGS ACROSS

           2   THE BORDER TO PROBATION AND YOUR CLIENT SAID NOTHING ABOUT

           3   BRINGING THE DRUGS ACROSS THE BORDER UNTIL AFTER THE PLEA

           4   AGREEMENT HAD BEEN NEGOTIATED.  YOU KNOW THAT FOR A FACT, AND

           5   YOU DIDN'T TELL THAT TO THE COURT OF APPEALS, DID YOU?

           6          MR. OBENAUER:  WELL, MAYBE WHAT HE TOLD ME WAS

           7   CONFIDENTIAL, AND I DIDN'T WANT TO RELEASE IT.

           8          THE COURT:  WELL, THAT'S A GOOD POINT BECAUSE I'M

           9   ORDERING THAT THE STATEMENT THAT -- LET ME SEE IF I CAN FIND IT

          10   -- THE STATEMENT THAT YOU FILED THAT YOU SUBMITTED TO THE

          11   COURT, YOU SUBMITTED TO ME, THAT YOU ASKED TO BE SEALED WHEREIN

          12   YOUR CLIENT ADMITTED THAT HE BROUGHT THE DRUGS ACROSS THE

          13   BORDER -- YOU SUBMITTED THAT STATEMENT TO ME AND YOU ASKED FOR

          14   ME TO SEAL IT WHEREIN YOUR CLIENT AT THE DEBRIEF HARING SAID HE

15:04:28  15   HAD BROUGHT THE DRUGS ACROSS FROM MEXICO.  RIGHT?  YOU DID

          16   THAT, DIDN'T YOU?

          17          MR. OBENAUER:  IT'S A COMPOUND SENTENCE.  WHICH ONE

          18   WOULD YOU LIKE ME TO --

          19          THE COURT:  ANY OF THOSE NOT TRUE?

          20          MR. OBENAUER:  I DON'T RECALL WHAT MY CLIENT SAID IN

          21   THE DEBRIEF.

          22          THE COURT:  MR. OBENAUER, I THINK WE OUGHT TO

          23   CONTINUE THIS HEARING, AND MAYBE YOU OUGHT TO GO BACK AND

          24   REFRESH YOUR RECOLLECTION ABOUT SOME OF THIS STUFF BECAUSE SOME

          25   OF THIS STUFF IS IMPORTANT TO ME.  I UNDERSTAND FULL WELL THAT

15:05:00  1  LAWYERS ARE TO BE ZEALOUS ADVOCATES.  I UNDERSTAND THAT.  I WAS
2  A LAWYER FOR 20 YEARS ALMOST.  I REPRESENTED LOTS OF PEOPLE
3  OVER THE YEARS.  I'VE NOW BEEN A JUDGE FOR 21 YEARS, AND I
4  THINK IT'S IMPORTANT THAT LAWYERS BE ZEALOUS.  BUT I ALSO THINK
5  THAT LAWYERS, AS OFFICERS OF THE COURT, HAVE A DUTY IN ORDER TO
6  PRESERVE THE INTEGRITY OF OUR SYSTEM TO BE CANDID, FORTHRIGHT
7  AND STRAIGHTFORWARD, NOT ONLY WITH THE JUDGES THEY APPEAR
8  BEFORE BUT WITH THE JUDGES OF THE COURT OF APPEALS.  AND I
9  THINK THERE WERE SEVERAL STATEMENTS IN YOUR APPELLATE BRIEF AND
10  REPLY BRIEF THAT, IN MY OPINION, WERE AT A MINIMUM HALF-TRUTHS
11  AND PERHAPS EVEN MISLEADING.  AND I, FOR ONE, DON'T APPRECIATE
12  THAT.

13          AND YOU APPARENTLY HAVEN'T GONE BACK AND DONE
14  RESEARCH AND GONE BACK AND FAMILIARIZED YOURSELF WITH THE CASE
15:05:59  15  SO AS TO RECALL WHAT TRANSPIRED.  BUT I WOULD LIKE FOR YOU TO
16  DO THAT BECAUSE I WANT TO HEAR YOUR RESPONSE TO WHY, WHY IT IS
17  THAT IF YOU SUBMIT SOMETHING TO ME THAT YOU WANT ME TO CONSIDER
18  AND IN THAT DOCUMENT YOUR CLIENT ACKNOWLEDGES AND SAYS THAT HE
19  BROUGHT THE DRUGS IN FROM MEXICO, AND THEN YOU ASK ME TO FILE
20  IT UNDER SEAL.  CHUTZPAH DOESN'T EVEN BEGIN TO EXPLAIN WHY IT
21  IS YOU SAY TO THE COURT OF APPEALS, "BUT THE JUDGE DIDN'T
22  EXPLAIN WHY HE WAS IMPOSING THIS ENHANCEMENT."  I DIDN'T
23  EXPLAIN IT BECAUSE YOU HAD FILED SOMETHING UNDER SEAL AND YOU
24  WERE ASKING THAT WE KEEP THIS CONFIDENTIAL.

25          I'M GOING TO CONTINUE THIS HEARING.  I WANT YOU TO GO

```
15:06:51   1   BACK, AND I WANT YOU TO REVISIT THIS FILE FROM THE BEGINNING,

           2   MR. OBENAUER, BECAUSE WHEN WE COME BACK I HAVE MORE QUESTIONS

           3   FOR YOU.  GLENN, GIVE ME A DATE.  I DON'T KNOW; MAKE IT JUNE

           4   12TH AT 1 O'CLOCK.  I WANT YOU TO GO BACK, AND I WANT YOU TO

           5   VISIT THAT STATEMENT THAT YOU SUBMITTED TO ME UNDER SEAL.  AND

           6   I WANT YOU TO GO BACK AND REVIEW YOUR COURT OF APPEALS BRIEF

           7   AND YOUR REPLY BRIEF BECAUSE I HAVE SOME MORE QUESTIONS BEFORE

           8   I IMPOSE SENTENCE.

           9            MR. OBENAUER:  THE PURPOSE OF MY REVIEWING THIS CASE

          10   IS FOR WHAT PURPOSE?

          11            THE COURT:  DOESN'T MATTER.

          12            MR. OBENAUER:  I JUST REVIEW THE PRIOR MATERIAL?

          13            THE COURT:  I WANT YOU TO REVIEW THE MATERIAL SO THAT

          14   YOU'RE FAMILIAR WITH THE CASE SO THAT YOU CAN RESPOND TO MY

15:07:36  15   QUESTIONS BECAUSE I'M GOING TO EVENTUALLY HAVE TO DEAL WITH

          16   THESE ISSUES IN ORDER TO RESOLVE THE CASE, AND SO I WANT YOU TO

          17   GO BACK AND FAMILIARIZE YOURSELF WITH THE CASE THAT YOU

          18   APPARENTLY HAVE JUST FORGOTTEN ALL ABOUT.  BUT I HAVEN'T

          19   BECAUSE I'VE TAKEN THE TIME, MR. OBENAUER, TO GO BACK AND

          20   REVIEW ALL OF THESE MATERIALS TO SEE WHAT IT IS WHAT HAPPENED,

          21   AND I WANT YOU TO DO THE SAME THING.  SO THE MATTER IS

          22   CONTINUED UNTIL JUNE 12TH AT 1 P.M. THANK YOU.

          23            MR. OBENAUER:  I'M ON VACATION, PAID VACATION, ON

          24   JUNE 12TH.  AT THE END OF THE MONTH, I AM AVAILABLE THEN.

          25            THE COURT:  WELL, ISN'T THAT NICE?  WELL, WE CAN DO
```

15:08:23   1    THAT.  WE CAN ACCOMMODATE YOU AT THE END OF THE MONTH.

           2              MR. OBENAUER:  MAY I LOOK AT MY CALENDAR PLEASE?

           3              THE COURT:  SURE.

           4              MR. OBENAUER:  23RD OF JUNE, 24TH OF JUNE, TO THE END

           5    OF JUNE -- TO JULY 6TH, THEN I'M AWAY AGAIN.

           6              THE COURT:  SAY THAT AGAIN?

           7              MR. OBENAUER:  END OF JUNE.

           8              THE COURT:  WHAT'S THE END OF JUNE?

           9              MR. OBENAUER:  I'M TALKING ABOUT 24, 25, 26, 27, 28,

          10    29.

          11              THE COURT:  THOSE ARE THE DATES YOU'RE AVAILABLE?

          12              MR. OBENAUER:  YES.

          13              THE COURT:  OKAY.  ALL RIGHT.  THEN I'LL TENTATIVELY

          14    SET THIS FOR JUNE 24TH AT 2 P.M.  I MAY HAVE TO CHANGE THAT,

15:09:25  15    BASED ON MY CALENDAR.  TELL ME AGAIN WHAT DATE YOU'RE NOT

          16    AVAILABLE SO IN CASE I HAVE TO CHANGE IT I DON'T CHANGE IT TO A

          17    DATE THAT INTERFERES WITH YOUR VACATION.

          18              MR. OBENAUER:  JUNE 5 TO 25.

          19              THE COURT:  SO JUNE 5TH TO JUNE 25TH YOU'RE NOT

          20    AVAILABLE.  OKAY.  I THOUGHT I'D JUST SET IT FOR JUNE 24TH, NO?

          21              THE CLERK:  YOU DID.

          22              THE COURT:  SO YOU'RE NOT AVAILABLE ON THE 24TH?

          23              MR. OBENAUER:  CORRECT.

          24              THE COURT:  THEN STRIKE THAT.  THAT'S NOT A GOOD

          25    DATE.  SO I GUESS WE OUGHT TO GO TO JULY 1.  HOW IS THAT?  ARE

15:10:13    1    YOU AVAILABLE JULY 1, MR. OBENAUER?

            2              MR. OBENAUER:  YEAH.

            3              THE COURT:  WHAT DATES ARE YOU NOT AVAILABLE AFTER

            4    THAT?

            5              MR. OBENAUER:  JULY 6 THROUGH 14.

            6              THE COURT:  OKAY.  GOOD.  WE'LL SEE YOU ON JULY 1ST

            7    AT 2 P.M.

            8              MR. OBENAUER:  ON BEHALF OF MY CLIENT, I'D LIKE TO

            9    PROCEED WITH THE SENTENCING HEARING TODAY.

           10              THE COURT:  I KNOW WHAT YOU'D LIKE TO DO TODAY, BUT I

           11    HAVE SOME QUESTIONS TO ASK YOU, AND YOU'RE OBVIOUSLY NOT

           12    PREPARED TO ANSWER MY QUESTIONS.  SO IT DOESN'T DO US ANY GOOD

           13    TO GO FORWARD.  SO THE MATTER IS CONTINUED.  THANK YOU.

           14              (MATTER CONCLUDED.)

           15                   C-E-R-T-I-F-I-C-A-T-I-O-N

           16

           17              I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED
                AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES
                DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT
           18    TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;
                THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY
           19    STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES
                WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL
           20    CONFERENCE.

           21              DATED: JUNE 5, 2019, AT SAN DIEGO, CALIFORNIA.

           22                        /S/ JULIET Y. EICHENLAUB
                                     JULIET Y. EICHENLAUB, RPR, CSR
           23                        OFFICIAL COURT REPORTER
                                     CERTIFIED SHORTHAND REPORTER NO. 12084
           24

           25

# EXHIBITS TO DEFENSE RESENTENCING MEMORANDUM

date filed: May 13, 2019

Gregory D. Obenauer
State Bar No. 103036
1901 First Ave. Ste. 213
San Diego, CA. 92101
(619) 230-1523

Attorney for DELGADO, Arturo

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
## HONORABLE JUDGE ROGER T. BENITEZ

| | |
|---|---|
| UNITED STATES OF AMERICA ) | No. 16CR2609 |
| ) | |
| ) | **DELGADO 's SENTENCE** |
| Plaintiff ) | **MEMORANDUM II: Exhibits III** |
| v. ) | **and IV** |
| ) | |
| DELGADO, ARTURO ) | **Date: Monday May 20, 2018** |
| ) | **Time: 9:00 a.m.** |

Defendant DELGADO-Vega through his attorney Gregory D. Obenauer submits Exhbits III and IV.

### INTRODUCTION

In his Sentence Memo II, Mr. Delgado submitted an exhibit (Document 76, p.10) in support of his request for a variance. That exhibit demonstrates the commitment he has made since his arrest to turn his life around to demonstrate that he is not only remorseful, but that he intends to be a productive and giving citizen. That exhibit is evidence that he has earned his GED. Considering his background, this is a terrific accomplishment. He was raised by his mother in Compton. She sold Tupperware and Avon products. She died from a brain tumor when he was 14. He then lived with his sister and has lived with her ever since. He never graduated

1

129

from high school. He used drugs and has been around drugs his whole life. And now, he has learned that sobriety is a better choice and his arrest was his wake-up call.  The third exhibit is evidence of his efforts and commitment to live without drugs. Victorville does not have RDAP program but has a 362.25 hr drug program with an emphasis on changing one's life in a positive way, how to stay out of prison. It is like a mini-RDAP. The fourth exhibit is another drug program which was interrupted when Mr. Delgado was moved to MCC.  He learned  the perils of different drugs and how to avoid  addiction and the criminal lifestyle.

Mr. Delgado understands that sobriety is a daily challenge and he will enroll in RDAP at his next destination.

<u>**CONCLUSION**</u>

If the Justice system is to be fair and humane, it must consider the life experiences of  Mr. Delgado, including  post-conviction rehabiitation. Mr. Delgado is not the same person who was arrested in 2016 and everything he has done since that time is evidence of who he is.


Respectfully Submitted                              Dated: May 13, 2019

<u>s /gregory d. obenauer</u>
Gregory D. Obenauer
Attorney for DELGADO

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
## HONORABLE JUDGE ROGER T. BENITEZ

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **No. 16CR2609** |
| | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **PROOF OF SERVICE** |
| | ) | |
| **DELGADO-Vega, Arturo** | ) | |
| _____ | ) | |

I , the undersigned, state:

1. I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party to this action.
2. My business address is 1901 1st. Ave. 213, San Diego, California, 92101.
3. I served this Defendant  DELGADO's  SENTENCE MEMORANDUM II Exhbits on opposing counsel by delivering via e-mail:

Efile.dkt.gc2@usdoj.gov

I certify under penalty of perjury that the foregoing is true and correct.

Executed  May 13, 2019, at San Diego, California.

s/ gregory d. obenauer
Gregory D. Obenauer

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

# Bureau of Prisons
## Psychology Services
## Group Participation

| | | | | |
|---|---|---|---|---|
| **Inmate Name:** | DELGADO-VEGA, ARTURO | | **Reg #:** | 59680-298 |
| **Date of Birth:** | 12/04/1993 | **Sex:** M | **Facilitator:** | (P)Kenan, Jennifer BTS |
| **Date:** | 03/16/2015 | **Group Facility:** VVM | **Group Title:** | [111] Weekly Contact Hours - J. Manglona, BTS |

**Status:** Completed
**Enroll Date:** 02/09/2018   **End Date:** 09/28/2018
**Total Hours:** 362.25

## SESSION DATA:

**Number of Sessions:** 33    **First Session Date:** 02/16/2018    **Last Session Date:** 09/28/2018

| Date | Title | Duration | Attendance | Participation | Homework |
|---|---|---|---|---|---|
| 09/28/2018 | Week ending September 28, 2018 | 900 | Complete Session | Good | Satisfactory |
| 09/21/2018 | Week ending September 21, 2018 | 900 | Complete Session | Good | Satisfactory |
| 09/14/2018 | Week ending September 14, 2018 | 900 | Complete Session | Good | Satisfactory |
| 09/07/2018 | Week ending September 7, 2018 | 420 | Incomplete Session | Fair | Satisfactory |
| 08/31/2018 | Week ending August 31, 2018 | 720 | Complete Session | Good | Satisfactory |
| 08/29/2018 | Week ending August 24, 2018 | 900 | Complete Session | Good | Satisfactory |
| 08/17/2018 | Week ending August 17, 2018 | 900 | Complete Session | Good | Satisfactory |
| 08/13/2018 | Week ending August 10, 2018 | 780 | Complete Session | Good | Satisfactory |
| 08/03/2018 | Week ending August 3, 2018 | 900 | Complete Session | Good | Satisfactory |
| 07/30/2018 | Week ending July 27, 2018 | 840 | Complete Session | Good | Satisfactory |
| 07/20/2018 | Week ending July 20, 2018 | 720 | Complete Session | Good | Satisfactory |
| 07/13/2018 | Week ending July 13, 2018 | 900 | Complete Session | Good | Satisfactory |
| 07/06/2018 | Week ending July6, 2018 | 540 | Complete Session | Fair | Satisfactory |
| 06/29/2018 | Week ending June 29, 2018 | 900 | Complete Session | Good | Satisfactory |
| 06/22/2018 | Week ending June 22, 2018 | 180 | Incomplete Session | Fair | Satisfactory |
| 06/15/2018 | Week ending June 15, 2018 | 180 | Incomplete Session | Fair | Satisfactory |
| 06/08/2018 | Week ending June 8, 2018 | 0 | Incomplete Session | Not Apply | Not Apply |
| 06/01/2018 | Week ending June 1, 2018 | 720 | Complete Session | Good | Satisfactory |
| 05/25/2018 | Week ending May 25, 2018 | 780 | Complete Session | Good | Satisfactory |
| 05/18/2018 | Week ending May 18, 2018 | 780 | Incomplete Session | Good | Satisfactory |
| 05/11/2018 | Week ending May 11, 2018 | 885 | Complete Session | Good | Satisfactory |
| 05/04/2018 | Week ending May 4, 2018 | 660 | Incomplete Session | Fair | Satisfactory |
| 04/27/2018 | Week ending April 27, 2018 | 900 | Complete Session | Good | Satisfactory |
| 04/20/2018 | Week ending April 20, 2018 | 540 | Complete Session | Good | Satisfactory |
| 04/13/2018 | Week ending 04/13/2018 | 900 | Complete Session | Good | Satisfactory |
| 04/06/2018 | Week ending April 6, 2018 | 810 | Complete Session | Good | Satisfactory |
| 03/30/2018 | Week ending March 30, 2018 | 900 | Complete Session | Good | Satisfactory |
| 03/23/2018 | Week ending March 23, 2018 | 540 | Complete Session | Good | Satisfactory |
| 03/16/2018 | Week ending March 16, 2018 | 660 | Complete Session | Good | Satisfactory |
| 03/09/2018 | Week ending March 9, 2018 | 240 | Complete Session | Good | Satisfactory |
| 03/02/2018 | Week ending 3/2/18 | 300 | Complete Session | Good | Satisfactory |
| 02/23/2018 | Week ending February 23, 2018 | 240 | Complete Session | Good | Satisfactory |
| 02/16/2018 | Week Ending February 16, 2018 | 300 | Complete Session | Good | Satisfactory |

Case: 19-50224, 02/02/2020, ID: 11581815, DktEntry: 9, Page 136 of 242

132

| Inmate Name: | DELGADO-VEGA, ARTURO | | Reg #: | 59680-298 |
|---|---|---|---|---|
| Date of Birth: | 12/04/1993 | Sex: M | Facilitator: | (P)Kenan, Jennifer BTS |
| Date: | 03/16/2015 | Group Facility: VVM | Group Title: | [111] Weekly Contact Hours - J. Manglona, BTS |

| Attendance | | Participation | | Homework | |
|---|---|---|---|---|---|
| Complete Session Present | 81.8 % | Good | 81.8 % | Not Apply | 3.0 % |
| Incomplete Session Excused | 18.2 % | Fair | 15.2 % | Satisfactory | 97.0 % |
| Incomplete Session Not Excused | 0.0 % | Poor | 0.0 % | Unsatisfactory | 0.0 % |
| | | Not Apply | 3.0 % | | |
| Absent Excused | 0.0 % | | | | |
| Absent Not Excused | 0.0 % | | | | |

Case: 19-50224, 02/02/2020, ID: 11581815, DktEntry: 9, Page 137 of 242

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

## Bureau of Prisons
## Psychology Services
## Group Participation

| | | | |
|---|---|---|---|
| **Inmate Name:** DELGADO-VEGA, ARTURO | | **Reg #:** | 59680-298 |
| **Date of Birth:** 12/04/1993 | **Sex:** M | **Facilitator:** | (P)Hendley, Derrick DTS |
| **Date:** 05/08/2018 | **Group Facility:** VVM | **Group Title:** | [302] FCI-2 Drug Education Class |

**Status:** Completed
**Enroll Date:** 05/08/2018    **End Date:** 05/17/2018
**Total Hours:** 12.0

### SESSION DATA:

**Number of Sessions:** 4    **First Session Date:** 05/08/2018    **Last Session Date:** 05/17/2018

| Date | Title | Duration | Attendance | Participation | Homework |
|---|---|---|---|---|---|
| 05/17/2018 | Ready for Change/ Test | 180 | Complete Session | Good | Satisfactory |
| 05/15/2018 | How to change? | 180 | Complete Session | Good | Satisfactory |
| 05/10/2018 | Understanding risk factors | 180 | Complete Session | Good | Satisfactory |
| 05/08/2018 | Group rules/ Understanding my addiction | 180 | Complete Session | Good | Satisfactory |

| Attendance | | Participation | | Homework | |
|---|---|---|---|---|---|
| Complete Session Present | 100.0 % | Good | 100.0 % | Not Apply | 0.0 % |
| Incomplete Session Excused | 0.0 % | Fair | 0.0 % | Satisfactory | 100.0 % |
| Incomplete Session Not Excused | 0.0 % | Poor | 0.0 % | Unsatisfactor | 0.0 % |
| Absent Excused | 0.0 % | Not Apply | 0.0 % | | |
| Absent Not Excused | 0.0 % | | | | |

### TEST DATA:

| Date | Title | Type | Score |
|---|---|---|---|
| 05/17/2018 | Test #1 | Posttest | 100 |

Case: 19-50224, 02/02/2020, ID: 11581815, DktEntry: 9, Page 138 of 242

134

# DEFENDANT'S SUMMARY CHART FOR RESENTENCING

date filed: February 20, 2019

1  DELGADO  SENTENCING SUMMARY CHART **16CR2609 BEN**
2  Sentencing Date Monday  **2/23/2017  9:00 a.m**   DEF   <u>X</u>

3  Defendant's Name: **DELGADO-Vega, Arturo**
4  Attorney's Name: Gregory D. Obenauer  230-1523
   Guideline Manual Used**: November 1 2016**

5
6                        **GUIDELINES CALCULATIONS**

7  The Defense recommends that the Court consider these calculations.

   1. Base Offense Level (USSG 2D1.1©(1) &(a)(5)                          34
8
   2. Minor Role                                                        -2
9
   4. Acceptance of Responsibility                                      -3
10
   5. Adjusted Offense Level                                            29
11
12 6. CH 11I

    VARIANCE:                                                           -5
13
     GUIDELINE RANGE: 57 – 71
14
     DEFENSE RECOMMENDATION                                    57 Months
15

16 Variance Request: Difficult Childhood, addiction, criminal history (2 convictions)
   Post Sentence rehabilition efforts
17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
(JUDGE ROGER T. BENITEZ)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 16CR2609 BEN |
| | ) |
| Plaintiff, | ) PROOF OF SERVICE |
| | ) |
| v. | ) |
| | ) |
| DELGADO-Vega, Arturo | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

I, the undersigned, state:

1. I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party to this action.

2. My business address is 1901 1st. Ave. 213, San Diego, California, 92101.

3. I served this Defendant DELGADO's SENTENCE CHART a on opposing counsel by delivering via e-mail:

Efile.dkt.gc2@usdoj.gov

I certify under penalty of perjury that the foregoing is true and correct.

Executed October 20, 2019, at San Diego, California.

s/ gregory d. obenauer
_____
gregory d. obenauer

# DEFENDANT'S MEMORANDUM FOR RESENTENCING

date filed: February 20, 2019

1  Gregory D. Obenauer
2  State Bar No. 103036
   1901 First Ave. Ste. 213
3  San Diego, CA. 92101
   (619) 230-1523
4
5  Attorney for DELGADO, Arturo
6
7
8              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF CALIFORNIA
9              JUDGE ROGER T. BENITEZ
10
11  UNITED STATES OF AMERICA    ) No. 16CR2609 BEN
                                )
12                              ) SENTENCE MEMORANDUM II
13              Plaintiff       )
    v.                          )
14                              ) Date: Monday February 25, 2019
15  DELGADO, ARTURO             ) Time: 2:00 p.m.
    _____)
16
17      The Defense apologizes for this late submission and any inconvenience it may have
    cost anyone.
18                    STATEMENT OF FACTS
19
       Arturo DELGADO-Vega (Mr. Delgado) was twenty three years old when he was
20
    arrested; he is now twenty six. He grew up in Compton and had less than an ideal
21
    childhood. He was raised by his mother  and his father was not around  because he had
22
    another family.  When he was a toddler, his mother had a stroke and was unable to work.
23
    Without a working adult in the home, Mr. Delgado and his two brothers and two sisters
24
    was forced to survive on little income. His mother received welfare and child support to
25
    provide for the family. His mother sold Tupperware and Avon products. Once his older
26
    sister Nancy was old enough to work she assisted the family and as did his brother
27
    Joselito who dropped out of school to work and support the family. When he was 13, his
28
    mother was diagnosed with a brain tumor and died. After his mother passed away,  Mr.
    Degado lived with his sister Jennifer Vega and he has lived with her since.

-1-

139

After his mother was diagnosed with a brain tumor his father returned to help when he could. In 2014, his father had one of his legs amputated from a work injury

**The Offense Conduct and Minor Role**

Per the Court's request, a list of participants:

Francisco Lares – Organizer, leader of DTO

NancyLares - Delgado's girlfriend

Randy Lares – age 19, Francisco's son

In 2012, Mr. Delgado was living in Los Angeles and with a friend was visiting in Mexacali. While attending a party he met Nancy Lares who was living with her mother.

Mr. Delgado began visiting Nancy in Mexico once or twice per month. Their relationship grew and he began visiting three times per month. After an evening of dining and dancing Mr. Delgado either would stay in a motel or return home to L.A. Family life with the Lares was normal. He attended Bar B Ques where the discussions were about food and music; drugs were never mentioned. He soon learned that her father was incarcerated but he did not inquire further. It wasn't until 2015 that he learned that her father was about to be deported and return home. In early 2016 Francisco Lares offered Mr. Delgado a job crossing narcotics. Mr. Delgado declined. But then Mr. Delgado was unemployed and having money problems. The Court had ordered monthly payments of $288.00 (PSR par 36) and Mr. Delgado had increased the payments to $800 per month as Ms. Sarabia was not working. Mr. Delgado had sold his Acura TL car for $3,200.00 but that money was running out.

In September 2016, Mr. Degado changed his mind and agreed to smuggle a load of drugs for Francisco Lares. Following the instructions of his Francisco Lares, his girlfriend's father and Randy Lares, his girlfriend's brother, Mr. Delgado participated in one "dry run" and two smuggling events. In each of these crossings, he dropped off narcotics at a Los Angeles location where Randy Lares waited for the car. Randy took the car and unloaded it somewhere else and then returned the car to Mr. Delgado.

On October 15, 2016, Mr. Delgado arrived at the Border Patrol Checkpoint on Highway 86, near Westmorland, California. As agents were questioning Mr. Delgado a

-2-

140

narcotics canine alerted to the card. In the secondary inspection, agents discovered approximately 12.9 kgs. of methamphetamine in the "rocker panels" of the car.

Although he initially denied knowledge of the drugs, Mr. Delgado ultimately disclosed to the government not only his participation in the Ocober 15, 2016 event but in two previous events, as discussed above. He has ended his relationship with Nancy Lares.

Mr. Delgado asks the Court to consider USSG3B.2 and the application note and grant Mr. Delgado a minor role adjustment. By examining Mr. Delgado's participation in relation to other actors, including all the circumstances, that examination supports the argument that he is substantially less culpable than the average participant in this criminal activity.

The notes in 3B1.2 focus on the following list (non-exhaustive) of factors:

(i) the degree to which the defendant understood the scope and structure of the criminal activity. *Mr. Delgado only knew that Francisco Lares was the planner and organizer of the operation. (See Ex. I Declaration)*

(ii) the degree to which the defendant participated in planning or organizing the criminal activity. *Francisco Lares planned and organized the crossings Francisco Lares provided him with the car. (See Ex. I Declaration)*

(iii) the degree to which the defenant exercised decision-making authority or influenced the exercise of decision-making authority. *Mr. Delgado had no decision making authority nor influence.(See Ex. I Declaration)*

(iv) the nature and extent of the defendant's participation in the commission of criminal activity, including the acts the defendant performed, and the responsibility and discretion the defendant had in performing those acts; *Mr. Delgado was a driver; that was his sole role. He did not load nor unload Mr. Delgado did not know the type nor amount of the drug. ((See Ex. I Declaration))*

(v) the degree to which the defendant stood to benefit from the criminal activity. *((See Ex. I Declaration) Mr. Delgado made 2 crossings and was paid $2,500 for each crossing*

The focus should be on the defendant's role The "Application Instructions" in 1B1.1 reveal that role analyses and overall sentence considerations are distinct from one another and should not overlap.

Mr. Delgado was a courier in this case. He performed no other role. That activity should be considered a factor that results in a minor role reduction. The commentary to 3B1.1 states:

A defendant who is convicted of a drug trafficking offense, whose

– 3 –

participation in that offense was limited to transporting or storing drugs and who is accountable under 1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under the guideline

The commentary then goes further, stating that couriers *should* be considered for minor role. "For example a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline" The Commentary continued:

> The Commission conducted a review of cases involving low level offenders, analyzed case law, and considered public comment and testimony. Overall, the study found that mitigating role is applied inconsistently and more sparingly than the Commission intended. In drug cased. the Commission's study confirmed that mitigating role is applied inconsistently to drug defendants who performed simlar low level functions (and that rates of application of applications vary widely from district to district)

In <u>U.S. v. Aguilar-Diaz</u>, 16-50102 (Ninth Circuit March 9, 2018) the Ninth Circuit reiterated the prohibition on treating courier status as dispositive of minor role. Amendment 794 clarified that the performance of an essential role – here, the role of smuggling drugs across the border – is not dispositive. Based on the circuit law and language in the guidelines, it appears a defendant's role as a courier should weigh in favor of granting minor role.

According to the U.S.Senencing Commission, there are more culpable participants than couriers. In a report* to Congress, the Commission described nine distinct roles (listed below in a continuum of decreasing culpability)

. **High-Level Supplier/Importer;** Imports or supplies large quantities of drugs (one kilogram or more); is near the top of the distribution chain; has ownership interest in the drugs; usually supplies drugs to other drug distributors and generally doesn't deal in retail amounts.

**Organizer/Leader**: Organizes or leads a drug distribution organization; has the largest share of the profits; possesses the most decision-making authority

–4–

142

1     **Grower/Manufacturer**; Cultivates or manufactures a controlled substance and

2     is the principal owner of the drugs.

3     **Wholesaler**: Sells more than retail/user-level quantities (more than one ounce)

4     *\*Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System,*

5     *Ch.8 at 165 – 167 (Oct. 2011)* http://bit.ly1sjz9M5

6     in a single transaction, purchases two or more ounces in a single transaction, or

7     possesses two ounces or more on a single occasion, or sells any amount to another

8     dealer for resale

9     **Manager/Supervisor:** Takes instruction form higher-level individual and

10     manages a significant portion of drug business or supervises at least one other

11     co-participant but has limited authority.

12     **Street-Level Dealer**: Distributes retail quantities (less than one ounce) directly to

13     users

14     **Broker/Steerer**: Arranges for drug sales by directing potential buyers to potential

15     sellers

16     **Courier**: Transports or carries drugs using a vehicle or other equipment
           **Mule**: Transports or carries drugs internally or on his or her person

17   If all of the above roles are less culpable than courier/mule, than minor role should

18 never be applied. And that result would be unjust.

19   Mr. Delgado was not able to identify more than two of the drug participants,

20 Francisco Lares and his son Randy.s But Mr. Delgado should not be denied minor role

21 because he has little inside knowledge or understanding of the scheme. That fact should

22 bolster the argument for minor role.

23 **The Two Level Upward Adjustment for Importation of Methamphetamine**

24   There should be no plus two increase for the importation of methamphetamine.

25 Under USSG 2D1.1(b) (5) the base offense level for possession of methamphetamine

26 with intent to distribute is increased two levels (in this case from a level 38 to a level

27 forty) "if the offense involved the importation of methamphetamine…and (B)the

28 defendant is not subject to an adjustment under 3B1.2 (Mitigating Role). Ninth Circuit
    case law makes clear that a court may not apply an upward adjustment under 2D1.1(B) 5

–5–

143

1  unless it identifies facts warranting the adjustment under a preponderance of evidence
2  standard. U.S.v. Job 851 F3d 889, 906-08 (9ª Cir. 2017)

3    Neither the defense, government nor Probation have recommended the two-level
4  increase under 3D1.1 (b) 5. Probation specifically noted in the presentence report that

6  "the increase cannot be recommended"(PSR5) and that "(the government attorney)
7  indicated that there is no evidence to prove the methamphetamine was imported from
8  Mexico" The government sentence summary chart did not include the two level
9  increase. As there was not evidence to support a two level increase, Mr. Delgado
10 requests that the plus two increase for importation not be applied which would result in a
   adjusted offense level of thirty four.
11 **Mr. Delgado's Postsentencing Rehabilitation**
12       After receiving a sentence, some defendants spend their time in an unproductive
13 manner, playing games or watching television. Some continue their life of crime. Others
14 make the most of their time by taking courses, learning skills, practicing their religion or
15 working on sobriety. That is what makes Mr. Delgado's postsentencing  rehabilitative
16 efforts so admirable, positive and encouraging.

17   In Pepper v. U.S., 562US476 (2011) the Supreme Court held that "when a
18 defendant's sentence has been set aside on appeal, a district court at resentencing  may
19 consider evidence of the defendant's postsentencing rehabilitation, and such evidence
20 may, in appropriate cases, support a downward variance from the now-advisory
21 Guidelines range p 9 – 27. "The plain language of 18US3661 makes clear that there is
22 no limitation  on background, character and conduct information, and it makes no
23 distinction between an initial sentencing and a subsequent resentencing. In addition,
24 postsentencing rehabilitation evidence may be highly relevant to several 3553(a) factors
25 that district courts are required to consider at sentencing." 12 – 15

26   At Victorville Medium prison, he has used his time wisely.(See Ex II)  He has spent
27 100 hours learning to repair wheelchairs. He has spent 93 hours to earn his GED. He has
   devoted 350 hrs in a drug program (not 1 hr as incorrectly reported) entitled FCC AIDS
28 AWARENESS. The word "BRAVE" acronym is an abbreviation for Bureau
   Rehabilitative And Values Enhancement. It is a program that teaches inmates how to

—6—

144

avoid the criminal lifestyle and includes a parenting class. Last, he recently enrolled in a class on making solar panels. He will resume the class when he returns to Victorville.

**Sentence Recommendation**

Mr. Delgado urges the Court to please consider the requests for minor role and variance. He believes they are factually supported and he believes that justice includes mercy.

## CONCLUSION

The extensive evidence of Mr. Delgado's rehabilitation since his initial sentence is clearly relevant to this sentence. Most fundamentally, that evidence provides the most up-to-date picture of his "history and characteristics."

Respectfully Submitted                    Dated: February 20, 2019

  s /gregory d. obenauer
  Gregory D. Obenauer
  Attorney for DELGADO

—7—

145

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBITS

# DECLARATION OF ARTURO DELGADO-Vega

I, Arturo DELGADO-Vega, the defendant in U.S.A. v. DELGADO-VEGA 16CR2609 declare the following:

1. On May23, 2017 I pled guilty to an Information which charged me with Possession of Methamphetamine with Intent to Distribute.

2. Regarding that charge, I knew that Francisco Lares was the planner and organizer of the operation. He recruited me and planned and organized my crossings and lent me the drug car for those crossings.

3. I had no decision making authority nor influence. I was the driver of the load car. That was my sole role. I did not load the car. I did not extract drugs from the car. I did not know the type of drug hidden in the car nor the weight.

4. I was paid $4,500 for 2 trips. For my personal use I used my sister's car, not Francisco Lares drug car.

I, Arturo DELGADO-Vega declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

EXHIBIT I

```
 SDCDP           *          INMATE EDUCATION DATA        *      02-04-2019
 PAGE 001 OF 001 *              TRANSCRIPT               *      11:05:20

 REGISTER NO: 59680-298    NAME..: DELGADO-VEGA              FUNC: PRT
 FORMAT.....: TRANSCRIPT   RSP OF: SDC-SAN DIEGO MCC

 -------------------------- EDUCATION INFORMATION --------------------------
 FACL ASSIGNMENT DESCRIPTION                 START DATE/TIME STOP DATE/TIME
 SDC  ESL HAS   ENGLISH PROFICIENT           01-01-2018 0001 CURRENT
 SDC  GED EARNED GED EARNED IN BOP           07-18-2018 0001 CURRENT

 -------------------------- EDUCATION COURSES --------------------------
 SUB-FACL  DESCRIPTION              START DATE  STOP DATE EVNT AC LV  HRS
 VVM BRAVE  VT WHEELCHAIR REPAIR,12-3 PM  06-25-2018 09-07-2018  P  C  M  100
 VVM BRAVE  GED P3, 12:00 - 1:30 P.M., M-F 03-27-2018 07-18-2018  P  C  P   93
 VVM BRAVE  RPP FCC AIDS AWARENESS (C1)    01-18-2018 01-18-2018  P  C  P    1

 -------------------------- HIGH TEST SCORES --------------------------
 TEST        SUBTEST      SCORE    TEST DATE     TEST FACL   FORM    STATE
 GED READY   MATH         145.0    07-11-2018    VVM         MA_RH   CA
             RLA          145.0    06-19-2018    VVM         LA-RA
             SCIENCE      151.0    05-23-2018    VVM         SC-RB
             SOC STUDY    149.0    05-23-2018    VVM         SS-RC
 GED 2014    MATH         146.0    07-18-2018    VVM                 CA
             RLA          149.0    06-20-2018    VVM                 CA
             SCIENCE      149.0    07-11-2018    VVM                 CA
             SOC STUDY    152.0    06-07-2018    VVM
 TABE E      LANGUAGE       4.3    03-26-2018    VVM         10
             MATH APPL      5.9    03-26-2018    VVM         10
             MATH COMP      4.5    03-26-2018    VVM         10
             READING        6.9    03-26-2018    VVM         10
```

```
 G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

148

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
HONORABLE JUDGE ROGER T. BENITEZ**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **No. 16CR2609** |
| | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **PROOF OF SERVICE** |
| | ) | |
| **DELGADO-Vega, Arturo** | ) | |
| | ) | |

I , the undersigned, state:

1. I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party to this action.

2. My business address is 1901 1st. Ave. 213, San Diego, California, 92101.

3. I served this Defendant DELGADO's SENTENCE MEMORANDUM II on opposing counsel by delivering via e-mail:

Efile.dkt.gc2@usdoj.gov

I certify under penalty of perjury that the foregoing is true and correct.

Executed February 20, 2019, at San Diego, California.

s/ gregory d. obenauer
Gregory D. Obenauer

149

# GOVERNMENT'S MEMORANDUM FOR RESENTENCING

date filed: February 19, 2019

ROBERT S. BREWER, JR.
United States Attorney
Charlotte E. Kaiser
Assistant U.S. Attorney
California Bar No. 256356
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7282
Fax: (619) 557-0510
Email:  charlotte.kaiser@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>ARTURO DELGADO-VEGA,<br><br>        Defendant. | Case No. 16CR2609-BEN<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date:    February 25, 2019<br>Time:   2:00 p.m.<br>Courtroom: 5A, Schwartz<br><br>The Honorable Roger T. Benitez |

COMES NOW the plaintiff, United States of America, by and through its counsel, Robert S. Brewer, Jr., United States Attorney, and Charlotte E. Kaiser, Assistant United States Attorney, and hereby files its Sentencing Memorandum, in the above-captioned case.  The United States incorporates its prior sentencing filing that it submitted under seal. The United States' final recommendation in this case remains at **97 months' custody**.

//

//

//

//

151

## A.    The Sentencing Guidelines

The United States recommends the following guideline calculations:

1.    Base Offense Level [USSG § 2D1.1(c)(1) & (a)(5)]          34
2.    Minor Role [USSG § 3B1.2]                                  -2
3.    Acceptance of Responsibility [USSG § 3E1.1(b)]            -3

    TOTAL ADJUSTED OFFENSE LEVEL                             29

Given defendant is in criminal history category III, his guideline range is 108 to 135 months' custody.

### 1.    Minor Role under USSG § 3B1.2(b)

A defendant may receive a 2-level reduction if he shows that he is a "minor participant" under USSG § 3B1.2(b).  In order to apply this 2-level reduction, the court makes a "fact-based" determination based on "the totality of the circumstances" that is "heavily dependent upon the facts of the particular case."  USSG § 3B1.2, application note 3.C.  The court should consider a "non-exhaustive list of factors" including:

(i)   the degree to which the defendant understood the scope and structure of the criminal activity;
(ii)  the degree to which the defendant participated in planning or organizing the criminal activity;
(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
(iv)  the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
(v)   the degree to which the defendant stood to benefit from the criminal activity.

USSG § 3B1.2, application note 3.C.; *see also United States v. Aguilar Diaz*, 884 F.3d 911, 915 (9th Cir. 2018).  "The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative.  Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." USSG § 3B1.2, application note 3.C.

In the instant case, the United States recommended a minor role reduction under USSG § 3B1.2 in addition to an 11-month downward variance under 18 U.S.C. § 3553(a) at the original sentencing hearing.  This court, however, determined that defendant had not met his burden and, therefore, did not grant a minor role reduction.  It then sentenced defendant to 120 months' custody.  Defendant appealed.

On appeal, the Ninth Circuit vacated and remanded this case for re-sentencing.  In so doing, it determined that this court did not have the benefit of the decision in *Aguilar-Diaz*, 884 F.3d at 918.  Specifically, in *Aguilar-Diaz*, the Ninth Circuit remanded that case for resentencing in order to "properly" apply the factors under USSG § 3B1.2 and Amendment 794.  884 F.3d at 918. In the instant case, the Ninth Circuit advised that the *Aguilar-Diaz* decision be considered including whether the court took into account all the "likely co-participants in the offense" when determining if defendant met his burden.

In the instant case, the United States stands by its earlier recommendation that defendant met his burden for a minor role reduction.  An analysis follows below.

*(i) Degree of Understanding the Scope and Structure of the Criminal Activity*

Defendant had a limited understanding of the scope and structure of the organization. He transported drugs at the behest of his recruiter, who was an identified drug trafficker. He then provided the load vehicle to the recruiter's son.  While the recruiter attempted to recruit defendant to become more involved in the organization, defendant demurred and maintained his role as one who transported drugs.

In *Aguilar-Diaz*, the Ninth Circuit noted that "when a defendant knows little about the scope and structure of the criminal enterprise in which he was involved, that fact weighs in favor of granting a minor-role adjustment." *Id.* at 917. Defendant did not know or is able to identify all the players from the farmers who cultivate the crops to the leaders in the control room.  Indeed, he did not know whom the recruiter was dealing with when the recruiter requested defendant to become involved with the organization.  Certainly, defendant understood very well the purpose and role of what an importer does to ensure that the drugs to the Los Angeles area.  Nonetheless, his interactions were limited in that

153

he dealt with the recruiter and the recruiter's son and not other individuals above the recruiter and his son.

### (ii) Degree of Participation in the Planning or Organizing Criminal Activity

Defendant participated in some advanced planning and organizing of criminal activity. He was involved in transporting other drug loads – he was caught on his fourth trip. However, he did not determine when to transport the drugs and was directed to meet up with the recruiter's son.

### (iii) Degree of Decision-Making Authority or Influence

As for decision-making authority, defendant did not have decision-making authority or influence. He transported drugs at the direction of his recruiter. He did not set the terms of the deal.

### (iv) Nature and Extent of Participation in Criminal Activity

As to the nature and extent of the criminal activity, while defendant was involved for approximately a month long time period and transported drugs multiple times, there are further facts that mitigate here. Specifically, when defendant was apprehended at a checkpoint, the car was not registered to him. Rather, other individuals maintained custody and control over the load vehicle. Additionally, while he drove the loads to the Los Angeles area, he lived there too.

### (v) Degree that Defendant Stood to Benefit from the Criminal Activity

As to the degree that defendant stood to benefit, defendant was paid $8,000 for his smuggling activities. He, therefore, was paid well. He, however, did not have a proprietary interest in the drug loads.

In the end, while a close call, the United States stands by its prior recommendation of a minor role reduction herein. Defendant met his burden to show that he was substantially less culpable than the average participant in this drug smuggling activity. Defendant was responsible for the transporting of drugs in a particular load car registered to other individuals and then traveling to the Los Angeles area where he lived. He specifically choose not to ingrain himself further into the drug trafficking organization. For these reasons, the United States recommends a minor role reduction in this case.

**B.     The Factors under 18 U.S.C. § 3553(a)**

According to 18 U.S.C. § 3553(a), the court:

shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—
> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant; and
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established for—
> (A)  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>> (i)  issued by the Sentencing Commission. . . ; and
>> (ii)  that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
> (B)  in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission. . . ;

(5)  any pertinent policy statement—
> (A)  issued by the Sentencing Commission. . . ; and
> (B)  that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

155

As for the nature and circumstances of the offense, defendant was apprehended at a checkpoint for smuggling approximately 12.914 kilograms of methamphetamine in a car registered to other individuals. By defendant's own admissions, he had smuggled other times at the behest of this recruiter.

As for the history and characteristics of the defendant, defendant was 22-years-old at the time and a United States citizen. Defendant was raised primarily by his mother; his father was not around. They lived in Compton. When defendant was a toddler, his mother had a stroke and was unable to work with regularity. His older siblings then started to work when they were able to do so. When defendant was 13-years-old, his mother was diagnosed with a brain tumor. She then died a year later. Since then, defendant had been living with his sister. His father started to come around and help out when he could do so. However, defendant's father had a heart condition that resulted in the amputation of one leg in 2014.

Defendant has a small child from a prior relationship. Based on defendant's criminal history, defendant engaged in violent and abusive behavior with this child's mother. Of concern, he has a 2016 conviction for corporal injury.

Defendant dropped out of high school after completing the 11th grade. He worked to support himself and his family. He, however, has limited employment history. He also has a petty theft conviction from stealing at a gas station where he worked.

Defendant has had a long-term addiction with drugs. He started using marijuana at age 16. Starting at age 18, defendant used cocaine twice a week. He was purchasing approximately $200 worth of cocaine a month. He also tried methamphetamine a few times. Defendant has expressed an interest in participating in drug treatment.

As for the need for the sentence imposed, defendant engaged in a serious offense in which he worked at the behest of a drug trafficker and transported a significant amount of methamphetamine that gravely would have impacted drug addicts and their respective families.

In terms of the kinds of sentences available, and the sentencing range, defendant faces a 20-year maximum sentence and has a guideline range of 108 to 135 months' custody.

As for pertinent policy statement, defendant was charged according to DOJ charging policies at the time. The fact that the policies have changed should play little to no role here.

As for the need to avoid unwarranted sentencing disparities, the United States recognizes that some other defendants with similar criminal histories may face a mandatory minimum sentence. However, in this case, defendant explained the circumstances of his criminal activity in more detail than most other defendants.

In light of these factors, the United States recommends an 11-month reduction under 18 U,S.C. § 3553(a) (or the equivalent of 1-level under USSG § 5K2.0) from the low end of the guideline range of 108 to 135 months. Defendant was a young adult who had a difficult childhood. He has a serious criminal history for someone of his age; indeed, the corporal injury conviction is troubling. However, he has had a long-term addiction to drugs since he was a teenager. He appears sincere in his interest to participate in drug treatment. Moreover, he provided more details about his offense conduct than most other defendants. Accordingly, a 97-month sentence is a fair and reasonable sentence when considering the factors under 18 U.S.C. § 3553(a).

## C.    Alternative Guidelines Calculations and Analysis under 18 U.S.C. § 3553(a)

Out of an abundance of caution, the United States recommends an alternative guideline calculation by the court, accounting for a rejection of the minor role adjustment. *See United States v. Munoz-Camarena*, 631 F.3d 1028, 1039 n.5 (9th Cir. 2011) (any error in guidelines calculation is harmless if the district court "acknowledges that the correct Guidelines range is in dispute and performs the sentencing analysis twice, beginning with the correct and incorrect range."); see Plea Agreement, Section X.F. ("The Government will recommend that defendant be sentenced to a term of imprisonment at the low end of the advisory guideline range as calculated by the Government pursuant to this agreement.").

//

157

As a first step, the court may calculate the guidelines as follows:

1.	Base Offense Level [USSG § 2D1.1(c)(1)]	38
2.	Acceptance of Responsibility [USSG § 3E1.1(b)]	-3

	TOTAL ADJUSTED OFFENSE LEVEL	35

Based on this alternative guidelines calculation, defendant's guideline range is 210 to 262 months' custody.

Of import, in remanding this case, the Ninth Circuit advised the court that, if it did not impose a minor role reduction, then it would need to determine whether "the government met its burden" as to an enhancement for importation of methamphetamine under USSG § 2D1.1(b)(5). For the record, the United States does not seek this enhancement in this case. At the outset, defendant pled to possession of methamphetamine with intent to distribute under 21 U.S.C. § 841(a)(1). He was not charged with importation of methamphetamine under 21 U.S.C. § 952, 960. Additionally, this enhancement was not a part of the United States' plea agreement. The United States, therefore, stands by its plea agreement. Finally, when defendant discussed his prior smuggling activities, he did so in an attempt to receiving mitigation in sentencing. Therefore, an enhancement may deter other defendants from interactions with the government. For these reasons, an enhancement as to importation of methamphetamine does not apply in this case.

As a second step, the court may apply the factors under 18 U.S.C. § 3553(a) to determine whether a downward variance to 97 months' custody is warranted in this case. In support of a variance, the United States incorporates its prior analysis under 18 U.S.C. § 3553(a). Moreover, should defendant submit evidence showing exceptional and exemplary post-sentencing conduct while in custody, the court should take that information into account.

//

//

158

**D.    Conclusion**

For the foregoing reasons, the Court should sentence defendant to **97 months' custody**.

DATED:  February 19, 2019.                              Respectfully submitted,

ROBERT S. BREWER. Jr.
United States Attorney

s/ Charlotte E. Kaiser
CHARLOTTE E. KAISER
Assistant U.S. Attorney

# GOVERNMENT'S SUMMARY CHART FOR RESENTENCING

date filed: February 19, 2019

**SENTENCING SUMMARY CHART**
[ ✓ ] AND GOVERNMENT MOTION UNDER USSG § 3E1.1(b)]

USPO ☐
AUSA ✓
DEF ☐

**Sentencing Date:** February 25, 2019

Defendant's Name: ARTURO DELGADO-VEGA     Docket No.: 16CR2609_BEN

Attorney's Name: Charlotte E. Kaiser     Phone No.: 619-546-7282

Guideline Manual Used: November 1, 2018     Agree with USPO Calc.: No

Base Offense Levels: (Drug Quantity if Applicable:) USSG § 2LD1.1(c)(1) & (a)(5)     34
12.914 kilograms of actual methamphetamine

Specific Offense Characteristics: USSG § _____     ____

_____     ____

_____     ____

Victim Related Adjustment:     ____

Adjustment for Role in the Offense:     -2

Adjustment for Obstruction of Justice:     ____

Adjustment for Reckless Endangerment During Flight:     ____

Adjusted Offense Level:     32
(☐ Combined (Mult. Counts) ☐ Career Off. ☐ Armed Career Crim.)

Adjustment for Acceptance of Responsibility: [ ✓ Gov. Motion Under USSG § 3E1.1(b)]     -3

Total Offense Level:     29

Criminal History Score:     6

Criminal History Category:     III
(☐ Career Offender ☐ Armed Career Criminal)

Guideline Range:     from 108 mths
(Range limited by: ☐ minimum mand. ✓ statutory maximum     to 135 mths
Departures:
USSG § _____     ____

_____     ____

Resulting Guideline Range: Adjusted Offense Level _____     from ____ mths
**RECOMMENDATIONS:** 97 months' custody, 3 years' supervised     to ____ mths
release, no fine, $100 special assessment (no need to impose if
paid)

Approved: RSK 02.19.19

161

# JUDGMENT AND COMITTMENT ORDER (BEFORE APPEAL AND REMAND)

date filed: December 6, 2017

AO 245B (CASDRev. 08/13) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT FILED

## SOUTHERN DISTRICT OF CALIFORNIA DEC -6 PM 3:17

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **V.** | (For Offenses Committed On or After November 1, 1987) |
| ARTURO DELGADO-VEGA (1) | |

Case Number: 16CR2609-BEN   DEPUTY

**GREGORY OBENAUER**
Defendant's Attorney

**REGISTRATION NO.** 59680298

☐ –

☒ pleaded guilty to count(s)   1 OF THE INFORMATION

☐ was found guilty on count(s)

after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| **Title & Section** | **Nature of Offense** | **Count Number(s)** |
|---|---|---|
| 21 USC 841(a)(1) | POSSESSION OF METHAMPHETAMINE WITH INTENT TO DISTRIBUTE | 1 |

The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ is    dismissed on the motion of the United States.

☒ Assessment : $100.00
–

☒ See fine page   ☐ Forfeiture pursuant to order filed _____, included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

November 27, 2017
Date of Imposition of Sentence

HON. ROGER T. BENITEZ
UNITED STATES DISTRICT JUDGE

16CR2609-BEN

163

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page **2** of **5** |
| CASE NUMBER: | 16CR2609-BEN | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
**ONE HUNDRED AND TWENTY (120) MONTHS**

☐    Sentence imposed pursuant to Title 8 USC Section 1326(b).

☒    The court makes the following recommendations to the Bureau of Prisons:
       1. RESIDENTIAL DRUG ABUSE PROGRAM
       2. INCARCERATION IN THE WESTERN REGION

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

     ☐   at _____ A.M.    on _____

     ☐   as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐   on or before

     ☐   as notified by the United States Marshal.

     ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

16CR2609-BEN

164

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page **3** of 5 |
|---|---|---|
| CASE NUMBER: | 16CR2609-BEN | |

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:
**FIVE (5) YEARS**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons unless removed from the United States.

The defendant shall not commit another federal, state or local crime.

*For offenses committed on or after September 13, 1994:*

The defendant shall not illegally possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter as determined by the court. Testing requirements will not exceed submission of more than 4 drug tests per month during the term of supervision, unless otherwise ordered by court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (*Check, if applicable.*)

☒ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

☒ The defendant shall cooperate in the collection of a DNA sample from the defendant, pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000, pursuant to 18 USC section 3583(a)(7) and 3583(d).

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. (*Check if applicable.*)

☐ The defendant shall participate in an approved program for domestic violence. (*Check if applicable.*)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court. The defendant shall also comply with any special conditions imposed.

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page 4 of 5 |
| CASE NUMBER: | 16CR2609-BEN | |

## SPECIAL CONDITIONS OF SUPERVISION

1.  Submit person, property, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2.  Not enter or reside in the Republic of Mexico without permission of the court or probation officer.

3.  Report vehicles owned or operated, or in which you have an interest, to the probation officer.

4.  Participate in a program of drug or alcohol abuse treatment, including drug testing and counseling, as directed by the probation officer. Allow for reciprocal release of information between the probation officer and the treatment provider. May be required to contribute to the costs of services rendered in an amount to be determined by the probation officer, based on ability to pay.

5.  Resolve all outstanding warrants within 60 days.

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| DEFENDANT: | ARTURO DELGADO-VEGA (1) | Judgment - Page **5** of **5** |
|---|---|---|
| CASE NUMBER: | 16CR2609-BEN | |

## FINE

The defendant shall pay a fine in the amount of    <u>500.00</u>    unto the United States of America.

This sum shall be paid    ☐    Immediately.

                 <u>x</u>    as follows:

Forthwith or through the Inmate Financial Responsibility Program (IFRP) at the rate of not less than $25.00 per quarter during the period of incarceration.

The Court has determined that the defendant    does    have the ability to pay interest. It is ordered that:

☒    The interest requirement is waived

# NOTICE OF APPEAL (BEFORE APPEAL AND REMAND)

date filed: December 3, 2017

Attorney Name and Address:
Gregory D. Obenauer
1901 1st Ave. Ste 213
San Diego, CA 92101

PHONE: 619 230-1523

_____ RETAINED ☒ APPOINTED

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

TRIAL JUDGE Roger T. Benitez        COURT REPORTER Amanda LeGore

UNITED STATES OF AMERICA )        CASE NO. 16CR2609
                          )
                          )        NOTICE OF APPEAL        (Criminal)
          vs.             )
DELGADO-Vega, Arturo      )
                          )
                          )
_____   )

       Notice is hereby given that Arturo DELGADO-Vega,
defendant/plaintiff above named, hereby appeals to the United States Court of Appeals for the
Ninth Circuit from the:        (check one)
(✔) Final Judgment
( ) Sentence Only (sentence imposed) 120 months 5 years Supervised Release
( ) Order (describe) _____
entered in this proceeding on the 27 day of November , 2017
If a government appeal: Was the filing of this appeal approved in accordance with 18 U.S.C.
§3742(b)(4) _____ Yes _____No

Date: 12/3/2017        _____
                              Signature

Transcripts required* ☒ Yes _____ No

Date ( ) Indictment (✔) Information Filed: 11/10/2016
Bail status in custody
Will there be a request to expedite the appeal? _____ Yes _____ No
(Note: This does not alleviate the requirement of filing a motion to expedite which must be done in
accordance with FRAP 27).
_____
* If transcript(s) required, a transcript designation and ordering form must be completed and the
court reporter(s) contacted to make arrangements for transcription.

K:\COMMON\CSA\forms\2005\appeal_crim.wpd Nov 16, 2009

169

# REPORTER'S TRANSCRIPT: ORIGINAL SENTENCING HEARING (BEFORE APPEAL AND REMAND)

date filed: November 27, 2017

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   UNITED STATES OF AMERICA,      )
                                    )   No. 3:16-CR-2609-BEN
 4              Plaintiff,          )
                                    )
 5   v.                             )   November 27, 2017
                                    )
 6   ARTURO DELGADO-VEGA,           )
                                    )
 7              Defendant.          )
     _____)   San Diego, California
 8

 9                 TRANSCRIPT OF PROCEEDINGS

10                  (Imposition of Sentence)

11      BEFORE THE HONORABLE ROGER T. BENITEZ, SENIOR JUDGE

12

13   APPEARANCES:
     FOR THE PLAINTIFF:       CHARLOTTE KAISER
14                            U.S. Attorney's Office
                              Southern District of California
15                            880 Front Street, Room 6293
                              San Diego, CA  92101-8893
16                            (619)557-5610

17

     FOR THE DEFENDANT:       GREGORY OBENAUER
18                            Law Office of Gregory Obenauer
                              1901 First Avenue, Suite 213
19                            San Diego, CA  92101
                              (619)230-1523
20
     THE PROBATION OFFICER:   JASON LEE
21
     COURT REPORTER:          AMANDA M. LeGORE
22                            ORCSR, RDR, CRR, FCRR, OCE
                              U.S. District Court
23                            333 West Broadway, Suite 420
                              San Diego, CA 92101
24                            amanda_legore@casd.uscourts.gov

25
```

2

1          (November 27, 2017; 2:44 p.m.)

2

3                    P R O C E E D I N G S

4

5          THE CLERK:  No. 5 on the calendar, 16-CR-2609.

6          The United States of America versus Arturo

7    Delgado-Vega, for a sentencing.

8          MR. OBENAUER:  Good afternoon, your Honor.  Greg

9    Obenauer for Mr. Delgado.

10          MS. KAISER:  Good afternoon, your Honor.  Charlotte

11    Kaiser on behalf of the United States.

12          (Pause.)

13          (Defendant enters.)

14          MR. OBENAUER:  Mr. Delgado is present in the court,

15    your Honor.

16          THE COURT:  Okay.  I believe this matter is set for

17    sentencing today.  I am a little bit confused.

18          The Government filed a memorandum, and I -- I was

19    trying to figure it out.  And I apologize, but I just never

20    really could figure it out.  I don't have a -- a sentencing

21    summary chart, other than -- well, let's see.  Let me backtrack

22    just a second.

23          I have a sentencing summary chart from the

24    Government.  It starts out with a base offense level of 34, but

25    it really isn't a Base Offense Level 34, is it?  It's a Base

3

1   Offense Level of 38.

2          MS. KAISER:  Yes, your Honor.  I wrote 38, minus 4.

3   I put the two subsections, (c)(1) and (a)(5) in it because we

4   recommend minor role.

5          THE COURT:  You know, I have a problem with the

6   Government's recommendation.  I'm not saying I'm not going to

7   accept it, but I have a bit of a problem with it.

8          The problem is this.  You -- you apparently are

9   agreeing to -- to minor role in this case.  And, of course, you

10  know -- what that does is it creates a -- an eight-point shift

11  down, doesn't it?

12         MS. KAISER:  It does, your Honor.

13         THE COURT:  That's -- that's a really significant --

14  and then, on top of that, you're asking me for an additional

15  one-level down under 5K2.0.  So that's -- that's -- that's nine

16  levels, altogether.

17         I -- I have asked -- I have asked in the past that --

18  that the Government provide me with a written memorandum to be

19  filed for the public to see why it is that we grant minor role

20  in -- in these cases, or why I'm being asked to grant minor

21  role in these cases.

22         I did get a memorandum from you, but it's under seal,

23  so the public can't see it.  So we're hiding it from the

24  public, you see.

25         MS. KAISER:  Your Honor -- that wasn't my intention,

173

4

1    your Honor.

2          THE COURT:  I'm sorry?  That was not your intention?

3          MS. KAISER:  To hide it from the public.

4          THE COURT:  Of course.  I know that.  I understand

5    that.  I mean, I know -- I know why you filed it.  But what you

6    did is you joined some materials, some information that you

7    probably didn't want the public to see.  Although, I must --

8    you know, the most recent case -- and it just came out of the

9    Ninth Circuit -- said, you know, that we shouldn't be sealing

10   this stuff.  Right?  I mean, unless there's a real threat, a

11   real -- a real substantial threat of harm.  We shouldn't just

12   be sealing things.

13         Now, I didn't see that in your moving papers.  Maybe

14   I missed it.  But --

15         MS. KAISER:  Well, your Honor, I -- I -- I thought I

16   had indicated that in my moving papers because it identified

17   actual individuals who we do know exist.

18         It talked about some people who are out of custody,

19   and it also deals with an active investigation over in the Los

20   Angeles area.  And -- and -- so for --

21         THE COURT:  So the basis for sealing is the active

22   investigation, not the fact that there may be a threat of harm

23   to the defendant?

24         MS. KAISER:  I don't have any corroborating evidence

25   of any direct threat of harm, and that's why I also included in

174

1  my analysis of -- part of the reason why we didn't recommend a

2  5K1.1 recommendation.  However, in all of my filings, I -- for

3  those, I always recognize that there is always a certain degree

4  of harm for any --

5          THE COURT:  But the Ninth Circuit has said that's not

6  enough.

7          MS. KAISER:  And I understand that, your Honor, and I

8  agree with that.  But, at the same time, there -- the main

9  reason is, yes, the active investigation.  But -- but tied into

10  that, too, is I'm not privy to all of the details as to that

11  investigation there, so I can't say -- and stand up and say,

12  your Honor, there's no harm.  Or either -- either which way, if

13  I don't have all of the specifics as to the harm issue.  But I

14  can say, with confidence, there's an active investigation.

15          THE COURT:  All right.  Now, so what I was saying

16  earlier is that you conflated two -- two different issues in

17  your memorandum.  One is the minor role issue, and the other

18  one is this one-level 5K2.0 departure, which -- which calls up

19  the issue of the investigation.

20          MS. KAISER:  Well, actually, the 5K -- oh, I'm sorry.

21  You're talking about the 5K1.1?

22          THE COURT:  There was no 5K --

23          MS. KAISER:  There was no 5K, but --

24          THE COURT:  There was a 5K2.0.  And the 5K2.0 I

25  understand you to say was -- basically, the reason for that was

175

6

| | |
|---|---|
|1|because even though the attempted cooperation did not lead to|
|2|anything, there certainly was an attempt.  Right?|
|3|MS. KAISER:  Well, that was part of it.  In my|
|4|sentence summary chart, I also outlined the reasons.|
|5|In my publicly filed sentencing summary chart, I|
|6|outlined the reasons and I called it a variance of 11 months,|
|7|the equivalent of one level.|
|8|THE COURT:  Oh, I see.|
|9|You didn't title it a 3553 -- just a second.  Let|
|10|me -- let me look at -- oh, I know -- at page 10 of your|
|11|memorandum, that's -- that's where I -- I got confused, and I|
|12|apologize, Ms. Kaiser.|
|13|You say, "In light of these factors, the United|
|14|States recommends an 11-level reduction under|
|15|3553(a) or the equivalent of one-level under|
|16|5K2.0."|
|17|So that's why I was calling it a 2.0 --|
|18|MS. KAISER:  Yes.|
|19|THE COURT:  -- departure.|
|20|MS. KAISER:  And I also put that information in my|
|21|sentencing summary chart, which I filed publicly, your Honor,|
|22|for the variance.|
|23|THE COURT:  I gotcha.  I gotcha.|
|24|Now, what is not in your publicly filed document,|
|25|however, is why we think that this defendant should receive|

176

1     minor role, which is why it winds up with an eight-level swing

2     on his sentence. From, you know -- I think it's 268 months. I

3     could be off on that. But 200-some-odd months, down to -- or

4     down to 108 months to 135 months, in that range.

5           MS. KAISER: Well, first, he's capped at 240 months

6     because he received the statutory maximum. At the time that

7     that was negotiated, that was the directive from the Department

8     of Justice.

9           However, your Honor, I -- I agree, minor role is a

10     significant departure, or adjustment. It's the -- the

11     Sentencing Commission provides for that, and it seems to create

12     a lot of discussion. However, in -- in my analysis, I had to

13     do two things here. One is front the issue. Because, as I'm

14     sure defense counsel will confirm, we had a lot of discussion

15     about this 5K1.1. A lot of back and forth.

16           Significant back and forth. And -- and so I -- I

17     felt it necessary to front the issue, to explain why it was

18     that we would not be recommending that.

19           The second is because a lot of the information that

20     was provided, that he disclosed, I had discussed with defense

21     counsel. And I said -- I explained, even though we had an

22     agreement about what I could and could not disclose, defense

23     counsel gave me permission to disclose certain information.

24           If it was going to play a role in my minor role

25     analysis, but which it would be information that I obtained

8

1    through our 5K1.1 discussions, which were subject to agreement.

2           So, for that, I -- that also raised the need to file

3    it under seal.

4           THE COURT:  All right.  So -- so tell me -- somebody

5    explain to me what the appeal waiver provision is, because at

6    this point in time, I'm -- I'm -- I'm a little confused.

7           MS. KAISER:  The appeal waiver which was negotiated

8    by my office provides a right to appeal if the Court imposes a

9    custodial sentence greater than 100 months.

10          THE COURT:  Did you negotiate this, Ms. Kaiser?

11          MS. KAISER:  I did not, your Honor, but I support it.

12   It's -- it's been negotiated by my office, through the internal

13   review process.  I stand by the plea agreement.

14          THE COURT:  And so you should.  I was just trying to

15   find out if you were the one who negotiated it.

16          Well, I'm -- I am troubled by the recommendation of

17   Mr. Bernard (phonetic).

18          This is a case involving 12 kilos of methamphetamine

19   brought in from Mexico.  The defendant, who has a prior violent

20   criminal conviction, and he's getting a considerable swing in

21   his -- in his sentence.  So I'm really troubled by it.

22          I'm not going to give you a tentative, although

23   that's my usual normal practice.  But, right now, I'm sort of

24   conflicted about it.  So I'll certainly hear from you and --

25   and then I'll decide later.

178

9

1          So, Mr. Obenauer, the floor is yours.

2          MR. OBENAUER:  Thank you, your Honor.

3          Basically, I -- this is the most punitive drug

4    because it's the most dangerous drug.  It's the worst drug.  My

5    client knows that.  He -- he knew it then, he knows it now, and

6    he's extremely remorseful for having done this.

7          He grew up in LA, in Compton.  His mom got hurt, or

8    she was ill early -- and kids had to work early, earlier than

9    they wanted to.

10         He didn't graduate from high school, but he should

11   have and hopefully will.

12         He's an outstanding young man.  And I say that in

13   both seriousness, and I don't say that easily.  I think he's a

14   young man who does a very stupid thing, and he's learned a

15   lesson about when things get tough and you can't pay the bills,

16   you just work more.

17         He has a criminal history of six points.  Two of them

18   are from violation -- his violation on -- while he was on

19   probation for the case that the Court just referred to.

20         Compton has probably the worst crimes per capita in

21   the state of California.

22         He's had an otherwise law-abiding life.  I think he

23   will be fine in the future.  As far as his role is concerned,

24   he never obtained the drugs, he never owned the drugs, he never

25   was the shot-caller.  He never told anybody when to cross.  He

1    never told anybody when to drop it off.  He was paid to cross.

2    He was a driver.  And I think he deserves a minor role

3    designation.

4              I think that the bulk of the defense argument was in

5    the -- the memorandum that I sealed on page 5.  It was the most

6    extensive amount of work or information that I've ever seen in

7    such a case, and he did this to try to make up for the wrongs

8    that he did.  His family is here today.  His sister-in-law --

9    from left to right, his sister-in-law, his cousin, his sister

10   was with him the whole time, and two children, niece and

11   nephew.  He's got a strong family support system.

12             I think that when the Court was talking about, you

13   know, specific facts of danger, I can tell you that the defense

14   hit the same wall that the Government did about an ongoing

15   investigation.  We could have done more, we wanted to do more,

16   but we were unable to do more.

17             He -- whether it's 3553 or it's just -- it's a

18   variable, I think that is fair in this case.  I don't -- I

19   don't think he's going to come back here.  I don't think he's

20   going to violate.  But that's his challenge.

21             The person I see here today, I hope he doesn't

22   change.  I hope he stays exactly the way he is because he's an

23   honorable man.  I just hope that he -- he gets some skills so

24   he can have a better life.  I know that he has learned from

25   this.

1        I would ask him -- I would ask the Court to follow

2   the recommendations of the defense and the Government and --

3   and sentence him that way.

4        And he wishes to address the Court.

5        THE COURT:  All right.  Mr. Delgado-Vega, you have a

6   right to address the Court.  Is there anything you wish to say,

7   sir?

8        THE DEFENDANT:  Yes, sir, if I can.  Yes, your Honor.

9        Well, I'm not going to sit here and lie to you while

10  standing here.  I know what I did.  I'm aware of what I was

11  carrying the day that I crossed the border on October 15th,

12  2016, of last year.  I'm truly guilty for it.  I'm full of

13  remorse for the family that I caused hurt and danger and only

14  suffering for them.  And not only to that, I wish they could be

15  here so I could give my apologies to them for the hurt and the

16  suffering I did to their relatives and everybody that -- for

17  the role that I had while I was being paid for it to do and

18  this -- in this matter, in this mistake.

19       But, sir, I just want to say, sir, if you could

20  please give me one more chance just to better my life, be there

21  for my daughter.  I'm a father of a two-year-old daughter.

22       And I know that my worst enemy, at this point, was my

23  financial problem.  That I come from a very low family income

24  resource.  And that I am -- again, I'm just trying to better my

25  life and provide for my daughter, provide for my family and my

12

1    way of -- if possible, if I can.

2         And I also want to say sorry to the United States of
3    America, because it is a country that I was raised and born.
4    And that instead of me progressing better for this country, I
5    think I did it a worse matter.  And I'm proud enough for this
6    country that I love, and I'm fortunate to be here because a lot
7    of people in other cases wish to be in this country.  And for
8    me being from this country, I felt like I've disappointed more
9    people in my family, too.

10        They're here today, supporting me, and they have been
11   supporting me for the past year.  And that I wish to say sorry
12   to them for being here.  And I know they are suffering from a
13   consternation that I've been here this whole year, and that I
14   wish I could show them, when I get out, that I could be a
15   better man, a better person.  And not just today but to the
16   Court, to the Government, and this country of the United
17   States, sir.

18        So my pitch right here today, sir, is if you could
19   please give me -- appoint me another opportunity to be a better
20   person in life and not just waste my time in this country.
21   Because I know that it's my mistake.  Nobody's mistake but
22   mine.  So I'm truly aware for it.  And I know that I'm pay --
23   I'm going to pay some significant time in jail for the mistake
24   that I did.  And I hope I could get another second chance, sir.

25        I want to say God bless everybody in this court, my

182

1  lawyer for helping me out and being there for me this whole

2  year.

3        And, you know, giving me comfort and -- and in this

4  time and matter.  And I want to say God bless to you and to the

5  prosecutor.  And thank you for your time, sir.

6        THE COURT:  Does Probation have anything?

7        THE PROBATION OFFICER:  Jason Lee with U.S.

8  probation.  We stand by the report and the recommendation of 84

9  months.

10        THE COURT:  What -- what was the reason for the

11  variance?  Refresh my recollection.  Probation's recommending a

12  variance here?

13        I think your guideline calculations, as I recall,

14  were, you know, 210 to 240 months.

15        THE PROBATION OFFICER:  Yes, your Honor.

16        THE COURT:  So tell me why Probation decided to

17  recommend 84 months.

18        THE PROBATION OFFICER:  Based on the defendant's age,

19  his --

20        THE COURT:  How old is he?

21        THE PROBATION OFFICER:  He's 23 years old, your

22  Honor.

23        THE COURT:  23.

24        THE PROBATION OFFICER:  Yes.

25        THE COURT:  Okay.

14

1          THE PROBATION OFFICER:  His age, his upbringing.  I
2    believe his mother was -- I'm sorry.  Some notes here.  His
3    mother and -- his mother was diagnosed, at a young age, when
4    he -- with brain -- a brain tumor.  And -- and the defendant
5    tried to help out his family whenever he could.

6          The defendant doesn't have any mental health issues.
7    His substance abuse, he did admit to daily marijuana use.
8    However, he hasn't received treatment in the past.

9          So the recommendation of 84 months is included to
10   allow the defendant to receive treatment while in custody
11   through the RDAP program or while he's out on supervised
12   release.

13         So in addition to the variance from the 210 months
14   from the low end, down to 84 months, if in fact he qualifies
15   for the RDAP program, he gets further time removed off of his
16   sentence.  Right?

17         THE PROBATION OFFICER:  That's correct, your Honor.
18   If he's eligible.

19         THE COURT:  If he's eligible.

20         THE PROBATION OFFICER:  Yes.  And also, lastly,
21   he's -- based on his financial situation, he was doing it to
22   help out his family.  And, again, in court, he apologized for
23   committing the offense.

24         THE COURT:  But isn't that true in almost every case
25   that we see come through here?  I mean, they're almost always

1  doing it for financial reasons and they always have financial
2  need?
3          THE PROBATION OFFICER:  That is correct, your Honor.
4          THE COURT:  Well --
5          MR. OBENAUER:  It's my understanding he won't get
6  RDAP with a DV, domestic violence.  Unless they make a mistake.
7          THE COURT:  Yeah, I don't know.
8          Well, so -- so I'm looking at the nonexhaustive list
9  of the factors set forth in -- what is it?  3B1.2?  It
10 certainly seems to me that he had -- there was considerable
11 planning and that he knew quite a bit about the drug
12 organization.
13         MR. OBENAUER:  Well, I think that that's explainable,
14 your Honor.  I mean, he's dating the No. 1 guy's daughter for
15 years.
16         THE COURT:  Yeah.
17         MR. OBENAUER:  And he's there and around it.  Not
18 that he was involved in any of the -- he -- he saw but did not
19 participate in the -- in that activity.  It was only until much
20 later --
21         THE COURT:  But he knew quite a bit about the
22 organization or the -- or the people.
23         MR. OBENAUER:  Well, he went -- one time -- yes.
24 He -- I'm kind of reluctant to say too much right now.  But I'm
25 saying that it -- that was a bad family.

185

16

```
 1          I'm sure that -- that the -- his girlfriend --
 2          THE COURT:  This isn't the same girlfriend that he
 3   kicked in the head in 2016, is it?
 4          MR. OBENAUER:  No.
 5          THE COURT:  He smiles.  Not a thing to smile about,
 6   what I just said.
 7          MR. OBENAUER:  It's not the person that I kicked.  I
 8   didn't kick nobody, sir.  I just -- in that case, it was -- it
 9   was meant for -- like there was no evidence or no -- anything
10   that I can say I kicked -- I kicked a victim, or anything.
11   Because that was the mother of my child, and I wouldn't hurt
12   her.  She just -- I guess, when I came in, sir, it was a time
13   that she had remorse for me dating somebody else.  And she
14   just -- I don't know if she wanted to see me in jail for any
15   reason.  And -- and until I got out, she feel remorse for the
16   things she did to me.  But like I told her, it's something
17   already done, and it just mess up -- it mess up my criminal
18   history and to this point, too.
19          MR. OBENAUER:  Your Honor, the defense hasn't had an
20   opportunity to look into those charges, or hasn't done that.
21   But being close to that family, being with that family, he saw
22   some things that were helpful later.  Not that he had any --
23          THE COURT:  We're talking about the new girlfriend?
24          MR. OBENAUER:  I'm talking -- girlfriend No. 2, yes.
25   In Mexico, yes.
```

186

17

1      THE COURT:  Right.

2      MR. OBENAUER:  Yes.

3      THE COURT:  But it doesn't matter how you learn of

4  the organization.  It just matters that you know about the

5  organization.  Right?

6      I mean, that's -- I don't see anything in 3B1.2 that

7  says if you learn about the organization because you're dating

8  the boss's daughter, that you don't count that.

9      I mean, am I missing something?

10      MR. OBENAUER:  How he came about the information, it

11  was not as a result of any bad activity by him.

12      THE COURT:  I don't see anything in 3B1.2 that says

13  that how you know about it, it has to be the result of bad

14  activity.

15      MR. OBENAUER:  I didn't say that.

16      THE COURT:  Okay.

17      MR. OBENAUER:  I'm just saying that he had access to

18  it, and it was of benefit to the Government.  And --

19      THE COURT:  But that's a different issue, altogether.

20  I mean, we're mixing apples and oranges.  There's no 5K1 motion

21  made by the Government.  The Government has not made a 5K1

22  motion.  I'm talking about minor role.  Minor role, 3B1.2.  We

23  look at -- there are five nonexhaustive factors.  Right?

24      One of which is how much -- you know, what does he

25  know about the drug trafficking organization, right?  What he

18

```
1   understands about the scope and the structure of the criminal
2   activity, as best I can tell, from looking at --
3           MR. OBENAUER:  As an actor.
4           THE COURT:  Where does it say that?
5           MR. OBENAUER:  Well, that's my interpretation of it.
6   That, as an actor -- in other words, as this person was -- knew
7   about the scope of the organization because he was part of the
8   organization.
9           THE COURT:  Well, we're going to wind up getting
10  there anyway because the end result is whether it's because
11  he's dating the boss's wife or however it is -- or daughter, he
12  winds up -- as best as I can tell, he does this not once, not
13  twice, not three times, but four times.
14          And, on top of that, he plans, by driving a car
15  across the border with a false compartment, and burning the
16  plates.  Right?  Am I missing something?
17          MR. OBENAUER:  I'm not sure that that's accurate,
18  your Honor.
19          THE COURT:  Well, I mean, you're representing him.
20  What do you mean it's not accurate?  That's basically what I --
21  let me see.  Maybe I'm -- maybe I'm missing something but --
22          So let me read to you from the Government's documents
23  under seal, which I know you've read.  Right?
24          It says, initially, the defendant did a dry run
25  for -- why?  He knew it was a dry run because once he
```

188

19

1    encountered Randy -- Randy being the son of the boss,
2    apparently, he opened the car and showed the defendant an empty
3    compartment.  Right?  Right?
4            MR. OBENAUER:  I suppose.  I don't remember it
5    specifically, your Honor.
6            THE COURT:  Then it says, since that dry run, the
7    defendant smuggled drugs approximately three times.
8            And then it says he would take the car from Mexico,
9    across the border, at the port of entry, and then travel to the
10   drop-off location in Los Angeles.
11           By the way, which is -- in my experience, it's --
12   it's more.  And perhaps Ms. Kaiser can correct me.  But my
13   experience tells me that a huge number of the, quote -- air
14   quotes -- courier, end of quotes, usually they drive the car
15   across the border and they drop it off somewhere near the
16   border for somebody else to pick up the car and take it
17   somewhere else.
18           My experience tells me that those who drive the car
19   further into the country usually are trusted more because they
20   have to go through not only the port of entry, but they also
21   have to go through the checkpoints, which creates an additional
22   level of risk.  At least I know that's what I've heard from the
23   Government in the past.  Maybe -- maybe the situation has
24   changed but --
25           MS. KAISER:  No, your Honor.  I don't think that

189

20

1   necessarily -- I don't disagree with that.  But I also -- my

2   understanding is that the defendant was based out of L.A. as

3   well.

4           THE COURT:  Right.  But the fact is that I'm correct

5   that -- that drug trafficking organizations look for people who

6   have -- who are more trusted when -- when they have them drive

7   the vehicles into the country more than just to the border.

8           MS. KAISER:  That can be the case, but you can also

9   be dealing with border crossers and other people.  But -- but

10  certainly.  But, in this case, when we had met with the

11  defendant and in opening further, my understanding is because

12  it had to deal with -- at least the way how we understood, it

13  had to deal with how he -- his contacts in Los Angeles for

14  this -- for this --

15          THE COURT:  So he had contacts in Los Angeles?

16          MS. KAISER:  Because that's where it appears would be

17  the main focal point, and that's where there's an active

18  investigation.

19          I also want to just state on the record, there's a

20  bit of a disconnect in terms of how defense counsel perceives

21  the recruiter versus how we perceive the recruiter.

22          They called him the boss.  He may have been a

23  defendant's boss, but this was not something that agents were

24  really jumping to meet, to get information; where they saw this

25  individual as a big player.

21

1      That's -- that's the sense we got, was that he --

2 he's essentially a recruiter and a handler.

3      THE COURT:  Okay.  So, again, now in the Government's

4 memorandum, it indicates the defendant was also contacted and

5 asked to drive a load to Chicago.

6      MR. OBENAUER:  And he declined.

7      THE COURT:  And he declined.  I agree.  I understand

8 that.

9      But the point I'm getting to, Mr. Obenauer, is that

10 you know, I have sentenced well over 1500 drug smugglers in my

11 career.  Well over 1500.  I think I have a little bit of

12 background into how this works.

13      And -- and my experience tells me that they wouldn't

14 have asked him to drive this load of drugs to Chicago -- all

15 the way to Chicago unless they knew that this gentleman was a

16 reliable smuggler.  Do you see what I'm getting at?  So --

17      MR. OBENAUER:  I don't know what was in the mind of

18 the person who proposed that.

19      THE COURT:  No, but I do.  I think I can draw a

20 reasonable inference from the fact that, again, in my

21 experience -- the true couriers, what I'll refer to as the

22 couriers, they're generally asked to bring the drugs across,

23 leave them at San Ysidro somewhere, Chula Vista, Calexico, and

24 then somebody else takes the drugs and they drive them further

25 into the country.  That's my -- that's my experience.

191

1         So now it strikes me that there was -- not only does

2  he know about the structure of the organization, he knows

3  about -- he planned -- we know he planned.  And how do we know

4  he planned?

5         Because he planned -- he drove a car with a -- with

6  a -- with a false compartment across the border and in order to

7  have a dry -- a dry run, to burn the plates.  We know that he

8  planned, because after he did that, he came back to Mexico.

9  That didn't just happen.  It wasn't just serendipity.  He came

10  back to Mexico so that he could get a load of drugs.  He drove

11  it across the border.  Then he went back to Mexico again.  He

12  got a second load.  Then he went back to Mexico and he got a

13  third load.  Right?

14         Now, the standard -- the standard -- so I've looked

15  at all of the nonexhaustive factors.  We know that he's made

16  money.  He was doing this to make money.  We know that he was

17  the sole driver and occupant of the vehicle when -- when he was

18  stopped.  We know that it's a large quantity of drugs.  12,

19  almost 13 kilos of methamphetamine.

20         And we also know that the people that are involved

21  in -- in -- in -- in this venture are this -- this -- this

22  person -- well, the girlfriend.  But there's no evidence that

23  she had anything whatsoever to do with the drug smuggling

24  venture.  And then there's the fellow who -- we'll refer to him

25  as the boss.  And then there was his son Randy, right?  And

23

1   then there was the defendant.

2           So there's three people, that we know of.

3           Now, the real standard, the real standard is you have

4   to convince me that he is substantially less culpable than the

5   average participant.  So I'm trying to figure out -- okay?

6           So we've got the recruiter.  Now, if the recruiter

7   was before me, I probably would increase his sentence for a

8   more aggravated role.  And Randy appears to be working with the

9   recruiter.  They seem to be hand-in-hand.

10          So those two people have an aggravated role.  That

11  leaves the defendant to be the average participant.

12          And so I ask myself, how can I possibly find that he

13  is substantially less culpable than the average participant?

14  He is, at best, the average participant.

15          So -- yeah, go ahead.

16          MR. OBENAUER:  Well, no, your Honor.  I just disagree

17  with the Court about the structure of the organization.  He

18  knew three guys.  That's what -- if that constitutes the

19  structure of the organization, the Government has already said

20  that they didn't even consider Juarez (phonetic) worthy of a

21  follow-up, which was very frustrating.  But that's how they

22  perceived him.

23          He knows three people, and they're all related.  If

24  that's --

25          THE COURT:  I know three people, based on what I'm

193

24

1   reading.

2          MR. OBENAUER:  The father, the uncle, and the son.

3   All Juarez.  They're all related.  If that constitutes the

4   structure, I think that that's a bit of a stretch because the

5   Government didn't think so.  And they didn't -- they didn't

6   want to know anything more, if there was any other information

7   available.

8          They didn't know -- they didn't consider that --

9   No. 1, Juarez to be --

10         THE COURT:  Let me -- let me interrupt you for just a

11  second.

12         This is why I've asked the Government, in the past,

13  to put it in writing so that the public can see why they make

14  the decisions they make and why they ask me to make the

15  decisions that I make.

16         If -- if in fact the Government really knows, has

17  information that indicates that the defendant really does not

18  have a minor role, doesn't the public have a right to know

19  that?  Doesn't the public have a right to know -- why is it

20  that this judge, Judge Benitez, is giving away a farm on a case

21  where the guidelines are 210 months, low end?  Why is he

22  imposing a sentence of 97 months?  Doesn't the public have a

23  right to know?  I mean, that's who we work for.

24         MR. OBENAUER:  Your Honor, the problem is that -- I

25  don't know what -- I have to assume that the publication of

194

1    this information would -- would have been potentially injurious

2    to my client and to -- and to those around him, and that's why

3    it was sealed.

4              I think that -- that the amount -- what was disclosed

5    was enough -- it was sufficient to make a logical conclusion

6    that that certainly would be a threat to my client.

7              THE COURT:  No, that's not the standard.  That's not

8    the standard.

9              MR. OBENAUER:  Well, I think it's a common sense

10   standard.

11             THE COURT:  Well, it may be a common sense standard,

12   but it's not a standard.  But that gets us far afield from what

13   I'm trying -- I'm trying to delve into, Mr. Obenauer.

14             What I'm trying to delve into is this.  This is what

15   I know about this organization.

16             We all know, we all know that drug trafficking

17   organizations, you know, vary in size.  Right?

18             We all know -- for example, I like to use the Pablo

19   Escobar organization.  Okay?

20             There's Pablo Escobar.  Pablo Escobar controlled

21   everything.  He owned everything.  He called all of the shots.

22   He told all of the people what to do.

23             If you assume that to be the case, then everyone

24   below Pablo Escobar would get a minor role because he would be

25   the only one who would really know everything there is to know

1    about the organization.  He would be the one who would make the

2    calls.  He would be the one who stood to get a benefit

3    financially.  He would be the one who essentially did all of

4    the planning.  Right?  But does that really make sense that

5    everyone below Pablo Escobar could get a minor role?  And the

6    answer is no.  No.  That would not make any sense, would it?

7            But what you have to do is you have to look at what

8    we know about the people that are involved in this transaction.

9    What we know is that there are the three people, including this

10   defendant.  But I can't find anyone, other than this defendant,

11   who would not get an aggravating role enhancement if he or she

12   were before me.

13           Now, if you want to talk about the big drug

14   trafficking organization, okay.  So then let's see.

15           So -- which, by the way, the Ninth Circuit has told

16   me on several occasions we can't do.  We can't do it.  That's

17   not the way it works.

18           You have to -- you have to deal with the known

19   participants.  And the known participants in this event are the

20   people that I've already named.

21           But if you wanted to hypothetically -- which I am not

22   going to do, because I'm not allowed to do that -- we would

23   look to see -- sure, so let's find out who is the real boss,

24   the real chief, the real kingpin of this drug trafficking

25   organization.

1    Then we would look to the people who might be below

2    them.  But then we get to this gentleman, and then we look at

3    the people below him.

4    So, for example, you've got some poor person in

5    Mexico who's maybe being paid 20 pesos to put some drugs into a

6    car.  We've got the people who are building the false

7    compartment.  You've got the people who are actually mixing the

8    methamphetamine.  I mean, there's all those people that would

9    be below him.  Do you see what I'm saying?  But those people,

10   we don't count.  We count the people that we know.

11   So, looking at the record, I know this gentleman

12   knows quite a bit about the organization.  I know that this

13   gentleman participated in burning plates.  I know that this

14   gentleman has been involved in three, possibly -- well,

15   actually four drug-smuggling ventures.  He got caught the last

16   time.

17   And we know that he was doing it for money.  We know

18   that it's a large quantity of drugs.  And he was a sole driver

19   or occupant of the vehicle.

20   I see nothing whatsoever in this case that leads me

21   to believe that this person, Mr. Delgado-Vega, was

22   substantially less culpable than the average participant.  So I

23   can't give him minor role.

24   So, having said all of that, I'm going to go through

25   the guidelines that I believe to be appropriate.

1        All right.  This is Base Offense Level 38, increase

2  by an additional two levels for importation of methamphetamine

3  for meth -- from Mexico under 2D1.1B5.

4        The defendant agreed to a three-level reduction for

5  acceptance.

6        He's in a Criminal History Category III.  By the way,

7  I should note that I've considered the 3553(a) factors.  I

8  guess I should -- I should indicate that for the record,

9  because I know that the guidelines are advisory.

10       I've considered the history and characteristics of

11  the defendant.  One of the -- one of the things that concerns

12  me about this defendant is that just -- just last year -- just

13  last year this gentleman was put on probation for a domestic

14  violence offense.  Which, as best I can tell, is an aggravated

15  felony.

16       MR. OBENAUER:  The defense made a motion -- or in its

17  papers for overrepresentation of criminal history.

18       THE COURT:  Well, you may have, but that's -- that's

19  denied.

20       He was convicted of a 273.5, conviction in February

21  of 2016.  He was sentenced to 180 days in jail, placed on five

22  years probation.  He was on probation at the time that he

23  committed this offense.

24       So, anyway, where was I?  I think I was at a 37 --

25  that can't possibly be right.  My math is terrible.  No, it is

1   right.  37, Criminal History Category III.

2            And then the Government has moved for a one-level

3   variance under 3553, which I will go along with.  So that puts

4   us at a Level 36.  A 36, one --

5            MR. OBENAUER:  I'm asking for a variance, your Honor.

6   As -- you know, as a result of the information that is

7   contained on page 5 in my sentencing memorandum.  The same

8   information that we've been talking about.

9            THE COURT:  I know.  And -- and -- and the Government

10  has told -- told me that that information is basically worth a

11  one-level variance, which is what I did.  And I don't have any

12  reason to doubt -- I mean, they're in the best position to tell

13  me what they think that information is worth.

14           So getting back to where I was.  The guideline range

15  of 188 to 235 months.

16           Now, I do note that this young man is young.

17  Although 23 -- you know, at 23 -- well, he's a father of

18  children.  At 23, people are allowed to vote.  They can become

19  parents, they can buy homes, they can go in the armed forces.

20  They can do a lot of things.  But, still, 23, I know, is pretty

21  young, and so I'll give him some credit for that.

22           I note that he has been smoking, as he put it, weed.

23  Weed.  For a long period of time.  I think since he was 16, if

24  I'm not mistaken; if I recall that correctly.

25           And he does come from a rather difficult family

1    background.  So, having said all of that, I've considered all

2    of the 3553(a) factors.  I'm satisfied that a sentence of 120

3    months is reasonable and sufficient but not greater than

4    necessary.  So I'll remand him to the custody of the Bureau of

5    Prisons for a period of 120 months.  I'll put him on five years

6    of supervised release.

7           As a condition of supervised release, he will obey

8    all laws, including state, local, and federal.  He'll comply

9    with all standard and mandatory conditions of supervised

10   release, including the following.

11          He will not enter or reside in the republic of Mexico

12   without the permission of the Court or the probation officer.

13   He'll participate in a program of drug or alcohol abuse

14   treatment, including drug testing and counseling, as directed

15   by the probation officer.

16          And he will allow for reciprocal release of

17   information between the probation officer and the treatment

18   provider.

19          He'll be required to contribute to the costs of

20   services rendered in an amount to be determined by the

21   probation officer, based on his ability to pay.

22          He will report all vehicles owned or operated or in

23   which he has an interest to the probation officer.

24          He'll resolve all outstanding warrants within 60

25   days.

1    He'll also submit his person, his property, his
2    residence, his office or his vehicle to a search conducted by
3    the United States probation officer at a reasonable time and in
4    a reasonable manner, based upon reasonable suspicion of
5    contraband or evidence of a violation of condition or release.

6    Failure to submit to a search may be grounds for
7    revocation, and he shall warn any of the residents that the
8    premises may be pursuant to searches pursuant to this
9    condition.

10   The guideline range for the fine is $40,000 to $1
11   million.  I don't believe he has the ability to pay that kind
12   of a fine.  However, he does appear to be an able-bodied man
13   who can work while he is in prison.  So I'll order that he pay
14   a $500 fine plus a $100 special assessment, all to be paid
15   forthwith or in installments of not less than $25 per quarter,
16   payable through the Inmate Financial Responsibility Program.

17   Now, because of his history with drugs -- which, in
18   this case, I think, is somewhat of a mitigating factor, I want
19   to make sure that he gets treated, if we can get him treated,
20   while he is in custody.

21   So I am going to recommend that he be placed in the
22   500-hour drug treatment program so that hopefully he will not
23   be engaging in antisocial or criminal behavior.  Again, as a
24   result of his drug use.

25   Now, I'll state for the record that I've considered

32

1    all of the 3553(a) factors.

2          No. 1, I've considered the seriousness of the

3    offense.  Smuggling 13 -- almost 13 kilos of methamphetamine

4    into the United States, I believe, to be a very serious

5    offense.  That can cause an awful lot of harm to an awful lot

6    of people, young people particularly.

7          I have considered his history and his

8    characteristics.  I've considered the need to promote respect

9    for the law and the fact that my sentence should be a sentence

10   that deters this defendant, and others, from similar conduct.

11   I've also considered other possible sentences, including both

12   higher and lower sentences.

13         I've settled on 120 months.  I believe that is a

14   reasonable, fair sentence.  It's sufficient but not greater

15   than necessary.

16         Mr. Obenauer, if you will do me a favor and please

17   deliver to him the conditions of supervised release, I would

18   appreciate it.

19         (Defendant handed document.)

20         MR. OBENAUER:  Would the Court recommend Victorville?

21   I understand the BOP sometimes takes those recommendations.

22         THE COURT:  You know, Mr. Obenauer, I -- I do not

23   make specific recommendations unless there's some extraordinary

24   reasons for my making such a specific recommendation.

25         It's just -- you know, the Bureau of Prisons has

1    their hands tied.  They have lots of budgetary issues and

2    security issues that they have to deal with, and I don't like

3    to tie their hands.  I will recommend the western region,

4    however.  Okay?

5         All right.  Mr. Delgado-Vega, you have been given a

6    copy of -- or the conditions of supervised release.  I want you

7    to understand that if you violate any of those conditions, sir,

8    you could be placed in custody for up to an additional five

9    years.  That's five years over and above 120 months that I just

10   imposed and over and above any other sentence you might receive

11   for any other offense that you might commit.

12        Sir, you've made two very serious errors in judgment,

13   at least in the last two years.  I hope that you will not make

14   another one by violating the conditions of supervised release.

15   Because if you do, as I said, you could be put in custody for

16   up to an additional five years.

17        Now, sir, I've imposed a sentence that's higher than

18   the sentence that was agreed upon in the plea agreement.  I

19   want you to understand that, as a result of that, you have a

20   right to file an appeal.  And if you wish to appeal, you must

21   file a notice of appeal.  That notice of appeal must be filed

22   with this court, not with the Ninth Circuit.  It must state

23   specifically what it is you are appealing from.

24        That notice must be filed within 14 days from the

25   date of the judgment, and you do have a right to have a lawyer

34

1  to represent you.  If you cannot afford to hire a lawyer, one

2  will be appointed for you at no cost to you.

3          Mr. Obenauer, I assume that you will continue to

4  represent him throughout the period of filing a notice of

5  appeal.  Is that correct?

6          MR. OBENAUER:  That is correct, your Honor.

7          THE COURT:  All right.  Is there anything that I have

8  missed?  Anything that I've overlooked?  Anything -- any

9  arguments that I have not addressed to your satisfaction,

10 Mr. Obenauer?

11         MR. OBENAUER:  To my satisfaction -- well, I -- I

12 agree we're finished here, your Honor.

13         THE COURT:  I'm sorry?

14         MR. OBENAUER:  We're finished.

15         THE COURT:  Okay.  Great.

16         All right.  Thank you.  Good luck to you, sir.

17         (Conclusion of proceedings.)

18                        -0-

19

20

21

22

23

24

25

35

*Certificate*

--oOo--

I certify, by signing below, that the foregoing is a correct stenographic transcript of the oral proceedings had in the above-entitled matter this 24th day of January, 2018.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore

_____

AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
CSR No. 15-0433   EXP:  3-31-2018

# GOVERNMENT'S SENTENCING SUMMARY CHART
# (BEFORE APPEAL AND REMAND)

date filed: October 12, 2017

ALANA W. ROBINSON
Acting United States Attorney
Charlotte E. Kaiser
Assistant U.S. Attorney
California Bar No.: 256356
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7282
Fax: (619) 557-0510
Email:  charlotte.kaiser@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ARTURO DELGADO-VEGA,<br><br>Defendant | Case No.: 16CR2609-BEN<br><br>Date:    10/23/2017<br>Time:    9:00 a.m.<br><br>The Honorable Roger T. Benitez<br><br>**THE UNITED STATES'<br>SENTENCING SUMMARY CHART** |

The Plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Alana W. Robinson, Acting United States Attorney and Charlotte E. Kaiser, Assistant U.S. Attorney, hereby files its Sentencing Summary Chart, which is based upon the files and records of this case.

DATED: October 12, 2017

Respectfully submitted,

ALANA W. ROBINSON
Acting United States Attorney

/s/Charlotte E. Kaiser
Assistant United States Attorney

207

SENTENCING SUMMARY CHART

[ ☒ ] AND GOVERNMENT MOTION UNDER USSG § 3E1.1(b)]

Sentencing Date: <u>October 23, 2017</u>

USPO ☐
AUSA ☒
DEF ☐

Defendant's Name: <u>ARTURO DELGADO-VEGA</u>      Docket No.: <u>16CR2609-BEN</u>

Attorney's Name: <u>Charlotte E. Kaiser</u>      Phone No.: <u>619-546-7282</u>

Guideline Manual Used: <u>November 2016</u>      Agree with USPO Calc.: ☐

Base Offense Level(s): <u>USSG § 2D1.1(c)(1) & (a)(5) (38-4) – 12.914 kgs methamphetamine</u>      34

Specific Offense Characteristics:

Adjustment for Role in the Offense – Minor Role - USSG § 3B1.2      -2

Adjustment for Obstruction of Justice:

Adjustment for Reckless Endangerment During Flight:

Adjusted Offense Level:      32

☐ Combined (Mult. Counts)    ☐ Career Off.    ☐Armed Career Crim.

Adjustment for Acceptance of Responsibility [☒ Government Motion – USSG §3E1.1(b)]      -3

Total Offense Level:      29

Criminal History Score:      6

Criminal History Category:      III

__ Career Offender      ___ Armed Career Criminal

Guideline Range:                                              from  <u>108</u> mths
(Range limited by: _____minimum mand.  <u>X</u> statutory maximum)    to  <u>135</u> mths
Departures:

Resulting Guideline Range: Adjusted Offense Level ___                from  mths
                                                                    to  mths

18 U.S.C. § 3553(a) Variance: A reduction of 11 months (equivalent of one-level) due to difficult family circumstances, youthful indiscretion, forthrightness post-plea, and on-going drug addiction issues.

RECOMMENDATION:      <u>97 months' custody, three years' of supervised release, $100 special assessment.</u>

**Approved**: CPH

208

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 16CR2609-BEN |
| Plaintiff, | ) | **CERTIFICATE OF SERVICE** |
| v. | ) | |
| ARTURO DELGADO-VEGA, | ) | |
| Defendant. | ) | |
| | ) | |

IT IS HEREBY CERTIFIED THAT:

I, Charlotte E. Kaiser, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the Government's Sentencing Summary Chart on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them:

1. Gregory D. Obenauer, Esq.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 12, 2017.

/s/ Charlotte E. Kaiser

# PLEA AGREEMENT

date filed: May 23, 2017

ALANA W. ROBINSON
Acting United States Attorney
Eric G. Roscoe
Assistant U.S. Attorney
District of Columbia Bar No.: 1006245
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9722

FILED

MAY 23 2017

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 16 CR 2609 BEN |
| Plaintiff, | PLEA AGREEMENT |
| v. | |
| ARTURO DELGADO-VEGA, | |
| Defendant. | |

IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF AMERICA, through its counsel, Alana W. Robinson, Acting United States Attorney, and Eric G. Roscoe, Assistant United States Attorney, and defendant, ARTURO DELGADO-VEGA, with the advice and consent of Gregory D. Obenauer, counsel for defendant, as follows:

//
//
//
//
//
//

EGR:tld:5/17/17

X A D 241

# I

## THE PLEA

A.  The Charge.  Defendant agrees to waive Indictment and plead guilty to a single-count Information charging defendant with:

> On or about October 15, 2016, within the Southern District of California, defendant ARTURO DELGADO-VEGA, did knowingly and intentionally possess, with intent to distribute, a mixture and substance containing a detectable amount of Methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

B.  Evidence Disposition.

Defendant agrees that, following entry of defendant's guilty plea, the Government need not hold or preserve any evidence seized in connection with this case.  With respect to any controlled substance seized in connection with this case, defendant agrees that, following entry of defendant's guilty plea, the Government need not preserve, and may destroy, the controlled substance thirty (30) days after the Government has provided defendant with the laboratory analysis report. If defendant believes that additional testing is needed, defendant will arrange for, and complete, such testing within the above-referenced thirty (30) day period, unless that period is extended by joint written agreement between the parties or by order of the Court, in which case the Government shall preserve the controlled substance for the agreed-upon or judicially mandated period.  Furthermore, if the court has issued a preservation order in connection with any seized evidence, the defendant agrees to jointly request that the Court lift or revoke the preservation order following entry of defendant's guilty plea.

C.  Forfeiture.  The defendant further agrees to the administrative and/or civil forfeiture of all properties seized in connection with this case which the defendant agrees are subject to

2                          Def. Initials _A·D_

forfeiture to the United States pursuant to Title 21, United States Code, Section 881. The defendant further waives his right to receive timely notice of administrative forfeiture as set forth in 18 U.S.C. § 983(a) and waives receipt of all notice of forfeiture in this and all other administrative and civil proceedings. Defendant waives and disclaims defendants' interest, if any, in the properties to be forfeited as described above. Defendant further agrees not to contest or to assist any other person or entity in contesting the forfeiture of the property(ies) seized in connection with this case.

## II

## NATURE OF THE OFFENSE

A. ELEMENTS EXPLAINED

Defendant understands that the offense to which defendant is pleading guilty has the following elements:

      1. Defendant knowingly possessed Methamphetamine; and

      2. Defendant possessed the Methamphetamine with the intent to deliver it to another person.

B. ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each of the elements of the crime, and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed:

//

      1. That on or about October 15, 2016, defendant ARTURO DELGADO-VEGA drove a vehicle to the United States Border Patrol Checkpoint (the "checkpoint") located near Westmorland, California.

      2. That at the time the vehicle arrived at the checkpoint, concealed within the vehicle was approximately 16.59 kilograms (36.57 pounds) of Methamphetamine, a Schedule II Controlled Substance.

3

Def. Initials _A.D_

3.      That at the time defendant drove the vehicle to the checkpoint, he knowingly possessed, with the intent to deliver to another person, Methamphetamine, or some other prohibited drug, concealed therein.

### III

### PENALTIES

Defendant understands that the crime to which defendant is pleading guilty carries the following penalties:

A.      a maximum 20 years in prison;

B.      a maximum $1,000,000 fine;

C.      a mandatory special assessment of $100.00 per count; and

D.      a term of supervised release of at least 3 years and up to life. Defendant understands that failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring defendant to serve in prison, upon any such revocation, all or part of the statutory maximum term of supervised release for the offense that resulted in such term of supervised release;

E.      possible ineligibility for certain Federal benefits.

### IV

### DEFENDANT'S WAIVER OF TRIAL RIGHTS

Defendant understands that this guilty plea waives the right to:

A.      continue to plead not guilty and require the Government to prove the elements of the crime beyond a reasonable doubt;

B.      a speedy and public trial by jury;

C.      the assistance of counsel at all stages of trial;

D.      confront and cross-examine adverse witnesses;

E.      testify and present evidence and to have witnesses testify on behalf of defendant; and,

F.      not testify or have any adverse inferences drawn from the failure to testify.

//

//

4

Def. Initials  A.D

214

V

## DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE
## PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE DEFENSE INFORMATION

The Government represents that any information establishing the factual innocence of defendant known to the undersigned prosecutor in this case has been turned over to defendant. The Government will continue to provide such information establishing the factual innocence of defendant.

Defendant understands that, if this case proceeded to trial, the Government would be required to provide impeachment information relating to any informants or other witnesses. In addition, if defendant raised an affirmative defense, the Government would be required to provide information in its possession that supports such a defense. Defendant acknowledges, however, that by pleading guilty defendant will not be provided this information, if any, and defendant also waives the right to this information. Finally, defendant agrees not to attempt to withdraw the guilty plea or to file a collateral attack based on the existence of this information.

VI

## DEFENDANT'S REPRESENTATION THAT GUILTY
## PLEA IS KNOWING AND VOLUNTARY

Defendant represents that:

A.     Defendant has had a full opportunity to discuss all the facts and circumstances of this case with defense counsel, and has a clear understanding of the charges and the consequences of this plea. Defendant understands that, by pleading guilty, defendant may be giving up, and rendered ineligible to receive, valuable government benefits and civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant further understands that the conviction in this case may subject defendant to various collateral consequences, including but not limited to deportation, removal or other adverse immigration consequences; revocation of probation, parole, or supervised release in another case; debarment from government contracting; and suspension or revocation of a

5

Def. Initials  A·D

215

professional license, none of which will serve as grounds to withdraw defendant's guilty plea;

B.  No one has made any promises or offered any rewards in return for this guilty plea, other than those contained in this agreement or otherwise disclosed to the court;

C.  No one has threatened defendant or defendant's family to induce this guilty plea; and,

D.  Defendant is pleading guilty because in truth and in fact defendant is guilty and for no other reason.

## VII

### AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE
### SOUTHERN DISTRICT OF CALIFORNIA

This plea agreement is limited to the United States Attorney's Office for the Southern District of California, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities, although the Government will bring this plea agreement to the attention of other authorities if requested by the defendant.

## VIII

### APPLICABILITY OF SENTENCING GUIDELINES

Defendant understands the sentence imposed will be based on the factors set forth in 18 U.S.C. § 3553(a). Defendant understands further that, in imposing the sentence, the sentencing judge must consult the United States Sentencing Guidelines (Guidelines) and take them into account. Defendant has discussed the Guidelines with defense counsel and understands that the Guidelines are only advisory, not mandatory, and the court may impose a sentence more severe or less severe than otherwise applicable under the Guidelines, up to the maximum in the statute of conviction. Defendant understands further that the sentence cannot be determined until a presentence report has been prepared by the U.S. Probation Office and defense counsel and the Government has had an opportunity to review and challenge the presentence report. **Defendant**

6

Def. Initials A.D

1 **agrees to request that a presentence report be prepared.** Nothing in

2 this plea agreement shall be construed as limiting the Government's duty

3 to provide complete and accurate facts to the district court and the

4 U.S. Probation Office.

5 **IX**

6 **SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE**

7     This plea agreement is made pursuant to Federal Rule of Criminal

8 Procedure 11(c)(1)(B). Defendant understands that the sentence is

9 within the sole discretion of the sentencing judge. The Government has

10 not made and will not make any representation as to what sentence

11 defendant will receive. Defendant understands that the sentencing judge

12 may impose the maximum sentence provided by statute, and is also aware

13 that any estimate of the probable sentence by defense counsel is a

14 prediction, not a promise, and is **not binding on the Court.** Likewise,

15 the recommendation made by the Government is not binding on the Court,

16 and it is uncertain at this time what defendant's sentence will be.

17 Defendant also has been advised and understands that, if the sentencing

18 judge does not follow any of the parties' sentencing recommendations,

19 defendant nevertheless has no right to withdraw the plea.

20 **X**

21 **PARTIES' SENTENCING RECOMMENDATIONS**

22     A.   SENTENCING GUIDELINE CALCULATIONS

23     Although the parties understand that the Guidelines are only

24 advisory and just one of the factors the court will consider under

25 18 U.S.C. § 3553(a) in imposing a sentence, the parties will jointly

26 recommend the following Base Offense Level, Specific Offense

27 Characteristics, Adjustments and Departures (if applicable), based on

28 the November 1, 2016 guidelines:

Def. Initials A·D

217

1.  Base Offense Level [USSG § 2D1.1]                      38*
    (The actual Base Offense Level (BOL)
    cannot be determined until the DEA
    laboratory has performed a chemical
    analysis of the substance.)

2.  Safety Valve (if applicable)                           N/A**
    [§§ 2D1.1(b)(17) and 5C1.2]

3.  Acceptance of Responsibility [§ 3E1.1]                 -3

**\*The parties agree that, if defendant is determined to be a career offender pursuant to USSG § 4B1.1(a), the applicable base offense level shall be determined pursuant to USSG § 4B1.1(b). Furthermore, the defendant will be ineligible for any role reduction.**

**\*\*If defendant truthfully discloses to the government all information and evidence the defendant has concerning the offense and relevant conduct, and if defendant otherwise qualifies for the "safety valve" in § 5C1.2, the government will recommend a two-level reduction under § 2D1.1(b)(17) and relief from any statutory mandatory minimum sentence pursuant to § 5C1.2. Defendant understands that, if he/she does not qualify under § 5C1.2, defendant may be subject to a statutory mandatory minimum sentence.**

//

B.   <u>ACCEPTANCE OF RESPONSIBILITY</u>

Notwithstanding paragraph A.3 above, the Government will not recommend any adjustment for <u>Acceptance of Responsibility</u> if defendant materially breaches this plea agreement by any of the following:

1.  Fails to truthfully admit a complete factual basis for the plea at the time it is entered, or

2.  Denies involvement in the offense, gives conflicting statements about that involvement, or is untruthful with the Court or probation officer, or

3.  Falsely denies prior criminal conduct or convictions; or

Def. Initials *A B*

218

4.   Fails to appear in court, or

5.   Engages in additional criminal conduct, or

6.   Attempts to withdraw the plea, or

7.   Fails to abide by any lawful court order, or

8.   Contests or assists any third party in contesting the forfeiture of property(ies) seized or forfeited in connection with this case.

C.   FURTHER ADJUSTMENTS AND SENTENCE REDUCTIONS INCLUDING THOSE UNDER 18 U.S.C. § 3553

The parties agree that defendant may request or recommend additional downward adjustments, departures, or sentence reductions under 18 U.S.C. § 3553. The Government may oppose any such downward adjustments, departures and sentence reductions not set forth in Section X, paragraph A above.

D.   NO AGREEMENT AS TO CRIMINAL HISTORY CATEGORY

The parties have no agreement as to defendant's Criminal History Category, except that, if defendant is determined to be a Career Offender, the parties agree that the defendant is automatically a Criminal History Category VI pursuant to USSG § 4B1.1(b).

//

E.   "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION

The parties agree that the facts in the "factual basis" paragraph of this agreement are true, and may be considered as "relevant conduct" under USSG § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

F.   PARTIES' RECOMMENDATIONS REGARDING CUSTODY

The Government will recommend that defendant be sentenced to the low end of the advisory guideline range as calculated by the Government pursuant to this agreement.

9

Def. Initials

219

1  G.  SPECIAL ASSESSMENT

2  The parties will jointly recommend that defendant pay a special

3  assessment in the amount of $100.00 to be paid forthwith at time of

4  sentencing.  The special assessment shall be paid through the office of

5  the Clerk of the District Court by bank or cashier's check or money

6  order made payable to the "Clerk, United States District Court."

7  H.  SUPERVISED RELEASE

8  The Government is free to recommend a period of supervised release.

9  If the Court imposes a term of supervised release, defendant agrees that

10  he will not later seek to reduce or terminate early the term of

11  supervised release until he has served at least two-thirds of his term

12  of supervised release and has fully paid and satisfied any special

13  assessments, fine, criminal forfeiture judgment and restitution

14  judgment.

15  **XI**

16  **DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK**

17  In exchange for the Government's concessions in this plea

18  agreement, defendant waives, to the full extent of the law, any right

19  to appeal or to collaterally attack the conviction and any lawful

20  restitution order, except a post-conviction collateral attack based on

21  a claim of ineffective assistance of counsel.  Defendant also waives,

22  to the full extent of the law, any right to appeal or to collaterally

23  attack the sentence, unless the court imposes a custodial sentence

24  greater than 100 months. If the defendant appeals, the Government may

25  support on appeal the sentence imposed.  If defendant believes the

26  Government's recommendation at the time of sentencing is not in accord

27  with this agreement, defendant will object at the time of sentencing;

28

10

Def. Initials A.O

220

1  otherwise the objection will be deemed waived and cannot be raised on
2  appeal.

3      If defendant breaches this plea agreement, at any time, in any way,
4  including, but not limited to, the reasons set forth in section X.B.
5  above, the Government may prosecute defendant for any counts, including
6  those with mandatory minimum sentences, dismissed or not charged
7  pursuant to this plea agreement.   Additionally, the Government may use
8  any factual admissions made by defendant pursuant to this plea agreement
9  in any such prosecution.

10                                  **XII**

11        **CRIMES AFTER ARREST OR BREACH OF THE AGREEMENT WILL PERMIT**
12  **THE GOVERNMENT TO RECOMMEND A HIGHER SENTENCE OR SET ASIDE THE PLEA**

13      This plea agreement is based on the understanding that, prior to
14  defendant's sentencing in this case, defendant has not committed or been
15  arrested for any offense not known to the Government prior to defendant's
16  sentencing.   This plea agreement is further based on the understanding
17  that defendant has committed no criminal conduct since defendant's
18  arrest on the present charges, and that defendant will commit no
19  additional criminal conduct before sentencing.   If defendant has engaged
20  in or engages in additional criminal conduct during this period, or
21  breaches any of the terms of any agreement with the Government, the
22  Government will not be bound by the recommendations in this plea
23  agreement, and may recommend any lawful sentence.   In addition, at its
24  option, the Government may move to set aside the plea.

25                                 **XIII**

26                           **ENTIRE AGREEMENT**

27      This plea agreement embodies the entire agreement between the
28  parties and supersedes any other agreement, written or oral.

11

Def. Initials A.D

## XIV

## __MODIFICATION OF AGREEMENT MUST BE IN WRITING__

No modification of this plea agreement shall be effective unless in writing signed by all parties.

## XV

## __DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT__

By signing this agreement, defendant certifies that defendant has read it (or that it has been read to defendant in defendant's native language). Defendant has discussed the terms of this agreement with defense counsel and fully understands its meaning and effect.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

12

Def. Initials *A.D*

XVI

<u>**DEFENDANT SATISFIED WITH COUNSEL**</u>

Defendant has consulted with counsel and is satisfied with counsel's representation. This is defendant's independent opinion, and his/her counsel did not advise him/her about what to say in this regard.

Respectfully submitted,

ALANA W. ROBINSON
Acting United States Attorney

DATED _5/17/17_ 

ERIC G. ROSCOE
Assistant U.S. Attorney

DATED _5/17/17_ 

GREGORY D. OBENAUER
Defense Counsel

**IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE.**

DATED _5/17/17_ 

ARTURO DELGADO-VEGA
Defendant

Rev. EGR:jam:9/16/14

13

Def. Initials *AD*

223

# **INFORMATION**

date filed: November 10, 2016

**FILED**

Nov 10 2016

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    s/ erlkaf                    DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ARTURO DELGADO-VEGA,<br><br>Defendant. | Case No.: **'16 CR2609 BEN**<br><br>I N F O R M A T I O N<br><br>Title 21, U.S.C., Sec.<br>841(a)(1) – Possession of<br>Methamphetamine with Intent<br>to Distribute (Felony) |

The United States Attorney charges:

On or about October 15, 2016, within the Southern District of California, defendant ARTURO DELGADO-VEGA, did knowingly and intentionally possess, with intent to distribute, a mixture and substance containing a detectable amount of Methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

DATED: ___11/10/16___ .

LAURA E. DUFFY
United States Attorney

CORETTA L. CATLIN
Assistant U.S. Attorney

CLC:tld:10/24/2016

225

# DOCKET SHEETS

APPEAL,CLOSED,PROTO,SEALDC

# U.S. District Court
## Southern District of California (San Diego)
## CRIMINAL DOCKET FOR CASE #: 3:16-cr-02609-BEN-1

Case title: USA v. Delgado-Vega                      Date Filed: 11/10/2016
Magistrate judge case number: 2:16-mj-08876-PCL      Date Terminated: 07/19/2019

Assigned to: Judge Roger T. Benitez

Appeals court case numbers: 17-50412
USCA, 19-50224 USCA

**Defendant (1)**

**Arturo Delgado-Vega**            represented by   **Gregory D Obenauer**
*TERMINATED: 07/19/2019*                            Law Office of Gregory D Obenauer
                                                    1901 First Avenue
                                                    Suite 213
                                                    San Diego, CA 92101
                                                    (619)230-1523
                                                    Fax: (619)230-1540
                                                    Email: golaw@mac.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Designation: CJA Appointment*

**Pending Counts**                                  **Disposition**

21:841(a)(1) - Possession of                        SENTENCE ON REMAND HELD ON
Methamphetamine with Intent to Distribute           7/1/2019: Custody of the Bureau of Prisons
(Felony)                                            for a term of 110 months. Supervised
(1)                                                 Release for a term of 5 years. $100.00
                                                    penalty assessment. Fine: $500.00.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                               **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                      **Disposition**

21:841(a)(1) - Possession of a Controlled
Substance with Intent to Distribute
(Methamphetamine)(Felony)

**Plaintiff**

**USA**
                               represented by   **Charlotte E Kaiser**
U S Attorney's Office
880 Front Street
Room 6293
San Diego, CA 92101
(619)546-7282
Email: Charlotte.Kaiser@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant United States*
*Attorney*

**Ajay Krishnamurthy**
US Attorney's Office
Southern District of California
880 Front Street, #6293
San Diego, CA 92101
619-546-9613
Email: ajay.krishnamurthy@usdoj.gov
*TERMINATED: 06/21/2017*
*Designation: Assistant United States*
*Attorney*

**Coretta Catlin**
Dentons US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
816-460-2447
Fax: 816-531-7545
Email: coretta.catlin@usdoj.gov
*TERMINATED: 01/03/2017*
*Designation: Assistant United States*
*Attorney*

**Eric George Roscoe**
U S Attorneys Office Southern District of
California
880 Front Street
Room 6293
San Diego, CA 92101
619-546-9722
Fax: 619-546-0510
Email: eric.roscoe@usdoj.gov
*TERMINATED: 06/21/2017*
*Designation: Assistant United States*
*Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| | | |

| 10/15/2016 | | Arrest of Arturo Delgado-Vega 10/15/16 (no document attached) (tar) [2:16-mj-08876-PCL] (Entered: 10/17/2016) |
|---|---|---|
| 10/17/2016 | 1 | COMPLAINT as to Arturo Delgado-Vega. (Copies provided to Counsel in Court). Initial Appearance set for 10/17/2016 in El Centro before Magistrate Judge Peter C. Lewis. Preliminary Hearing set for 10/27/2016 01:30 PM in El Centro before Magistrate Judge Peter C. Lewis. Arraignment set for 11/10/2016 01:30 PM in El Centro before Magistrate Judge Peter C. Lewis. (tar) (Additional attachment(s) added on 10/17/2016: # 1 info sheet) (tar). [2:16-mj-08876-PCL] (Entered: 10/17/2016) |
| 10/17/2016 | 2 | Minute Entry for proceedings held before Magistrate Judge Peter C. Lewis: Initial Appearance as to Arturo Delgado-Vega held on 10/17/2016. Appointed Attorney Gregory D Obenauer for Arturo Delgado-Vega. Government oral motion for detention due to risk of flight. No bail. Preliminary Hearing set for 10/27/16 at 1:30 pm. Arraignment set for 11/10/16 at 1:30 PM. Detention Hearing - RF set for 10/20/2016 01:30 PM in El Centro before Magistrate Judge Peter C. Lewis. (CD# 10/17/2016 PCL:01-1:48-1:52-1:55-1:56). (Plaintiff Attorney Rosario Gonzalez). (Defendant Attorney Jaidee Serrano). (no document attached) (tar) [2:16-mj-08876-PCL] (Entered: 10/18/2016) |
| 10/17/2016 | 3 | ***English. No Interpreter needed as to Arturo Delgado-Vega (no document attached) (tar) [2:16-mj-08876-PCL] (Entered: 10/18/2016) |
| 10/17/2016 | 4 | ORAL MOTION to Detain by Arturo Delgado-Vega. (no document attached) (tar) [2:16-mj-08876-PCL] (Entered: 10/18/2016) |
| 10/17/2016 | 5 | CJA 23 Financial Affidavit by Arturo Delgado-Vega (tar) [2:16-mj-08876-PCL] (Entered: 10/18/2016) |
| 10/19/2016 | 6 | NOTICE OF ATTORNEY APPEARANCE Coretta Catlin appearing for USA. (Catlin, Coretta)Attorney Coretta Catlin added to party USA(pty:pla) (dxj). [2:16-mj-08876-PCL] (Entered: 10/19/2016) |
| 10/20/2016 | 7 | Minute Entry for proceedings held before Magistrate Judge Peter C. Lewis: Detention Hearing as to Arturo Delgado-Vega held on 10/20/2016. USA oral motion for detention; 4 motion granted as to Arturo Delgado-Vega. Order of detention to be submitted by AUSA. (CD# 10/20/2016 PCL 1:25 - 2:30). (Plaintiff Attorney Christine Ro). (Defendant Attorney Gregory Obenauer cja). (no document attached) (erf) [2:16-mj-08876-PCL] (Entered: 10/21/2016) |
| 10/26/2016 | 8 | FINDINGS OF FACT AND ORDER OF DETENTION as to Arturo Delgado-Vega. Signed by Magistrate Judge Peter C. Lewis on 10/26/16. (tar) [2:16-mj-08876-PCL] (Entered: 10/27/2016) |
| 10/27/2016 | 9 | Minute Entry for proceedings held before Magistrate Judge Peter C. Lewis: Preliminary Hearing Continued as to Arturo Delgado-Vega. Defense oral motion to continue hearing granted. Preliminary Hearing continued to 11/10/2016 01:30 PM in El Centro before Magistrate Judge Peter C. Lewis. (CD# 10/27/2016 PCL 1:43-1:45). (Plaintiff Attorney Christine Ro, AUSA). (Defendant Attorney Gerard Wasson s/a for Gregory Obenauer (n/a), CJA). (no document attached) (ccc) [2:16-mj-08876-PCL] (Entered: 10/28/2016) |
| 11/10/2016 | 10 | INFORMATION as to Arturo Delgado-Vega (1) count(s) 1. (tar) (Entered: 11/10/2016) |
| 11/10/2016 | 11 | WAIVER OF INDICTMENT by Arturo Delgado-Vega (erf) (Entered: 11/14/2016) |
| 11/10/2016 | 12 | Minute Entry for proceedings held before Magistrate Judge Peter C. Lewis: Arraignment on the information as to Arturo Delgado-Vega (1) Count 1 held on 11/10/2016. Not Guilty plea entered. Motion Hearing/Trial Setting set for 12/5/2016 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. The defendant may remain in El Centro and schedule a plea before Magistrate Judge Peter C. Lewis. Alternatively, counsel is |

|  |  |  |
|---|---|---|
|  |  | directed to contact the clerk for Magistrate Judge Bernard G. Skomal if a Change of Plea Hearing needs to be scheduled in San Diego. (CD# 11/10/2016 PCL 1: 2:04-2:06&2:12-2:13). (Plaintiff Attorney Christine Ro). (Defendant Attorney Gregory Obenauer cja). (no document attached) (erf) (Entered: 11/14/2016) |
| 12/05/2016 | 13 | Minute Entry for proceedings held before Judge Roger T. Benitez: Motion Hearing/Trial Setting as to Arturo Delgado-Vega held on 12/5/2016. Defense oral request for continuance - Granted. Motion Hearing/Trial Setting reset for 12/19/2016 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (Court Reporter/ECR Debbie OConnell). (Plaintiff Attorney Carol Lee). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 12/07/2016) |
| 12/09/2016 | 14 | MOTION for Discovery by Arturo Delgado-Vega. (Attachments: # 1 Memo of Points and Authorities Discovery Motion)(Obenauer, Gregory) (Entered: 12/09/2016) |
| 12/09/2016 | 15 | NOTICE OF WITHDRAWAL OF DOCUMENT filed by Arturo Delgado-Vega *Discovery Motion* (Attachments: # 1 Memo of Points and Authorities Discovery Motion) (Obenauer, Gregory) Contacted attorney re incorrect event used on 12/16/2016 (knb). (Entered: 12/09/2016) |
| 12/09/2016 | 16 | MOTION for Discovery by Arturo Delgado-Vega. (Attachments: # 1 Memo of Points and Authorities Discovery Motion)(Obenauer, Gregory) (Entered: 12/09/2016) |
| 12/12/2016 | 17 | RESPONSE in Opposition by USA as to Arturo Delgado-Vega re 16 MOTION for Discovery (Catlin, Coretta) (knb). (Entered: 12/12/2016) |
| 12/17/2016 | 18 | Joint MOTION to Continue *MOTION HEARING DATE* by Arturo Delgado-Vega. (Obenauer, Gregory) (Entered: 12/17/2016) |
| 12/19/2016 | 19 | Minute Entry for proceedings held before Judge Roger T. Benitez: Motion Hearing/Trial Setting as to Arturo Delgado-Vega held on 12/19/2016. Granting 18 Joint Motion to Continue as to Arturo Delgado-Vega (1). Motion Hearing/Trial Setting reset for 1/23/2017 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (Court Reporter/ECR Debbie OConnell). (Plaintiff Attorney Matthew James Sutton). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 12/20/2016) |
| 01/03/2017 | 20 | NOTICE OF ATTORNEY APPEARANCE Eric George Roscoe appearing for USA. *Removing Coretta Catlin* (Roscoe, Eric)Attorney Eric George Roscoe added to party USA(pty:pla) (knb). (Entered: 01/03/2017) |
| 01/09/2017 | 21 | MOTION to Suppress Evidence by Arturo Delgado-Vega. (Attachments: # 1 Memo of Points and Authorities Suppress Statements and Evidence)(Obenauer, Gregory) (Entered: 01/09/2017) |
| 01/12/2017 | 22 | DECLARATION by Arturo Delgado-Vega Re: Doc. No. 21 (Obenauer, Gregory) Modified on 1/12/2017 to add link to Motion (jrd). (Entered: 01/12/2017) |
| 01/16/2017 | 23 | RESPONSE in Opposition by USA as to Arturo Delgado-Vega re 21 MOTION to Suppress Evidence *and Statements* (Attachments: # 1 Exhibit 1. Moralez-Armenta District Court Order, # 2 Exhibit 2. Defendant Waiver of Rights)(Roscoe, Eric) (Entered: 01/16/2017) |
| 01/18/2017 | 24 | Joint MOTION for Protective Order by USA as to Arturo Delgado-Vega. (Roscoe, Eric) (Entered: 01/18/2017) |
| 01/23/2017 | 25 | Minute Entry for proceedings held before Judge Roger T. Benitez: Motion Hearing/Trial Setting as to Arturo Delgado-Vega held on 1/23/2017. Motion Hearing/Trial Setting continued to 2/21/2017 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (Court Reporter/ECR Debbie OConnell). (Plaintiff Attorney Eric George Roscoe). |

|  | | (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 01/24/2017) |
|---|---|---|
| 01/24/2017 | 26 | PROTECTIVE ORDER, Granting 24 Joint Motion for Protective Order as to Arturo Delgado-Vega (1). Signed by Judge Roger T. Benitez on 1/23/2017.(knb) (jao). (Entered: 01/25/2017) |
| 01/27/2017 | 27 | Supplemental MOTION for Discovery by Arturo Delgado-Vega. (Attachments: # 1 Exhibit ROI Discovery 47)(Obenauer, Gregory) (Entered: 01/27/2017) |
| 02/02/2017 | 28 | RESPONSE in Opposition by USA as to Arturo Delgado-Vega re 27 Supplemental MOTION for Discovery *Request for Staff and Funding Information Checkpoint 86* (Roscoe, Eric) (Entered: 02/02/2017) |
| 02/21/2017 | 29 | Minute Entry for proceedings held before Judge Roger T. Benitez: Motion Hearing/Trial Setting as to Arturo Delgado-Vega held on 2/21/2017. Evidentiary Hearing set for 4/25/2017 09:30 AM in Courtroom 5A before Judge Roger T. Benitez. (Court Reporter/ECR Debbie OConnell). (Plaintiff Attorney Todd Robinson). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 02/23/2017) |
| 03/27/2017 | 30 | Ex Parte MOTION for Order *Permitting Defense Expert to Receive Checkpoint and Canine Materials* by Arturo Delgado-Vega. (Obenauer, Gregory) (fth). (Entered: 03/27/2017) |
| 03/29/2017 | 31 | Ex Parte MOTION for Order *EXPERT FUNDING* by Arturo Delgado-Vega. (Attachments: # 1 Exhibit Falco CV)(Obenauer, Gregory) (fth). (Entered: 03/29/2017) |
| 04/11/2017 | 32 | ORDER Permitting Defense Expert Witness Andre Falco Jimenez to Review Checkpoint and Canine Materials re 30 Motion for Order as to Arturo Delgado-Vega (1). Signed by Judge Roger T. Benitez on 4/5/2017.(fth) (Entered: 04/11/2017) |
| 04/11/2017 | 33 | ORDER for Funding for Defense Expert Andre Falco Jimenez re 31 Motion for Order as to Arturo Delgado-Vega (1). Signed by Judge Roger T. Benitez on 4/5/2017. (fth) (Entered: 04/11/2017) |
| 04/24/2017 | 34 | NOTICE OF ATTORNEY APPEARANCE Ajay Krishnamurthy appearing for USA. (Krishnamurthy, Ajay)Attorney Ajay Krishnamurthy added to party USA(pty:pla)(knb). (Entered: 04/24/2017) |
| 04/25/2017 | 35 | Minute Entry for proceedings held before Judge Roger T. Benitez: Evidentiary Hearing - Day 1, as to Arturo Delgado-Vega (1) held on 4/25/2017. Witnesses C/S/T. Exhibits marked/received. Denying 21 Motion to Suppress Evidence. Motion Hearing/Trial Setting set for 6/12/2017 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (Court Reporter/ECR Debbie OConnell). (Plaintiff Attorney Eric George Roscoe, Shane Harrigan, Ajay Krishnamurthy). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 05/03/2017) |
| 05/05/2017 | 36 | Evidentiary Hearing WITNESS LIST as to Arturo Delgado-Vega (gxr) (Entered: 05/05/2017) |
| 05/05/2017 | 37 | Evidentiary Hearing Government EXHIBIT LIST as to Arturo Delgado-Vega (gxr) (Entered: 05/05/2017) |
| 05/05/2017 | 38 | Evidentiary Hearing Defendant EXHIBIT LIST as to Arturo Delgado-Vega (gxr) (Entered: 05/05/2017) |
| 05/19/2017 | 39 | NOTICE OF HEARING as to Defendant Arturo Delgado-Vega. At the request of defense counsel, Change of Plea Hearing set for 5/23/2017 01:30 PM before Magistrate Judge Bernard G. Skomal. (no document attached) (tkl) (Entered: 05/19/2017) |

| 05/23/2017 | 40 | Minute Entry for proceedings held before Magistrate Judge Bernard G. Skomal: Change of Plea Hearing as to Arturo Delgado-Vega held on 5/23/2017. Plea Tendered by Arturo Delgado-Vega. Guilty on count One (1) of the Information. Excludable(s) started as to Arturo Delgado-Vega: (XT) Interest of Justice 5/23/17 to 8/28/17). PSR Ordered.( Sentence With PSR set for 8/28/2017 09:00 AM before Judge Roger T. Benitez.) Pending motions - withdrawn. Motion hearing/trial setting date - vacated. (CD# 5/23/2017 BGS1:148-208). (Plaintiff Attorney AUSA, Julia Cline s/a for Eric Roscoe, n/a). (Defendant Attorney Gregory Obenauer, CJA). (no document attached) (tml) (Entered: 05/23/2017) |
| 05/23/2017 | 41 | CONSENT TO RULE 11 PLEA before Magistrate Judge Bernard G. Skomal by Arturo Delgado-Vega. (knb) (Entered: 05/24/2017) |
| 05/23/2017 | 42 | PLEA AGREEMENT as to Arturo Delgado-Vega (knb) (Entered: 05/24/2017) |
| 05/24/2017 | 43 | FINDINGS AND RECOMMENDATION of the Magistrate Judge upon a Tendered Plea of Guilty as to Arturo Delgado-Vega: Recommending that the district judge accept the defendant's plea of guilty. Signed by Magistrate Judge Bernard G. Skomal on 5/23/2017. (knb) (Entered: 05/24/2017) |
| 05/26/2017 | 44 | Ex Parte MOTION for Order *Interim Billing* by Arturo Delgado-Vega. (Attachments: # 1 Declaration In Support of Interim Payment)(Obenauer, Gregory) (Entered: 05/26/2017) |
| 06/07/2017 | 45 | ORDER Granting 44 Motion for Order re Interim Billing for Attorney Obenauer as to Arturo Delgado-Vega (1). Signed by Judge Roger T. Benitez on 6/1/2017.(knb) (Entered: 06/08/2017) |
| 06/21/2017 | 46 | NOTICE OF ATTORNEY APPEARANCE Charlotte E Kaiser appearing for USA. (Kaiser, Charlotte)Attorney Charlotte E Kaiser added to party USA(pty:pla) (knb). (Entered: 06/21/2017) |
| 06/27/2017 | 47 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Evidentiary Hearing) as to Arturo Delgado-Vega held on 4/25/2017, before Judge Roger T. Benitez. Court Reporter/Transcriber: Deborah M. O'Connell. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 7/18/2017. Redacted Transcript Deadline set for 7/28/2017. Release of Transcript Restriction set for 9/25/2017. (akr) (Entered: 06/27/2017) |
| 07/10/2017 | 48 | ORDER ACCEPTING GUILTY PLEA as to count(s) 1 of the Information, as to Arturo Delgado-Vega, adopting 43 Findings and Recommendation. Signed by Judge Roger T. Benitez on 7/10/2017. (knb) (Entered: 07/11/2017) |
| 07/20/2017 | 49 | PRE-SENTENCE REPORT as to Arturo Delgado-Vega. Report prepared by: Steven Evert. (Document applicable to USA, Arturo Delgado-Vega.) (Ponce, K.) (knb). (Entered: 07/20/2017) |
| 08/17/2017 | 50 | Ex Parte MOTION for Order *Continue Sentence Hearing* by Arturo Delgado-Vega. (Obenauer, Gregory) (knb). (Entered: 08/17/2017) |
| 08/17/2017 | 51 | Minute Order issued by the Honorable Roger T. Benitez: granting 50 Joint Motion for Order as to Arturo Delgado-Vega (1). Sentence With PSR reset for 10/23/2017 09:00 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 08/17/2017) |

| 10/12/2017 | 52 | SENTENCING SUMMARY CHART by USA as to Arturo Delgado-Vega (Kaiser, Charlotte) (ajs). (Entered: 10/12/2017) |
|---|---|---|
| 10/19/2017 | 53 | Sentencing Document: Sentence Letters by Arturo Delgado-Vega (Attachments: # 1 Exhibit SENTENCE Letters)(Obenauer, Gregory) (Entered: 10/19/2017) |
| 10/20/2017 | 54 | Defendant's Ex Parte Application to Seal Sentencing Memorandum and Sentencing Summary Chart. (cc: Benitez Chambers, Atty Gregory Obenauer) (jah) Modified on 10/24/2017 (tb-v). (dlg). (Entered: 10/23/2017) |
| 10/20/2017 | 56 | Defendant's Sentencing Memorandum. (cc: Benitez Chambers, Atty Gergory Obenauer) (jah) Modified on 10/24/2017 (tb-v). (dlg). (Entered: 10/23/2017) |
| 10/20/2017 | 57 | Defendant's Sentencing Summary Chart. (cc: Benitez Chambers, Atty Gregory Obenauer) (jah) Modified on 10/24/2017 (tb-v). (dlg). (Entered: 10/23/2017) |
| 10/23/2017 | 58 | Minute Entry for proceedings held before Judge Roger T. Benitez: Sentence With PSR Hearing as to Arturo Delgado-Vega held on 10/23/2017. Sentence With PSR reset for 11/27/2017 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. Court hereby orders that the defendant remain incarcerated in San Diego, California until he has been sentenced. (Court Reporter/ECR Cynthia Ott). (Plaintiff Attorney Charlotte E. Kaiser). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 10/24/2017) |
| 11/09/2017 | 59 | WITHDRAWN per 60 Notice of Withdrawal of Document. Ex Parte MOTION for Order *Interim Billing* by Arturo Delgado-Vega. (Attachments: # 1 Declaration In Support of Interim Payment)(Obenauer, Gregory) (knb) (Entered: 11/09/2017) |
| 11/09/2017 | 60 | NOTICE OF WITHDRAWAL OF DOCUMENT filed by Arturo Delgado-Vega re 59 Ex Parte Motion for Order *Application for Interim Billing* (Attachments: # 1 Declaration In Support of Interim Payment)(Obenauer, Gregory) (knb). (Entered: 11/09/2017) |
| 11/27/2017 | 61 | Minute Entry for proceedings held before Judge Roger T. Benitez: Sentence With PSR Hearing held on 11/27/2017 for Arturo Delgado-Vega (1), Count(s) 1, Custody of BOP for a term of 120 months; Supervised release for a term of 5 years; Penalty Assessment $100.00; Fine $500.00. (Court Reporter/ECR Amanda LeGore)(USPO Jason Le) (Plaintiff Attorney Charlotte Kaiser, AUSA). (Defendant Attorney Gregory Obenauer, CJA). (no document attached) (kas) (Entered: 11/28/2017) |
| 12/03/2017 | 62 | NOTICE OF APPEAL by Arturo Delgado-Vega re 65 Judgment. Fee Waived. (Notice of Appeal electronically transmitted to US Court of Appeals.) (Attachments: # 1 Proof of Service Notice of Appeal)(Obenauer, Gregory). (akr). (Modified on 12/7/2017: Added link to Judgment.) (akr). (Entered: 12/03/2017) |
| 12/04/2017 | 63 | USCA Case Number 17-50412 for 62 Notice of Appeal filed by Arturo Delgado-Vega. (akr) (Entered: 12/04/2017) |
| 12/04/2017 | 64 | USCA Time Schedule Order for 62 Notice of Appeal filed by Arturo Delgado-Vega. (NOTICE TO PARTIES of deadlines regarding appellate transcripts: Appellant shall file transcript designation and ordering form with the US District Court (see attached), provide a copy of the form to the court reporter, and make payment arrangements with the court reporter on or by 12/26/2017 (see Ninth Circuit Rule 10-3.2); Due date for filing of transcripts in US District Court is 1/23/2018.) (cc: Court Reporters). (Attachments: # 1 Transcript Designation and Ordering Form). (akr) (Entered: 12/04/2017) |
| 12/06/2017 | 65 | JUDGMENT as to Arturo Delgado-Vega (1), Count(s) 1, Custody of BOP for a term of 120 months; Supervised release for a term of 5 years; Penalty Assessment $100.00; Fine $500.00. Signed by Judge Roger T. Benitez. (anh) (Entered: 12/07/2017) |

| 12/21/2017 | 66 | TRANSCRIPT DESIGNATION AND ORDERING FORM by Arturo Delgado-Vega for proceedings held on 11/27/2017 re 62 Notice of Appeal. (Obenauer, Gregory). (akr). (Main Document 66 replaced on 12/21/2017 with printed .pdf of document, which was originally e-filed as an active fillable form. Modified on 12/21/2017: A 67 and 68 corrected form was filed on 12/21/2017.) (akr). (Entered: 12/21/2017) |
|---|---|---|
| 12/21/2017 | 67 | NOTICE OF WITHDRAWAL OF DOCUMENT filed by Arturo Delgado-Vega with corrected Transcript Designation and Ordering Form attached. (Obenauer, Gregory). (Main Document 67 replaced on 12/21/2017 with printed .pdf of document, which was originally e-filed as an active fillable form. Edited docket text to add note that the attached document is a corrected form originally filed as 66 Transcript Designation and Ordering Form. The filer has also filed the corrected form using the 68 Transcript Designation and Ordering Form event.) (akr). (Entered: 12/21/2017) |
| 12/21/2017 | 68 | TRANSCRIPT DESIGNATION AND ORDERING FORM by Arturo Delgado-Vega for proceedings held on 11/27/2017 re 62 Notice of Appeal. (Obenauer, Gregory). (Main Document 68 replaced on 12/21/2017 with printed .pdf of document, which was originally e-filed as an active fillable form.) (akr). (Entered: 12/21/2017) |
| 01/23/2018 | 69 | TRANSCRIPT DESIGNATION AND ORDERING FORM by Arturo Delgado-Vega for proceedings held on 11/27/2017 re 62 Notice of Appeal. (Attachments: # 1 Proof of Service)(Obenauer, Gregory). (akr). (Entered: 01/23/2018) |
| 01/24/2018 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Imposition of Sentence) as to Arturo Delgado-Vega for date of 11/27/2017 before Judge Roger T. Benitez, re 62 Notice of Appeal. Court Reporter/Transcriber: Amanda M. LeGore. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 2/14/2018. Redacted Transcript Deadline set for 2/26/2018. Release of Transcript Restriction set for 4/24/2018. (akr) (Entered: 01/24/2018) |
| 01/03/2019 | 71 | NOTICE OF SPREADING THE MANDATE as to Defendant Arturo Delgado-Vega. Appeal Mandate Hearing set for 1/14/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 01/03/2019) |
| 01/14/2019 | 72 | Minute Entry for proceedings held before Judge Roger T. Benitez: Appeal Mandate Hearing as to Arturo Delgado-Vega held on 1/14/2019. Defendant not appearing. Appeal Mandate ordered filed for USCA Case Number(s): 17-50412. Sentence on Remand With PSR set for 2/25/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. Government counsel is ordered to writ defendant for sentencing. (Court Reporter/ECR Amanda LeGore). (Plaintiff Attorney Fred A. Sheppard). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 01/15/2019) |
| 01/15/2019 | 73 | MANDATE of USCA vacating and remanding for resentencing as to Arturo Delgado-Vega re 62 Notice of Appeal. (akr) (Entered: 01/15/2019) |
| 02/19/2019 | 74 | SENTENCING SUMMARY CHART by USA as to Arturo Delgado-Vega (Kaiser, Charlotte) (anh). (Entered: 02/19/2019) |
| 02/19/2019 | 75 | SENTENCING MEMORANDUM by USA as to Arturo Delgado-Vega (Kaiser, Charlotte) (anh). (Entered: 02/19/2019) |
| 02/20/2019 | 76 | SENTENCING MEMORANDUM by Arturo Delgado-Vega (Obenauer, Gregory)(anh). (Entered: 02/20/2019) |

| 02/20/2019 | 77 | SENTENCING SUMMARY CHART by Arturo Delgado-Vega (Obenauer, Gregory) (anh). (Entered: 02/20/2019) |
| 02/25/2019 | 78 | NOTICE OF CHANGE OF HEARING as to Defendant Arturo Delgado-Vega. Sentence on Remand With PSR reset for 3/8/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 02/25/2019) |
| 02/27/2019 | 79 | NOTICE OF CHANGE OF HEARING as to Defendant Arturo Delgado-Vega. Sentence on Remand With PSR reset for 3/11/2019 09:00 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 02/27/2019) |
| 03/06/2019 | 80 | NOTICE OF CHANGE OF HEARING as to Defendant Arturo Delgado-Vega. Sentence on Remand With PSR reset for 3/11/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 03/06/2019) |
| 03/07/2019 | 81 | NOTICE OF CHANGE OF HEARING as to Defendant Arturo Delgado-Vega. Sentence on Remand With PSR reset for 3/12/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 03/07/2019) |
| 03/11/2019 | 82 | MOTION to Continue - *Unopposed* by USA as to Arturo Delgado-Vega. (Kaiser, Charlotte) (anh). (Entered: 03/11/2019) |
| 03/11/2019 | 83 | Ex Parte MOTION for Order *for Continuance of Sentence Hearing* by Arturo Delgado-Vega. (Obenauer, Gregory)(anh). (Entered: 03/11/2019) |
| 03/11/2019 | 84 | Minute Order issued by the Honorable Roger T. Benitez: finding as moot 82 Motion to Continue as to Arturo Delgado-Vega (1); granting 83 Joint Motion for Order as to Arturo Delgado-Vega (1). Sentence on Remand With PSR reset for 4/18/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 03/11/2019) |
| 04/15/2019 | 85 | Ex Parte MOTION for Order *to Continue Sentence Hearing* by Arturo Delgado-Vega. (Obenauer, Gregory) (anh). (Entered: 04/15/2019) |
| 04/17/2019 | 86 | Minute Order issued by the Honorable Roger T. Benitez: granting 85 Ex-Parte Motion for Order to continue as to Arturo Delgado-Vega (1). Sentence on Remand With PSR reset for 5/20/2019 09:00 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 04/17/2019) |
| 05/13/2019 | 87 | Sentencing Document: Sentence Exhibits by Arturo Delgado-Vega (Attachments: # 1 Exhibit Drug Program(s))(Obenauer, Gregory) (anh). (Entered: 05/13/2019) |
| 05/16/2019 | 88 | NOTICE OF CHANGE OF HEARING as to Defendant Arturo Delgado-Vega. Sentence on Remand With PSR reset for 5/28/2019 09:00 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 05/16/2019) |
| 05/22/2019 | 89 | NOTICE OF CHANGE OF HEARING as to Defendant Arturo Delgado-Vega. Sentence on Remand With PSR reset for 5/28/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 05/22/2019) |
| 05/28/2019 | 90 | Minute Entry for proceedings held before Judge Roger T. Benitez: Sentence on Remand With PSR Hearing as to Arturo Delgado-Vega held on 5/28/2019. On Court's own motion, Sentence on Remand With PSR continued to 7/1/2019 02:00 PM in Courtroom 5A before Judge Roger T. Benitez. (Court Reporter/ECR Juliet Eichenlaub). (Plaintiff Attorney Charlotte E. Kaiser). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 05/28/2019) |
| 06/06/2019 | 91 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Arturo Delgado-Vega held on 5/28/2019 before Judge Roger T. Benitez. Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber: Juliet Y. Eichenlaub. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 6/27/2019. Redacted Transcript Deadline set for 7/8/2019. Release of Transcript Restriction set for 9/4/2019. (akr) (Entered: 06/06/2019) |
| 06/10/2019 | 92 | Order to Unseal Documents as to Arturo Delgado-Vega. Signed by Judge Roger T. Benitez on 6/10/19. (dlg) (Entered: 06/10/2019) |
| 07/01/2019 | 93 | Minute Entry for proceedings held before Judge Roger T. Benitez: Sentence on Remand With PSR Hearing held on 7/1/2019 for Arturo Delgado-Vega (1), Count(s) 1 of the Information. Custody of the Bureau of Prisons for a term of 110 months. Supervised Release for a term of 5 years. $100.00 penalty assessment. Fine: $500.00. Defendant is advised of appellate rights. Court appoints attorney Gregory D. Obenauer for defendant's appeal process. (Court Reporter/ECR Cynthia Ott). (Plaintiff Attorney Charlotte E. Kaiser). (Defendant Attorney Gregory D. Obenauer). (no document attached) (gxr) (Entered: 07/02/2019) |
| 07/05/2019 | 94 | NOTICE OF APPEAL by Arturo Delgado-Vega re 97 Amended Judgment. Fee Waived. (Notice of Appeal electronically transmitted to US Court of Appeals.) (Obenauer, Gregory). (akr). (Modified on 7/19/2019: Added link to Judgment.) (akr). (Entered: 07/05/2019) |
| 07/08/2019 | 95 | USCA Case Number 19-50224 for 94 Notice of Appeal filed by Arturo Delgado-Vega. (akr) (Entered: 07/08/2019) |
| 07/08/2019 | 96 | USCA Time Schedule Order for 94 Notice of Appeal filed by Arturo Delgado-Vega. (NOTICE TO PARTIES of deadlines regarding appellate transcripts: Appellant shall file transcript designation and ordering form with the US District Court (see attached), provide a copy of the form to the court reporter, and make payment arrangements with the court reporter on or by 7/26/2019 (see Ninth Circuit Rule 10-3.2); Due date for filing of transcripts in US District Court is 8/26/2019.) (cc: Court Reporter). (Attachments: # 1 Transcript Designation and Ordering Form). (akr) (Entered: 07/08/2019) |
| 07/19/2019 | 97 | Amended JUDGMENT on Remand as to Arturo Delgado-Vega (1), Count(s) 1, SENTENCE ON REMAND HELD ON 7/1/2019: Custody of the Bureau of Prisons for a term of 110 months. Supervised Release for a term of 5 years. $100.00 penalty assessment. Fine: $500.00. Signed by Judge Roger T. Benitez. (jrm) (jao). (Entered: 07/19/2019) |
| 07/26/2019 | 98 | TRANSCRIPT DESIGNATION AND ORDERING FORM by Arturo Delgado-Vega for proceedings held on 7/1/2019 re 94 Notice of Appeal. (Obenauer, Gregory). (akr). (Entered: 07/26/2019) |
| 10/08/2019 | 99 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Sentence on Remand) as to Arturo Delgado-Vega for date of 7/1/2019 before Judge Roger T. Benitez re 94 Notice of Appeal. Court Reporter/Transcriber: Cynthia R. Ott. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 10/29/2019. Redacted Transcript |

| | | Deadline set for 11/8/2019. Release of Transcript Restriction set for 1/6/2020. (akr) (Entered: 10/08/2019) |
|---|---|---|
| 11/29/2019 | [100](#) | ORDER of USCA as to Arturo Delgado-Vega re [94](#) Notice of Appeal. The appellant's unopposed motion for a second extension of time in which to file the opening brief is granted. Briefing schedule issued. (akr) (Entered: 11/29/2019) |

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | U.S.C.A. No. 19-50224 |
| Plaintiff-Appellee, | ) | U.S.D.C. No. 16-CR-2609-BEN |
| | ) | |
| v. | ) | |
| | ) | PROOF OF SERVICE |
| **ARTURO DELGADO-VEGA,** | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

I hereby certify that on February 2, 2020, I electronically filed the foregoing EXCERPTS OF RECORD with the Clerk for the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system" because they will not be served via the CM/ECF system.

I further certify that I mailed an additional copy of the excerpt of record and the opening brief to the Defendant-Appellant.

*s/ Gregory D. Obenauer*